IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

POINT BLANK BODY ARMOR, INC.    *

                Plaintiff        *

        vs.                      *  CIVIL ACTION NO. MJG-01-3256

ALLEN PRICE, et al.             *

                                 *

                Defendants
*       *       *       *       *       *       *       *       *

## MEMORANDUM AND ORDER

The Court has before it:

1.    Defendants' Motion for Summary Judgment on Counts I
      and II of Plaintiff's Complaint [Paper 23];

2.    Plaintiff's Cross-Motion for Summary Judgment [Paper
      35];

3.    Defendant's Motion for Summary Judgment as to the
      Counterclaim for Unpaid Wages [Paper 39][1];

and the materials submitted by the parties in relation

thereto.  The Court has held a hearing and has had the benefit

of the arguments of counsel.

---

[1]    Defendants withdrew this motion at the hearing
before this Court on March 4, 2003.  Thus, the motion shall be
denied without prejudice.

I.    <u>BACKGROUND</u>[2]

The instant case arises out of a dispute over the alleged misappropriation of Plaintiff's trade secrets by the Defendants, former employees of the Plaintiff, and alleged breaches of confidentiality agreements by the Defendants. Further, Defendants have counterclaimed for certain wages and other assets to which they claim they are entitled.

Plaintiff Point Blank Body Armor, Inc. ("Plaintiff" or "Point Blank") has been engaged, at all times here relevant, in the development, manufacture, marketing and sale of protective armor and apparel for use by law enforcement professionals, including the vests commonly referred to as "bullet-proof vests" or "body armor."

Defendants Allen Price ("Price"), Joseph Krummel ("Krummel"), and James Murray ("Murray"), are former employees of Point Blank. Price was hired in April 1998 as Director of Research and Development,[3] Krummel and Murray were hired as

_____

[2]    Because both sides seek summary judgment, the facts are here presented in a neutral fashion. Any material disagreement between the parties as to the facts will be detailed, as necessary, in the Discussion section of this Memorandum.

[3]    To be precise, Krummel and Price allege that they were initially hired by Lanxide, Inc., like Point Blank a subsidiary of DHB Capital Group. When Lanxide went out of business in or around November 1999, both became employees of Point Blank. <u>See</u> Def's Mot. for Summ J. at 4-5.

Ballistics Engineers, Krummel in May 1998 and Murray in February 2001.  All three of the Defendants had previous experience in the development, design, and testing of ballistic materials and ballistic packages for other employers.

On or about May 1, 1998, while Price was employed by Lanxide, he was asked to sign, and did sign, a confidentiality agreement relating to Point Blank's confidential information.[4] See Pl's Mem. in Support of Cross Motion for Summ. J., exs. 1, B.  Murray signed the same form of agreement on January 3, 2001, approximately one month before his employment with Point Blank commenced.  Id. at ex. 2.  The agreements are headed "Confidential Information, Non-Disclosure, and Confidentiality Agreement," and further state: "[t]his agreement is entered into... between [name of signer] (hereinafter "Employee") and Point Blank Body Armor, Inc."  Id.

Krummel states that he never signed a confidentiality agreement, and, in fact, that he specifically declined to do

_____

[4]    In his Motion for Summary Judgment, Defendant Price places the date of his signature of the confidentiality agreement with Point Blank as May 1, 2000, and states that Price was "still employed by Lanxide" at that point.  See Def's Mot. for Summ. J. at 8.  However, as Defendants themselves point out, Lanxide ceased to exist as of November 1999.  See Id. at 4.  Further, Price's signed confidentiality agreement indicates the date as May 1, 1998.  See Pl's Mem. in Support of Cross Motion for Summ. J. at ex. 1.

so.  Point Blank contends that Krummel did sign such an
agreement, but that the agreement was lost.  In any event, no
original or copy of an agreement signed by Krummel has been
found.

While Point Blank employees, Defendants were members
of a department responsible for the design and testing of
ballistic packages, which are ballistic- and weapon-resistant
inserts used in protective armor.

On or about August 1, 2000, Price and Krummel formed a
new corporation, United States Ballistic Engineering ("USBE").
Sandra Hatfield ("Hatfield"), Point Blank's President and
Chief Operating Officer, was aware of this new business
venture.  The parties disagree as to how much was disclosed to
Hatfield and Point Blank regarding the specific activities
planned for, or engaged in, by USBE.

On or about January 9, 2001, Point Blank entered into an
agreement, which was to be effective January 1, 2001, with
USBE.  The agreement provided that USBE would form a group to
market Point Blank's products in the "Northeastern part of the
U.S."  The arrangement further provided that USBE would
"continue" its "research efforts.... However USBE will in no
way work for or consult with any other Body Armor
organization.... We will work to integrate any product or

4

manufacturing activities that are a result of our work into DHB [parent company of Point Blank]." Letter from Price to Hatfield of January 9, 2001, at Ex. A9 to Pl's Mem. in Response. The term of the agreement was stated to be three years. Id.

On January 3, 2001, USBE executed a sales agency agreement ("Agency Agreement") with Point Blank The Agency Agreement provided for USBE to act as Point Blank's "exclusive sales representative to sell Point Blank's products...." in certain specified states. Sales Agency Agreement, at Ex. A4 to Pl's Mem. in Response.

In September of 2001, Price, Krummel, and Murray resigned their employment with Point Blank. At the time they left Point Blank, according to Point Blank company reports, Defendants were working on four projects, identified as "Premier," "LC.04," "Gold Flex 04," and "Thrustguard."

In October of 2001, Gator Hawk Armor Inc. ("Gator Hawk") announced through a press release that it had "signed a long-term contract with USBE, under which USBE would act as an "outside R&D firm for [Gator Hawk]."

II.  <u>LEGAL STANDARD</u>

In deciding a summary judgment motion, the Court must look beyond the pleadings and determine whether there is a genuine need for trial.  See <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-53 (1986).  If the defendant carries its burden by showing an absence of evidence to support a claim, the plaintiff must demonstrate that there is a genuine issue of material fact for trial.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324-25 (1986).  The Court must look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses but must view it realistically.  Nevertheless, the non-movant is entitled to have all reasonable inferences drawn in his favor.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).

An issue of fact must be both genuine and material in order to forestall summary judgment.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the plaintiff.  See <u>Anderson</u>, 477

6

U.S. at 248.  An issue of fact is material only if the establishment of that fact might affect the outcome of the lawsuit under governing substantive law.  See id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

III.    DISCUSSION

As noted above, Plaintiff presents claims for breach of a confidentiality agreement (Count I) and for misappropriation of trade secrets (Count II).  Inasmuch as the existence vel non of any "trade secrets" is central to both causes of action, it is appropriate to first discuss the trade secret misappropriation claim.

A.    Misappropriation of Trade Secrets

To establish a claim for the misappropriation of trade secrets under Maryland law, a plaintiff must first prove that it is the owner of a trade secret, which the Maryland Uniform Trade Secrets Act (MUTSA) defines as:

e.    [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (1) Derives independent value, actual or potential,
>     from not being generally known to, and not being
>     readily ascertainable by proper means by, other
>     persons who can obtain economic value from its
>     disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable
>     under the circumstances to maintain its secrecy.

Md. Code Ann. (Comm.) §11-1201(e). Once ownership of a trade
secret is established, a plaintiff must show that the
defendant misappropriated its property either by acquiring the
secret through improper means (including theft, bribery,
breach or inducement of breach of a duty to maintain secrecy,
or corporate espionage) or by disclosing or using the secret
without express or implied consent. Md. Code Ann. (Comm.)
§11-1201(b)-(c).[5]

## 1. Use of Trade Secrets

Defendants contend that they cannot be liable under the
MUTSA for trade secret misappropriation because Plaintiff has
not presented evidence of any specific secrets that were
misappropriated by Defendants.

Plaintiff's counsel, at argument, articulated a theory
upon which, she contends, there might have been a disclosure

---

[5]    It is not alleged that Defendants acquired Point
Blank's trade secrets by improper means, but that they used
those secrets without Point Blank's permission, constituting a
misappropriation under MUTSA. See Md. Code Ann. (Comm.) §11-
1201(c)(2).

8

or use of trade secrets by Defendants.  Plaintiff has not, however, presented _evidence_ from which a reasonable jury could find that there _was_ such a disclosure or use.  The Court must resolve the instant motion on the evidence presented by Plaintiff and not the theoretical possibility espoused by Plaintiff's counsel at argument.

Essentially, Plaintiff relies upon the fact that it conducted testing of various materials for use in ballistic applications.  The testing yielded the result that Twaron 3000 fabric "was a low-cost fabric that performed well" in ballistic applications.  Pl's Supp. Memo. in Response, at 16. Point Blank used the fabric in a number of designs for various contracts.  _Id._  Presumably, although the evidence is less than clear on this point, there were test results indicating the relative merits of using Twaron 3000 in different configurations and in combination with certain other materials.

On the evidence presented, Plaintiff is not entitled to trade secret protection for the "discovery" through testing that Twaron 3000 was a well-performing material in ballistic applications.  Plaintiff, of course, has no proprietary rights with regard to Twaron 3000 fabric _per se_.  Nor is it, or was it, a secret that Twaron 3000 fabric can be used for ballistic

9

purposes.  Indeed, the manufacturer of Twaron 3000 markets the fabric to the public for this very purpose.  Butryn Aff. at ¶11.[6]

Of course, the fact that Twaron 3000 fabric's use in ballistic applications was in the public domain does not constitute a public disclosure of the details of the testing results.  Hence, theoretically, as pointed out by Plaintiff's counsel, there might be useful proprietary information in those details.  On the other hand, it is theoretically possible as well that there is no information of commercial value in the "secret" test results.

The only evidence of a possible use of any trade secret of Plaintiff's relates to certain research and development paperwork acquired during discovery (the "R & D sheets")[7] from

---

[6]    It is unclear from the record whether Plaintiff has actually manufactured and sold a product containing the Twaron fabric.  If it has done so, it would have made its products containing the fabric available for public inspection and copying by anyone who chose to examine the product.  Thus, the use of Twaron 3000 would have entered the public domain in this way, in addition to its being offered for sale for such purposes by its manufacturer.

[7]    An "R&D Sheet" is a computer-generated "sketch" of a potential design for a ballistic package and vest.  The parameters of the design are based on specifications for a product that is desired by a client -- for example, that the vest will stop a certain type of bullet but still be flexible. The designs are submitted to a manufacturer who creates a prototype of the design for testing and then are forwarded to an independent ballistics-testing lab for testing.  If the

USBE.  This evidence shows that Defendants had put in an order
for two sample products to be manufactured for testing
purposes, both containing Twaron 3000 fabric, and one
constituting a design identical to a Point Blank design except
for the removal of a single ply, or layer, of Twaron 3000
fabric.

Krummel, who created the two R&D sheets at issue,
testified in an affidavit that the indication on the R&D
sheets that Twaron was to be used in constructing the sample
product was an error.  Krummel stated that neither USBE nor
its customer, Gator Hawk, intended to use or did use Twaron
fabric at the time the R&D sheet was produced.  He testified
that a sample based on the R&D sheet alleged to constitute a
copy of a Point Blank design was produced with a different
fabric.  In an affidavit, Terry Butryn, President of Barrday,
Inc., which manufactures Twaron, stated that he had never sold
any Twaron fabric to USBE, Gator Hawk, or to any of the
Defendants.  Butryn Aff. at ¶¶8-11.

---

prototype "passes," it then <u>may</u> become the basis for a new
product.  Price testified in an affidavit that, in general,
multiple R&D sheets were created in connection with any one
project or set of specifications.  He also testified that an
experienced ballistics engineer can produce an R&D sheet "in a
matter of minutes."  <u>See</u> Price Aff. at ¶7, Ex. M to Def's
Reply.

Plaintiff presents no evidence to refute Defendants' proof to the effect that the R&D sheet at issue mistakenly referred to the Twaron 3000 fabric, and that there was never a sample or product made in response to the R&D sheet that used Twaron 3000 fabric.

Plaintiff has not produced evidence sufficient to permit a finding that there was any protectable trade secret used by Defendants in the design of the sample, based upon the R&D sheets referring to Twaron 3000 fabric or any other samples or products at all. It is possible, presumably, that there could be some design that might arguably support a finding for Plaintiff. For example, and strictly as a hypothetical matter, if Point Blank's secret test results yielded a particularly valuable, but not generally known in the field, combination of material[8], a product design that could be traced to the test results might indicate use of a protectable trade secret. Nevertheless, in the instant case, Plaintiff has not presented evidence adequate to permit a finding that the Defendants in fact have, or threaten to, use any trade secret of Plaintiff. The fact, if it be a fact, that

---

[8] By reference to characteristics other than the brand name of the fabric

12

Defendants know of trade secrets that they could use is insufficient to establish a case against them.

In sum, on the evidence here presented, Plaintiff cannot establish that Defendants have used, or are threatening to use, any of Plaintiff's protectable trade secrets.  In so concluding, the Court is not holding that Defendants have a "license" to utilize such secrets as there may be in regard to Plaintiff's test results.  Thus, while the Court holds that the Defendants - and anyone else for that matter - are free to use Twaron 3000 fabric in ballistic materials[9], the Court is not holding that Defendants are unrestricted in regard to their future conduct.

Defendants, like Plaintiffs, will be marketing ballistic products that, once sold, will be available for detailed examination by anyone who chooses to cut one open.  Should Plaintiff discover, in any of Defendants' products, a design as to which it can establish the use of specific trade secret information, it will be free to take appropriate legal actions.  However, in the instant case, on the evidence presented, there is no viable claim against Defendants for actual or threatened use of trade secrets.

_____

    [9]    Subject, of course, to any pertinent rights of the manufacturer, distributor etc.

13

## 2.   Inevitable Disclosure

Plaintiff seeks relief on the theory that because Defendants were privy to a large amount of proprietary information while employed by Point Blank, it is inevitable that they will use that information in developing ballistic products for USBE.

The doctrine of inevitable disclosure, as stated by the Seventh Circuit in the case of PepsiCo v. Redmond, 54 F.3d 1272 (7th Cir. 1995), provides that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Id. at 1266.

The question of whether the doctrine of inevitable disclosure will be adapted in Maryland is one of first impression. See Padco Advisors, Inc. v. Omdahl, 179 F.Supp.2d 600, 611 (D.Md. 2002) (declining to adopt the theory of inevitable disclosure where there was no evidence of actual misappropriation).

In the instant case, as discussed above, it appears that Defendants are capable of designing and producing products — even those that might use Twaron 3000 fabric — without disclosing or using Plaintiff's protectable trade secrets. Accordingly, Plaintiff has not presented evidence to establish

14

that the Defendants would inevitably use or disclose protectable trade secrets.  Thus, even if the doctrine of inevitable disclosure were accepted in Maryland law, Plaintiff would not prevail on the evidence presented in the instant case.  Accordingly, the Court need not now predict what the Maryland Court of Appeals would decide in regard to the doctrine of inevitable disclosure.

      B.    <u>Count II: Breach of Confidentiality Agreement</u>

Point Blank argues that, as a matter of law, it is entitled to prevail on its claim that Defendants Price and Murray are in breach of valid confidentiality agreements executed by them in the course of their employment with Point Blank.  Defendants contend that the Price contract is invalid for lack of consideration.  Defendants also deny taking any action constituting a breach of the agreement.

To prevail on an action for breach of contract under Maryland law,[10] a plaintiff must demonstrate:

1.    A contractual obligation;

2.    Breach of that obligation by the defendant; and

3.    That the Plaintiff suffered actual damages arising out of that breach.

_____

[10]    The parties appear to agree that Maryland law applies.

See Parlette v. Parlette, 596 A.2d 665, 671 (Md. 1991).

### 1.   Existence of Contractual Obligation for Price

Defendant Price claims that no contractual obligation arose between himself and Point Blank pursuant to the confidentiality agreement he signed, as the agreement lacked additional consideration because he was already employed when he signed the agreement.

Both sides cite Simko, Inc. v. Graymar Co., 464 A.2d 1104 (Md. Ct. Spec. App. 1983) in support of their respective positions.  In Simko, the Maryland Court of Special Appeals held that continued employment of an at-will employee "for a substantial period beyond the threat of discharge" could constitute sufficient consideration for a restrictive covenant in an employment contract.  Id. at 567. A "[t]hreat of discharge" need not be explicit, but may be inferred from conduct such as the employer's insistence on the signing of the agreement.  Id. at 566.

Price states that he signed the confidentiality agreement at issue on a May 1998 visit to a Point Blank manufacturing facility, when he was still employed by Lanxide, and that he understood the agreement to concern information he may have gained while on that and subsequent visits to the Point Blank

16

facilities.  He did not understand the signing of the agreement to be a condition of his current or future employment.  <u>See</u> Price Affidavit at ¶18.  Thus Price argues that the agreement was not signed for consideration because there was no threat of discharge, explicit or implicit, attached to its signing, and thus no implicit promise of continued employment.

Point Blank argues that Price's employment term with Point Blank effectively commenced in April 1998. Price's deposition testimony indicates that he was hired by Sandra Hatfield, who was at that time President of Point Blank, in April of 1998, and that one of his duties as an employee of Lanxide was to act as Director of Research and Development for Point Blank.  <u>See</u> Price Depo. at 24-27.

There are genuine issues of material fact blocking summary judgment for either side on the question of whether Price's confidentiality agreement is invalid for lack of consideration.  In particular, there is evidence from which a reasonable jury could find either way on such questions as whether Price was effectively hired by Point Blank at the time he signed the agreement, and if not, whether the consideration for the confidentiality agreement was provided through the ability of Price to work for Lanxide and perform duties

relating to Point Blank, etc.  Accordingly, neither side can obtain summary judgment on this issue.  The Court will assume, for the purpose of analyzing Defendants' summary judgment motion, that the Price agreement is valid and enforceable.


### 2.  Breach of Agreement

Defendants contend that Plaintiff has no cause of action for breach of confidentiality agreements because it has not presented evidence sufficient to prove that any protected trade secrets or proprietary information was disclosed by Price or Murray in violation of the terms of the agreement.[11]

As previously discussed in the context of Point Blank's trade secret claim, Plaintiff has not presented evidence adequate to establish any disclosure or use of trade secrets by Defendants.  Therefore, there is no viable breach on contract claim based upon any such disclosure or use.

In theory the scope of information covered by the confidentiality agreements at issue could be larger than that covered by Maryland trade secret law.  The confidentiality

---

[11]    The Court here assumes, arguendo, that Krummel's actions in designing ballistic packages for USBE were in concert with Price and Murray, who were bound by the confidentiality agreement.  Therefore, the absence the absence of proof that Price or Murray acted personally would not be fatal to Plaintiff's contract based claim.

agreements at issue prohibit the signer from "us[ing], disseminat[ing], reveal[ing], or disclos[ing]" "all confidential or proprietary... information or data... provided by the Employer or its Affiliates... whether or not the specific words 'confidential' or 'proprietary' are used."  See Conf. Agreement at Ex. A1 to Pl's Mem. in Response.

In the instant case, Plaintiff has not presented evidence, or argument, to establish that the "confidential or proprietary... information or data" protected by the confidentiality agreements consists of anything more than the alleged "trade secrets" heretofore discussed.  Accordingly, Plaintiff has not presented any viable claim based upon the confidentiality agreements.

C.    <u>Attorney's Fees</u>

Under the MUTSA, reasonable attorney's fees may be awarded to a prevailing party if "a claim of misappropriation is made in bad faith."  Md. Code Ann. (Comm.) §11-1204(1). Maryland courts have held that a finding that a party acted in "bad faith" under the MUTSA requires "clear evidence that the action is entirely without color and taken for other improper purposes...."  <u>Opti Graphics, Inc. v. Agee</u>, 591 A.2d 578, 588

(Md. Ct. Spec. Apps. 1991), <u>citing</u> <u>Needle v. White</u>, 568 A.2d 856 (Md. 1990).

Defendants contend, in their Reply memorandum, that they are entitled to a fee award because the prevailing law does not support Plaintiff's claims and because statements allegedly made by Point Blank's President, David Brooks, indicated that Point Blank was initiating the suit to put USBE out of business.

The MUTSA authorizes the filing of a lawsuit when misappropriation is "threatened," and not only when it actually occurs. Md. Code Ann. (Comm.) 11-1202(a). Moreover, this Court has held, as discussed above, that testing results from research and development conducted by Point Blank could, in certain circumstances, constitute protectable trade secrets. The Court does not find, therefore, clear evidence that the action was <u>entirely</u> without color. Accordingly, there will be no award of legal fees.

VI. <u>CONCLUSION</u>

For the foregoing reasons:

1.    Plaintiff's Motion for Summary Judgment [Paper 35] is DENIED.

2.    Defendants' Motion for Summary Judgment [Paper 23] is GRANTED in part and DENIED in part.

20

      a.   Defendants are hereby awarded summary judgment on Counts I and II of Plaintiff's Complaint.

      b.   Defendants' request for attorney's fees is DENIED.

3.   Defendant's Motion for Summary Judgment on the Counterclaim for Unpaid Wages [Paper 39] is DENIED WITHOUT PREJUDICE.

4.   By March 28, 2003, Defendants shall advise whether they wish to dismiss the Counterclaim without prejudice to reinstatement is Plaintiff appeals and the case is remanded.

      a.   If so, Judgment shall be entered dismissing this case.

      b.   If not, Defendant shall arrange a telephone conference to be held by April 4, 2003, to schedule further proceedings in this case.

SO ORDERED, on <u>Wednesday, March 12, 2003</u>.


                      / s /

                 Marvin J. Garbis
          United States District Judge