# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| POINT BLANK BODY ARMOR, INC. | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| ALLEN PRICE, | * |
| JOSEPH KRUMMEL, and | * |
| JAMES MURRAY | * |
| | * |
| | * |
| Defendants. | * |
| | * Civil Action No. MJG 01 CV 3256 |
| | * |
| ALLEN PRICE, | * |
| JOSEPH KRUMMEL, and | * |
| JAMES MURRAY | * |
| | * |
| Counter-plaintiffs, | * |
| | * |
| v. | * |
| | * |
| POINT BLANK BODY ARMOR, INC. | * |
| | * |
| Counter-defendant. | * |

## DEFENDANTS AND COUNTER-PLAINTIFFS'
## OBJECTIONS TO ADMISSIBILITY OF DEFENDANT AND COUNTER-DEFENDANT'S
## DESIGNATIONS OF DEPOSITION TESTIMONY

Defendants and Counter-Plaintiffs, Allen Price, Joseph Krummel, and James Murray (collectively referred to hereinafter as Defendants and Counter-Plaintiffs), by their undersigned attorneys and pursuant to F.R.Civ.P. 32(b), submit the following Objections to Plaintiff and Counter-Defendant Point Blank Body Armor, Inc.'s ("Point Blank") Designations of Deposition Testimony.

**Designated Testimony Subject to Objection**

**Deposition of Sandra L. Hatfield, July 24, 2002[1]**

| | |
|---|---|
| Page 106, Line 18 through Page 107, Line 3. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 166, Line 16. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 167, Line 2. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 168, Line 10. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 169, Lines 14 and 15. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 170, Lines 17 through 20. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
| Page 175, Line 16. | Objection.  Deponent Hatfield's testimony is objectionable as hearsay testimony |

---

[1] Relevant portions of the transcript of this deposition are attached as Exhibit A hereto.

|                          | not covered by any of the exceptions under Rules 802 or 803 of the Federal Rules of Evidence. |
|--------------------------|-----------------------------------------------------------------------------------------------|
| Page 179, Lines 4 through 18. | Objection.  Deponent Hatfield's testimony is, under Rule 611 of the Federal Rules of Evidence, objectionable as unresponsive to the question posed by counsel at page 178 line 18 through page 179 line 3. |

### Deposition of Dawn Schlegel, June 5, 2003[2]

| Page 62, Line 12 through Page 62, Line 22. | Objection.  Deponent Schlegel's response at lines 19 through 22 is, under Rule 611 of the Federal Rules of Evidence, objectionable as unresponsive to the question posed by counsel at lines 17 through 18.  Further, the response provided by Ms. Schlegel is objectionable as unsupported lay opinion testimony not covered by the exception under Rule 701 of the Federal Rules of Evidence. |
|--------------------------|-----------------------------------------------------------------------------------------------|
| Page 94, Line 18 through Page 95, Line 10. | Objection.  Deponent Schlegel's responses at page 95 lines 18 through 23 and at page 96, lines 2 through 10 are objectionable as unsupported lay opinion testimony not covered by the exception under Rule 701 of the Federal Rules of Evidence. |
| Page 98, Line 23 through Page 99, Line 23. | Objection.  Deponent Schlegel's responses at page 99 lines 2 through 11 objectionable as inadmissible speculation under Rules 602 and 611 Federal Rules of Evidence. |
| Page 120, Line 4 through Page 121, Line 9. | Objection.  Counsel's questions and Deponent Schlegel's responses at page 120 line 4 through page 121, line 9 are objectionable as leading under Rule 611 Federal Rules of Evidence. |

---

[2] Relevant portions of the transcript of this deposition are attached as Exhibit B hereto.

**Deposition of Allen L. Price, May 7, 2003[3]**

| | |
|---|---|
| Page 29, Line 20 through Page 30, Line 2. | Objection.  Counsel's inquiry of Deponent Price's at page 29 line 20 through page 30, line 1 is, under Rule 611 of the Federal Rules of Evidence, objectionable as argumentative. |

**Deposition of Joseph Krummel, May 13, 2003[4]**

| | |
|---|---|
| Page 18, Lines 18 through 25. | Objection.  The portion of deponent Krummel's deposition designated by Plaintiff and Counter-Defendant, Point Blank, is unintelligible, as page 18, line 18 merely contains "read it before you signed it?" |
| Page 24, Line 8 through Page 25, Line 15. | The portion of deponent Krummel's deposition designated by Plaintiff and Counter-Defendant, Point Blank, is unintelligible, as page 24 lines 8 through 12 represents in incomplete sentence and only contains half of an answer that is contained at page 24 lines 5 through 12. |

**Deposition of James W. Murray, May 7, 2003[5]**

| | |
|---|---|
| Page 12, Line 14 through Page 12, Line 12. | Objection.  The portion of deponent Murray's deposition designated by Plaintiff and Counter-Defendant, Point Blank, is unintelligible. |
| Page 48, Line 18. | Objection.  The portion of deponent Murray's deposition designated by Plaintiff and Counter-Defendant, Point Blank, is unintelligible, as page 48, line 18 merely contains "means?" |

---

[3] Relevant portions of the transcript of this deposition are attached as Exhibit C hereto.
[4] Relevant portions of the transcript of this deposition are attached as Exhibit D hereto.
[5] Relevant portions of the transcript of this deposition are attached as Exhibit E hereto.

Date:   July 10, 2003

_____/s/_____
Robert S. Brennen, Esquire #04499
William M. Krulak, Jr. Esquire #26452
MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland 21202
(410) 727-6464
Attorneys for Defendants and Counterclaimants, Price,
Krummel, and Murray

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

POINT BLANK BODY ARMOR, INC.,

          Plaintiff

    vs.                    CIVIL ACTION NO:
                            MJG-01-CV-3256

ALLEN PRICE
JOSEPH KRUMMEL,
and JAMES MURRAY

          Defendants
_____/

        The deposition of SANDRA L. HATFIELD was

held on Wednesday, July 24, 2002, commencing at 9:00

A.M., at the Law Offices of Miles & Stockbridge, 10

Light Street, Baltimore, Maryland, 21202, before R.

Dwayne Harrison, a Notary Public.

APPEARANCES:
             ANGELO M. FILIPPI, ESQUIRE
                On behalf of Plaintiff

             ROBERT S. BRENNEN, ESQUIRE
             WILLIAM M. KRULAK, JR., ESQUIRE
                On behalf of Defendants

ALSO PRESENT:

        ALLEN L. PRICE   JAMES MURRAY   JOSEPH KRUMMEL

REPORTED BY:  R. Dwayne Harrison

106

1    Q    Have you seen that document before?
2    A    Yes, I have.
3    Q    When was the first time you saw that?
4    A    When Al Price sent it to me.
5    Q    Do you recall when Al Price sent it to you?
6    A    No.
7    Q    Did you have any discussions with
8  Mr. Brooks about the content of this letter after
9  Mr. Price sent it to you?
10    A    I may be mistaken. It could have been sent
11  by Mr. Brooks. I'm not for sure. I know it was faxed
12  to me.
13    Q    Do you recall having any conversations with
14  Mr. Brooks about the content of this letter?
15    A    In general, yes, but not specifically
16  detail by detail, no.
17    Q    What do you generally recall?
18    A    If the three employees involved would take
19  on a bigger role, they would were basically in our
20  employment and were going to help expand our business
21  et cetera, for at least the next three years and they

107

1  wanted to be -- take on a bigger role in our
2  international sales, hiring a rep group. Just things
3  in general.
4    Q    Was there anything in the letter that in
5  your conversation with Mr. Brooks you indicated you
6  didn't like?
7    A    Not that I recall.
8    Q    Anything that he indicated he didn't like?
9    A    Not that I recall.
10        MR. BRENNEN: Let's have this marked as the
11  next exhibit.
12        (Hatfield Deposition Exhibit Number 7 was
13  marked for purposes of identification.)
14    Q    Do you recall seeing Exhibit 7 before?
15    A    Yes.
16    Q    Is that your handwriting at the top of the
17  page?
18    A    Yes, it is.
19    Q    So you sent this copy or a copy bearing
20  that note to Mr. Brooks?
21    A    Yes.

108

1    Q    Did Mr. Brooks respond to you?
2    A    He said it looked fine.
3    Q    Did you have any discussions other than
4  that, it looked fine, with Mr. Brooks?
5    A    It basically complied with what they had
6  discussed.
7    Q    Did you have any discussions with Mr. Price
8  about this letter in particular?
9    A    Yes.
10    Q    What did you discuss?
11    A    I know we discussed the addition of Jim
12  Murray setting up a sales rep group for the northeast.
13  If I'm not mistaken, Joe Krummel would be taking on
14  more responsibilities for international and
15  developmental product there. Going forward as a team,
16  developing a training team, being more involved with
17  customers, training our in-house customer service
18  personnel. Just things in general and it was
19  basically, you know, we're all in this together now for
20  the next three years. So we're ready to go and feel
21  good about our future.

109

1    Q    Was this the first you heard of Mr. Murray?
2    A    No, I knew of Mr. Murray in the industry.
3  It's a small industry.
4    Q    When approximately do you recall first
5  hearing of Mr. Murray?
6    A    Seeing his name on H.P. White reports.
7    Q    Do you believe you had ever met Mr. Murray
8  prior to receiving this letter?
9    A    I don't recall.
10    Q    Did you have any knowledge of Mr. Murray
11  working for Honeywell at the time you received this
12  letter?
13    A    Not that I can recall, no.
14    Q    Mr. Murray was hired by Point Blank in
15  January of 2001?
16    A    We hired him sometime in that time track.
17  I'm horrible at time tracks and dates.
18    Q    It's okay. What was your understanding of
19  what Mr. Murray was hired to do at that time?
20    A    Eventually, certainly he was going to make
21  sure that Point Blank's range was in compliance with

28 (Pages 106 to 109)

166

1    A    Not to my knowledge.
2    Q    When did you first learn that Mr. Price and
3    Mr. Krummel and Mr. Murray had decided to resign their
4    positions with Point Blank?
5    A    When Frank Erwin sent me the letter that he
6    had gotten from them.
7    Q    Did you talk to Mr. Erwin about that after
8    he sent it to you?
9    A    He was on the phone when he sent it.
10   Q    Talking to you?
11   A    Yes.
12   Q    So he called you at the same time?
13   A    Yes.
14   Q    What did Mr. Erwin say in the telephone
15   conversation?
16   A    He was shocked.
17   Q    And did you respond?
18   A    I was shocked too because I had to hang up
19   with Al Price to take the call.
20   Q    Okay. Do you recall anything else that you
21   specifically discussed with Mr. Erwin in that

167

1    conversation?
2    A    He couldn't believe I didn't know.
3    Q    Anything else?
4    A    No.
5    Q    What did you do when you got off the phone
6    with Mr. Erwin?
7    A    Read it three times.
8    Q    Then what did you do?
9    A    Went to the bathroom.
10   Q    Okay. That's good. What did you do after
11   going to the bathroom?
12   A    Sat down in my office, closed the doors,
13   tried to call Al Price.
14   Q    Okay. You were unsuccessful at least at
15   that point?
16   A    Correct.
17   Q    What else did you do?
18   A    Called Mr. Brooks and told him I was
19   sending him something and faxed it to him.
20   Q    Did you stay on the phone with Mr. Brooks
21   while he got the fax?

168

1    A    No, I had to go to the bathroom again.
2    Q    What happened after you got back from the
3    bathroom the second time?
4    A    It was a short conversation. I didn't want
5    to talk about it.
6    Q    With who?
7    A    With Mr. Brooks. It was late in the
8    evening.
9    Q    What did Mr. Brooks say?
10   A    "What happened."
11   Q    And what did you say?
12   A    "I don't know."
13   Q    Did he say anything else in that
14   conversation?
15   A    No. I think he was speechless.
16   Q    Was that a Friday evening?
17   A    Yes.
18   Q    Were you in your office the next day?
19   A    No.
20   Q    When was the next time that you talked to
21   or otherwise communicated with anyone about the

169

1    resignations after that conversation with Mr. Brooks on
2    the evening after getting the fax from Mr. Erwin?
3    A    I know I got a couple of calls over the
4    weekend.
5    Q    From whom?
6    A    I don't remember. I know that Frank was
7    one and Dawn Schlegel. I don't specifically remember
8    any more conversations with anybody else.
9    Q    Do you recall what you discussed with
10   Mr. Erwin over the weekend?
11   A    No.
12   Q    How about what you discussed with
13   Ms. Schlegel?
14   A    I think everyone was wanting to know what
15   happened.
16   Q    You gave them the same response you gave
17   Mr. Brooks?
18   A    I don't know.
19   Q    Okay. What was the next time you had any
20   communication with anyone relating to the resignation?
21   A    Monday.

43 (Pages 166 to 169)

Sandra L. Hatfield - 7/24/02

170

1   Q   All right. Tell me about the first one,
2   the first communication you had on Monday.
3       A   I don't remember in chronological order who
4   I talked to but it started from corporate to some of
5   our reps and internally.
6       Q   Who did you communicate with in corporate?
7       A   Mr. Brooks.
8       Q   Anyone else?
9       A   Dawn Schlegel.
10      Q   Anyone else?
11      A   Not that I can recall.
12      Q   Was the conversation or communication with
13  Mr. Brooks simultaneous with Ms. Schlegel?
14      A   No.
15      Q   What do you recall from the conversation
16  with Mr. Brooks?
17      A   Just did I have any forwarning that this
18  was going to happen, you know. Just questions of why
19  wouldn't I know that this was going to happen that they
20  were so unhappy.
21      Q   Did you express any anger at the situation

171

1   in your conversation with Mr. Brooks?
2       A   No.
3       Q   Did he?
4       A   No.
5       Q   Do you recall anything else about it in
6   your conversation with him?
7       A   No.
8       Q   How about your conversation with Dawn
9   Schlegel on that Monday?
10      A   Basically, the same thing. Same reaction.
11      Q   You mentioned that you -- where you had
12  communications with reps as well?
13      A   Correct.
14      Q   What type of reps are we talking about?
15      A   Independent sales reps.
16      Q   Do you recall any particular rep that you
17  talked to?
18      A   Rick Hockensmith, Dan Wheeler, Lynn Baker.
19  That's ones I recall.
20      Q   Tell me what you recall talking to
21  Mr. Hockensmith.

172

1       A   Basically, the same thing, what happened.
2       Q   Did he call you to ask you that question or
3   did you call him and tell him about the resignations?
4       A   I don't recall.
5       Q   Anything else you recall from that
6   conversation?
7       A   No.
8       Q   How about with Dan Wheeler?
9       A   Basically, the same thing.
10      Q   Any recollection other than that with Dan
11  Wheeler?
12      A   No.
13      Q   Would the same be true for Lynn Baker?
14      A   Yes.
15      Q   You testified that you also had some
16  communications internally. You mean with other people
17  at Point Blank?
18      A   Yes.
19      Q   Who did you talk to?
20      A   Wayne Kolbeck, Ronda Graves, Beverly
21  Fitzgerald. I can't recall anyone else specifically.

173

1       Q   Did you have a meeting in which this was
2   discussed with various officers at Point Blank or were
3   these all individual conversations?
4       A   No, I would say that I don't recall.
5       Q   Did you have a conference room in Point
6   Blank's offices?
7       A   Yes, we do.
8       Q   Do you recall anything specific about your
9   conversation with Wayne Kolbeck?
10      A   Specific? Not as surprised as I was.
11      Q   He wasn't as surprised?
12      A   No.
13      Q   Did he say why he wasn't surprised?
14      A   He just wasn't surprised.
15      Q   How about Ronda?
16      A   Wasn't really surprised.
17      Q   Did she say why she wasn't really
18  surprised?
19      A   Just general feeling of non-support from
20  the R&D group in the past months before the
21  resignation.

44 (Pages 170 to 173)

Sandra L. Hatfield - 7/24/02

174

1    Q    Do you recall anything specific that
2  Ms. Graves said about feeling that there had not been
3  support?
4    A    Phone calls not being returned.
5    Q    How about Bev Fitzgerald? Do you remember
6  anything specific about the conversation with her?
7    A    Other than, you know, letting her know and
8  she made the same comment.
9    Q    That they hadn't returned phone calls?
10    A    Right. I don't think they were shocked.
11  They were not as shocked.
12    Q    When did you first have any communication
13  with Mr. Price or Mr. Krummel or Mr. Murray?
14    A    I don't recall the day. Maybe it was -- I
15  don't recall what day.
16    Q    Do you recall whether it was within that
17  week?
18    A    After the resignation?
19    Q    Yes.
20    A    Yes.
21    Q    Tell me what you recall from your first

175

1  communication with Mr. Price after learning about the
2  resignation?
3    A    That it was a personal decision, it was
4  certainly nothing against anyone within the
5  organization and, you know, wrapping up what they were
6  working on within the next 14 days.
7    Q    Did you express your shock at the event to
8  Mr. Price?
9    A    Yes, I did.
10    Q    What did you say to him?
11    A    I couldn't believe that he didn't even call
12  me on the phone and he had already done it and I had to
13  find out the way I found out after the way we
14  communicated over three years.
15    Q    What did he say in response?
16    A    He agreed.
17    Q    Did you discuss with him any possibility of
18  reversing the decision?
19    A    We could have but it wasn't a long
20  conversation.
21    Q    What do you recall of your first

176

1  communication with Mr. Krummel after learning of the
2  resignation?
3    A    Recommendation of their replacement,
4  personnel.
5    Q    Who did Mr. Krummel -- did Mr. Krummel tell
6  you -- did he give you some recommendations in that
7  conversation?
8    A    Yes, he did.
9    Q    Who did he recommend?
10    A    Simply because I gave that person my word
11  I'd never divulge, I would prefer not to say.
12  Certainly Joe knows who it is.
13    Q    Okay. You told the person that you would
14  never divulge that Joe Krummel had recommended --
15    A    That he had talked to me about leaving his
16  employer.
17    Q    He's still employed with somebody else?
18    A    Yes, sir.
19    Q    Was it just the one person?
20    A    Two.
21    Q    Can you tell me who the other person was?

177

1    A    I gave them the same promise and they are
2  still with their employer.
3    Q    So you discussed with both of those people
4  the possibility of coming over and taking Krummel and
5  Price and Murray's place?
6    A    Yes.
7    Q    And they both declined?
8    A    I declined.
9    Q    You declined?
10    A    To make an offer.
11    Q    Did either Mr. Price or Mr. Murray ever
12  give you recommendations for replacements?
13    A    After those two, not to my knowledge, no.
14    Q    Did you express your shock to Mr. Krummel
15  when you first spoke with him?
16    A    I don't recall if I did or not.
17    Q    Did you ever have a direct conversation
18  with Mr. Murray after the resignations were announced?
19    A    Not that I recall, no.
20    Q    Did you do anything to prepare the company
21  for the transition with their departure?

45 (Pages 174 to 177)

Sandra L. Hatfield - 7/24/02

178

1    A   As best we could.
2    Q   Did you have any meetings specifically to
3  discuss what the company was going to do?
4    A   We had discussions on what our short-term
5  plan would be. But for our future plans we didn't have
6  a plan. I had no reason to have a plan.
7    Q   Well, are you saying you had no reason to
8  have a plan because you didn't anticipate this
9  resignation?
10   A   That's correct.
11   Q   But then after you learned of the
12  resignation, there wasn't any process that you went
13  through to create a plan?
14   A   Can we take one break so I can talk to my
15  attorney?
16   Q   Sure.
17     (There was a break in the proceedings.)
18   Q   We had been -- I've asked you whether there
19  was any planning or meetings in terms of how to
20  transition after the resignations. You indicated that
21  you didn't have a plan because you didn't anticipate

179

1  this and I asked you, well, then, once you found out
2  about it did you create a plan and then you said you
3  needed to talk to your attorney.
4    A   Right. Have a plan before their
5  resignation was official within that two weeks, then
6  the answer is no. We were in that building from
7  Thursday until Monday. We didn't leave our factory
8  because that was right after 9/11. It was the end of
9  the fiscal year for the government. We were swamped
10  with our customers. We were in a horrific -- we didn't
11  have time to put a plan together because we were
12  diverting shipments for the military and our government
13  and we were -- quite frankly, four of us were in the
14  building for 47 hours straight without leaving.
15  Planning on the devastation that we had incurred with
16  losing the entire R&D team was not something that I
17  could address at that time. We had to take care of our
18  customers.
19   Q   So, the answer is no, you didn't have a
20  plan?
21   A   Did not have a plan.

180

1    Q   Okay. Did there come a time subsequent to
2  that when there was any meetings on the issue of
3  replacing the R&D team?
4    A   With the entire staff?
5    Q   With anyone. Did you have a meeting with
6  anyone?
7    A   Yes.
8    Q   Who did you meet with?
9    A   To develop a plan?
10   Q   To do anything with respect to the fact
11  that the R&D team just left.
12   A   I did discuss it with Rick Hockensmith.
13   Q   What did you discuss with Rick Hockensmith?
14   A   My ideas on changing how we had done
15  research & development in the past.
16   Q   Do you know approximately when that meeting
17  took place?
18   A   It was in October.
19   Q   Do you know whether the decision to sue
20  Mr. Price and Mr. Krummel and Mr. Murray had been made
21  by the company at the time you had that conversation

181

1  with Mr. Hockensmith?
2    A   No.
3    Q   No, it had not been?
4    A   I don't know.
5    Q   After you learned that they had resigned or
6  intended to resign and given two weeks notice, what was
7  your understanding as to what Mr. Price and Mr. Krummel
8  and Mr. Murray intended to do for a living?
9    A   Grow USBE.
10   Q   Did you have an understanding as to how
11  they were going to grow it?
12   A   Doing ballistic research.
13   Q   Did you have any understanding as to who
14  their clients or customers were going to be?
15   A   My understanding was it would be more with
16  end users.
17   Q   You mean, like, police departments?
18   A   Or military buying units.
19   Q   Did Mr. Price discuss with you in any of
20  your conversations, after you learned of the
21  resignation but before it became effective, his goals

46 (Pages 178 to 181)





1

2   UNITED STATES DISTRICT COURT

    DISTRICT OF MARYLAND

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

    POINT BLANK BODY ARMOR, INC.,

4

                        Plaintiff,

5

            -against-                Civ# MJ01CV

6

    ALLEN PRICE, JOSEPH KRUMMEL and

7   JAMES MURRAY,

8                       Defendants.

    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9

                        June 5, 2003

10                      10:15 a.m.

11

12      Deposition of DAWN SCHLEGAL, taken

13  by defendants, at the offices of Greenberg

14  & Traurig, 885 Third Avenue, New York, New

15  York, before Michele Fischer, CM, a Certified

16  Shorthand Reporter and Notary Public within and

17  for the State of New York.

18

19

20

21

22

23

24

25

LEGALINK
A WORDWAVE COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Schlegal

1

2      Q.    An individual with a net worth

3    exceeding one million dollars can be an

4    accredited investor, right?

5      A.    I believe so.

6      Q.    And a person with an annual income

7    for over the prior two years of at least

8    $200,000, with a reasonable expectation of an

9    annual income of the same amount in the ensuing

10   year, can be an accredited investor?

11     A.    That's correct.

12     Q.    But you don't know whether Mr. Price,

13   Mr. Krummel or Mr. Murray had a million dollars

14   net worth or had that level of income, right?

15     A.    I had no idea what their net worth

16   is.

17     Q.    And you didn't undertake any efforts

18   to find that out in 2001?

19     A.    It was my opinion that an accredited

20   investor relates to a sale or a purchase, and I

21   don't consider these certificates, and

22   therefore, I don't see it's applicable.

23     Q.    Thank you for your opinion.

24   Now, my question was, though, and I

25   just want an answer to my question -- I'm not

1                   Schlegal

2         Q.    What value did you give them that was

3    expensed over the year?

4         A.    Whatever the stock provides was on

5    the date of -- whatever the date of that your

6    contract was, that close.

7         Q.    And what document would that value be

8    recorded in?

9         A.    It would be listed on DHB's stock as

10   far as here we issued these shares, this is the

11   par value, this is additional paid in capital

12   for the fair market value on the date of

13   issuance.  And then we'd expense it on Point

14   Blank, through our intercompany from DHB to

15   Point Blank.

16        Q.    And would you have done that for the

17   full number of shares on these certificates?

18        A.    Yes.  You take, even if they are

19   unvested, they don't care because they were

20   issued.  So it has nothing to do with their

21   vesting period as far as the value.  You have

22   to value it because you issued it, then expense

23   it over the vesting period.

24        Q.    Who doesn't care that they have

25   vested?

```
 1                        Schlegal
 2        A.    The accounting principle doesn't say:
 3    Okay, you have to take the value as of the date
 4    that they vest.  It's actually the date that
 5    they are issued.  It doesn't matter that it's
 6    vested or not vested subsequently.
 7             There's been a lot of rule changes in
 8    '02 under different acts on valuing stocks,
 9    options and stock warrants, lots of them, but
10    I'm talking pre that.
11        Q.    Absolutely.  Do you know what
12    particular accounting principles you're talking
13    about that would have applied in January of
14    2001?
15        A.    Stock compensation.
16        Q.    So if I wanted to figure out what
17    value was ascribed to these shares by the
18    company as of this time for that purpose that
19    you just described, I just need to find out
20    what the trading price of the stock was as of
21    January 3, 2001?
22        A.    That's correct.
23        Q.    Subsequent to giving the certificates
24    and the warrants to Mr. Brooks for delivery to
25    Mr. Price, Mr. Krummel and Mr. Murray, were you
```

Schlegal

1

2      A.    I believe someone called after they

3  left regarding the restriction, I don't believe

4  anyone ever called before.

5      Q.    You don't have any recollection of

6  them calling before the three gentleman

7  resigned from Point Blank?

8      A.    No.

9      Q.    Let me show you what has been

10  previously marked as Price Exhibit 3.

11          Now, I recognize that you're neither

12  the author or recipient of this apparent e-mail

13  transmission, but you'll see there that appears

14  to be an e-mail from a Kathy Dubbs from Morgan

15  Stanley to Allen Price, in which she indicates

16  that somebody in the Morgan Stanley restricted

17  securities area had a conversation with you, in

18  which you imparted some information.

19          Do you see that?

20      A.    Yes.

21      Q.    Do you have any recollection of the

22  events that may have led to this e-mail?

23      A.    Like I said before, someone called me

24  and asked me about the certificates, and I told

25  them.

```
 1                      Schlegal

 2            If someone asked me what the general

 3       rule of Section 144 is, it's usually you have

 4       to hold it for one year in order for Section

 5       144 to be effective.

 6            I wouldn't have told them dates as

 7       far as when they were issued, or anything off

 8       the top of my head, because I don't have that

 9       information in my office.  It -- normally when

10       someone called I gave them the general

11       information about Rule 144.

12       Q.   Do you get calls from investment

13       banks or brokerages in which they ask questions

14       like this, but they don't identify who the

15       beneficial holders of the stock are?

16       A.   Yes.

17       Q.   In any event, you don't have a

18       recollection of having had such a conversation

19       with anybody from Morgan Stanley in or around

20       March 20, 2001, specifically in reference to

21       Mr. Price, Mr. Krummel and Mr. Murray?

22       A.   On March 20, no.  If someone -- so

23       no.

24       Q.   But it would be fair to say that you

25       can't say that you did not receive an inquiry
```

```
1                          Schlegal

2    EXAMINATION BY

3    MS. JUNGHAUS:

4         Q.    Ms. Schlegal, if you would refer back

5    to Exhibit 4.

6         A.    Yes.

7         Q.    Which is the form SB 2 filed in 1997,

8    which Mr. Brennen asked you about earlier, and

9    turn to page nine of it.

10        A.    Yes.

11        Q.    And I think the question Mr. Brennen

12   had asked you was whether any of the shares

13   which were issued to Mr. Price or Mr. Krummel

14   in 1998 would have been shares described in

15   this filing.

16             Do you recall that?

17        A.    Yes.

18        Q.    And in fact, on page nine of the form

19   SB 2, in the paragraph that's captioned The

20   Offering --

21        A.    Yes.

22        Q.    -- it says that:  All of the shares

23   being offered hereby were issued in private

24   placements, in the first paragraph, does it

25   not?
```

```
1                    Schlegal

2        A.    Yes.

3        Q.    And the purpose of this filing is to

4   provide a mechanism by which the shareholders

5   who own the 1,850,000 shares covered by the

6   filing could sell them, right?

7        A.    That's correct.

8        Q.    And since they were all acquired in

9   private placements, none of them were the

10  shares issued to Mr. Krummel and Mr. Price;

11  isn't that right?

12       A.    That's correct.

13       Q.    Because theirs weren't part of

14  private placements?

15       A.    That's correct.

16       Q.    So this form SB 2 is completely

17  irrelevant to Mr. Price's and Mr. Krummel's

18  shares, is it not?

19       A.    Yes.

20            MR. BRENNEN:   Objection.

21       Q.    Now, you've told us, or you were

22  asked to look at the language on the stock

23  certificates that were issued to Mr. Price and

24  Mr. Krummel and Mr. Murray in 2001, and the

25  language which says fully paid and
```





1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

Northern Division

1

2

3

4

5    POINT BLANK BODY ARMOR, INC.    :

6         Plaintiff    :

7    Vs.    :    CIVIL ACTION NO.

8    ALLEN PRICE, JOSEPH KRUMMELL    :    MJG 01 CV 3256

9    and JAMES MURRAY    :

10         Defendants    :

11

12         Deposition of **ALLEN PRICE**, taken on

13    Wednesday, May 7, 2003, at 11:25 a.m., at the law

14    offices of Piper Rudnick, LLP, 6225 Smith Avenue,

15    Baltimore, Maryland, before Bonnie L. Russo,

16    Notary Public.

17         ----------------------------

18

19

20    Reported by:

21    Bonnie L. Russo

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

29

1    Q.    What did you say to them?

2    A.    I said, "Looking at this, this gives

3    Point Blank a greater opportunity to screw us."

4    Q.    Did they say anything to you, either one

5    of them?

6    A.    We kind of chuckled about it but we

7    looked at it and said -- well, by the time we got

8    this this was actually -- we were two weeks into

9    working for them already and we just made the

10    decision to continue on.

11    Q.    Why did you view it as an opportunity to

12    be screwed?

13    A.    Well, my past experience with DHB.

14    Q.    What does that mean?

15    A.    Unavailability to get out of pocket

16    expenses in a timely manner and in some case not

17    at all.

18         I had the opportunity over two and a

19    half years to observe business philosophy.

20    Q.    Okay.    And having had that opportunity

21    you nevertheless chose to go forward and sign up

30

1    with an intent to work for them for three years?

2        A.   Uh-huh.

3        Q.   Did you receive the stock certificate

4    called for in the agreement?

5        A.   When we signed this?

6        Q.   At any time.

7        A.   Yes.  We received a stock certificate

8    in, I believe it was, in the early March of

9    2001.  Yes.

10           (Price Deposition Exhibit No. 2 was

11   marked for identification.)

12           BY MS. JUNGHANS:

13       Q.   If you would look at what the reporter

14   has marked as Exhibit 2.

15           Are you familiar with that document?

16       A.   I believe I am.

17       Q.   What is it?

18       A.   I believe this is the certificate of

19   stock that was sent to me by DHB.

20       Q.   Do you recall how you received it?  Did

21   it come in the mail?



1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3                     Northern Division

4      - - - - - - - - - - - - - - - X

5      POINT BLANK BODY ARMOR, INC., :

6                 Plaintiff,              :

7         v.                             :   Civil Action No.

8      ALLEN PRICE, JOSEPH KRUMMEL,   :   MJG 01CV3256

9      and JAMES MURRAY,                 :

10                Defendants.             :

11     - - - - - - - - - - - - - - - X

12                          Towson, Maryland

13                          Tuesday, May 13, 2003

14                Deposition of JOSEPH KRUMMEL, a

15     Defendant herein, called for examination by

16     counsel for Plaintiff in the above-entitled

17     matter, pursuant to notice, the witness being duly

18     sworn by PAUL A. GASPAROTTI, a Notary Public in

19     and for the State of Maryland, taken at the

20     offices of Miles & Stockbridge, PC, 800 Washington

21     Avenue, Towson, Maryland 21204, at 10:53 a.m.,

22     Tuesday, May 13, 2003, and the proceedings being

23     taken down by Stenotype by PAUL A. GASPAROTTI, and

24     transcribed under his direction.

25

Joseph Krummel                                                                    May 13, 2003
Towson, MD

---

Page 18

1    A.   This is my one-page summary of
2  employment package.
3    Q.   And this document is what DHB came up
4  with in lieu of the five-page document that
5  Mr. Price and his attorney had prepared, correct?
6    A.   Correct.
7    Q.   Okay.  And it was prepared by them but
8  signed by you?
9    A.   Correct.
10   Q.   Okay.  Now, how was this document
11 transmitted to you?
12   A.   How was it transmitted to me?
13   Q.   Yes.
14   A.   I don't recall whether it was given to
15 me in person or whether it was delivered to me
16 Fed Ex or faxed, I don't recall.
17   Q.   All right.  However you got it, did you
18 read it before you signed it?
19   A.   Yes.
20   Q.   Or I should ask you, is that your
21 signature?
22   A.   Yes, it is.
23   Q.   And you reviewed it before you signed
24 it?
25   A.   Yes, I did.

---

Page 19

1    Q.   Now, I take it you observed that unlike
2  the draft agreement which said you would get so
3  much stock and so many options and have to give
4  them back if you left the company, this one had a
5  different formula.  This one said the stock
6  certificate and the warrant will vest on a certain
7  schedule?
8    A.   Yes, it says it would vest, it would be
9  prorated, so to me, prorated says pretty much the
10 same thing that that does.  I understood it to be
11 that they prorated it over the time that we
12 stayed.  In other words, if we left early, that it
13 would prorate to that date.
14   Q.   But the mechanics are different,
15 though, aren't they?
16   A.   Explain that.
17   Q.   Well, in your draft agreement it says
18 you will get the certificate and if you leave, you
19 have an obligation on you to give the unearned
20 portion back.  This one says you may get a
21 certificate but it will only vest as you work.
22   A.   I don't know the difference between
23 those two.  To me they are very much the same.
24   Q.   So to you, you weren't concerned about
25 that, because you thought it was functionally the

---

Page 20

1  same thing?
2    A.   Yes, I thought it was the same.
3    Q.   And like the prior draft, this also
4  doesn't have any statement one way or the other as
5  to whether the stock certificate will be
6  restricted or unrestricted.
7    A.   Just like my original agreement with my
8  original stock.
9    Q.   That wasn't my question.  The question
10 was, does the summary of employment package state
11 one way or the other whether the stock is to be
12 restricted or unrestricted?
13   A.   It doesn't say it's restricted, no.
14   Q.   And it doesn't say it's unrestricted
15 either, does it?
16   A.   Correct, and neither did my last
17 agreement with them.
18   Q.   Okay.  And so, is it fair for me to
19 assume that you had no discussion either with
20 Mr. Price or that was reported back to you about
21 discussions between Mr. Price and Mr. Brooks about
22 whether the stock would be restricted or
23 unrestricted, because you assumed it would be
24 unrestricted?
25   A.   Since I had experience in that, since I

---

Page 21

1  had already dealt with them before and received
2  stock that was unrestricted, I don't believe I
3  even knew that there was such a thing as
4  restricted stock.
5    Q.   All right.  Did you at some point
6  receive the stock called for in this document,
7  Exhibit 2?
8    A.   Yes, I received a certificate of stock.
9         (Krummel Exhibit 3 marked for
10        identification.)
11        BY MS. JUNGHANS:
12   Q.   Showing you what has been marked as
13 Exhibit 3, is that a copy of the stock certificate
14 that you received?
15   A.   It's a partial photocopy of it, yes.  I
16 believe so.
17   Q.   Front and back, right?
18   A.   Uh-huh.
19   Q.   Actually it might be slightly cut off
20 on the right-hand side.  How did this come to you?
21   A.   I believe by Fed Ex.
22   Q.   All right.  Do you recall when you
23 received it?
24   A.   I don't recall the exact date, but I
25 know it wasn't -- it was, may have been a month or

---

6 (Pages 18 to 21)

Joseph Krummel                                                                May 13, 2003

Towson, MD

Page 22

1    so after we decided to stay, took the deal.
2        Q.    So sometime in early 2001?
3        A.    I believe so. I don't recall the exact
4    date.
5        Q.    I'm sure you don't, but I mean, in the
6    February-March time frame?
7        A.    It must have been, yes.
8        Q.    And when you got the stock certificate,
9    did you look at it?
10        A.    Yes.
11        Q.    And did you notice that on the face of
12    it, it says restricted securities and then it
13    refers you to a legend endorsed on the reverse
14    side?
15        A.    I don't recall when I became aware that
16    it was restricted. I can't say when I looked at
17    it I said oh, it's restricted.
18        Q.    At some point you became aware?
19        A.    At some point I became aware that this
20    wasn't like it was before.
21        Q.    And did you become aware through your
22    own study of the document or from talking to
23    Mr. Price or what?
24        A.    I don't recall whether we asked the
25    question to our broker or we asked questions to,

Page 23

1    what happened first, whether we asked it to some
2    advisors that we had from our church that had
3    knowledge of this type of thing, and found out
4    that it was in fact restricted and what that
5    really means, or it was Scott. I don't recall
6    which was first.
7        Q.    Scott being Mr. Bauermaster?
8        A.    Yes.
9        Q.    Who are these advisors at your church
10    that you refer to?
11        A.    They are on the board of directors of
12    DHB, Bronson Hokuf is one fellow's name.
13        Q.    How do you spell the last name?
14        A.    H-O-K-U-F, something like that.
15        Q.    Do you recall the names of any others?
16        A.    I'm trying to remember this fellow's
17    last name. John Judway, and again, I don't know,
18    I'm speculating here, I don't know if I actually
19    talked with them or not.
20        Q.    Had you been consulting with Mr. Hokuf
21    and Mr. Judway in general about your employment
22    and/or the creation of USBE or anything?
23        A.    I don't recall at that time if we were
24    actually talking to them, but at some point we did
25    ask them to advise us on things like this

Page 24

1    business.
2        Q.    So do you think at some point you
3    discussed with either or both of these gentlemen
4    the fact that this is restricted stock?
5        A.    As I said, I don't recall how it
6    actually came to my attention what restricted
7    securities actually means, that these were
8    restricted. I don't recall whether it was from
9    Bauermaster looked at this and said hey, it's
10    restricted, or that someone else looked at it and
11    said it's restricted, but at some point I became
12    aware what restricted stock means.
13        Q.    And was that, the point at which the
14    awareness dawned on you, if you will, was that
15    early in your employment at Point Blank?
16        A.    Early in my employment?
17        Q.    Well, let's say within the first six
18    months?
19        A.    Well, I started in '98.
20        Q.    I apologize, you're right. Early in
21    the first six months of 2001?
22        A.    Yes, definitely.
23        Q.    And what did you do after you realized
24    that the stock was restricted?
25        A.    Probably spit.

Page 25

1        Q.    What do you mean?
2        A.    I probably wasn't too happy, I didn't
3    know that that was going to be the case when we
4    made the deal with them. That wasn't discussed.
5    I didn't know it would be different than it was
6    before as far as restrictions go, so we had to
7    find out when we could actually exercise this.
8        Q.    Well, did you ever, before you made
9    inquiries about whether you could dispose of the
10    stock, did you ever go back to anybody at Point
11    Blank or DHB and say this is not the deal I
12    thought I made?
13        A.    I personally don't know whether I did
14    that or not, but I know someone did talk to Dawn
15    Schlagel and asked her what's the deal with this,
16    and then she explained it to you us and we said --
17        Q.    Someone like who?
18        A.    It could have been Al Price, it could
19    have been Jim Murray. I don't recall.
20        Q.    It wasn't you?
21        A.    I don't think it was me, but I don't
22    recall. It could have been, I wouldn't be
23    surprised if it was, but I know I came -- I know
24    that we did talk with them, myself or someone
25    talked to Dawn and got the information that here's

7 (Pages 22 to 25)



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

Northern Division


POINT BLANK BODY ARMOR, INC. :

       Plaintiff        :

Vs.                 : CIVIL ACTION NO.

ALLEN PRICE, JOSEPH KRUMMELL : MJG 01 CV 3256

and JAMES MURRAY      :

       Defendants     :


      Deposition of JAMES W. MURRAY, taken on

Wednesday, May 7, 2003, at 10:00 a.m., at the law

offices of Piper Rudnick, LLP, 6225 Smith Avenue,

Baltimore, Maryland, before Bonnie L. Russo,

Notary Public.

           ------------------------


Reported by:

Bonnie L. Russo

Page 10

1   A. Yes.

2   Q. And did he -- is he the one that

3 presented you with Exhibit 1, that is before you

4 signed it?

5   A. Yes. I got it from Mr. Price and Point

6 Blank gave it to him and said this is what we

7 would like to use as our agreement.

8   Q. Do you recall whether it was presented

9 to you on the date that is on here, January 3, or

10 was it presented to you at some point prior to

11 that?

12   A. Actually, I believe it was after that,

13 but I can't remember. I can't remember if it was

14 when we were at Point Blank the first week of

15 January or if they faxed it to us after that.

16   Q. Well, I note on the top of the copy that

17 I have, which has been marked, that there is a

18 fax legend at the top that says January 12, 2001.

19     Do you see that?

20   A. Yes.

21   Q. Does that refresh your recollection at

Page 11

1 all?

2   A. Well, that's what makes me -- well, I

3 think that -- I don't remember having discussions

4 about this when I was at Point Blank. I believe

5 they sent us something -- faxed something to our

6 office after.

7   Q. I infer from what you are saying that

8 you were physically present at Point Blank's

9 office in the first week of January 2001?

10   A. I was at Point Blank, yes, in Florida.

11   Q. As best you can recall it, is that when

12 your employment began, whether or not you had

13 actually signed an employment agreement?

14   A. Yes.

15   Q. And as best you can recall it you think

16 that employment agreement was actually signed

17 after you got back from that first week in

18 Florida trip?

19   A. You know, I am not really sure but I

20 don't -- I know that David presented this to us

21 sometime after we went to Point Blank. Now,

Page 12

1 whether it was while we were still there or after

2 we got back I'm not sure.

3   Q. During that trip that you made did you

4 meet David Brooks?

5   A. No.

6   Q. Whom did you meet?

7   A. I met -- well, I met a lot of people at

8 Point Blank. I met with Sandra Hatfield, Ronda

9 Graves. I just got introduced to the whole place

10 because I just joined the team.

11   Q. Did you talk to any of those individuals

12 about the terms of your employment agreement?

13   A. No.

14   Q. Whenever it was, or in early January of

15 2001, when that document was presented to you by

16 Mr. Price did you read it?

17   A. Yes.

18   Q. Did you consult with anyone prior to

19 executing it? I should strike that.

20     I should ask you is this your

21 signature?

Page 13

1   A. Yes, that's my signature.

2   Q. Did you consult with anyone prior to

3 executing it?

4   A. Just talked to Mr. Price and Mr.

5 Krummel. Nobody outside of that.

6   Q. Did you ask Mr. Price -- let's stick

7 with Mr. Price.

8     Did you ask him any questions about

9 what the agreement meant?

10   A. I'm sure we had a little bit of

11 conversation about it, but I can't remember

12 asking any specific questions.

13   Q. Did you have any questions?

14   A. I think I had questions about -- I think

15 I had questions about when the health insurance

16 would start and also about the -- how the

17 vacation stuff worked.

18   Q. There are two handwritten notations on

19 Exhibit 1, and the first one deals with the

20 health insurance issue. Someone has written in

21 after the typed words, "The company will provide

**Page 46**

1  Q. Well, the employment agreement could be
2  read, could it not, to mean that at the end of
3  the first year of your employment you will have
4  13 -- a warrant for 13,333 shares and that the
5  warrant says that as of January 3, 2002, which is
6  the end of the first year of your employment, you
7  will have a warrant for 13,333 shares?
8  A. Say that again.
9  Q. They could both be read to say, could
10  they not, that at the end of the first year of
11  employment you will be vested in a warrant for
12  13,333 shares if you last a year?
13  A. I guess we could read this to say that,
14  Exhibit 3, that after as of January 3, 2002 I
15  would be vested in 13,333 shares.
16  Q. Do you contend that either the
17  employment agreement or the warrant gives you an
18  entitlement to anything in terms of warrant prior
19  to January 3, 2002?
20  A. I believe that the employee -- the
21  summary of employment package agreement would

**Page 47**

1  give me a prorated amount of stock vested over
2  the amount of time that I was there.
3  Q. I am not asking you about the stock. I
4  am asking you about the warrant.
5  A. The warrant, yes.
6  Q. But you would agree, would you not, that
7  in Exhibit 1 in the employment agreement the
8  sentence related to the stock certificate is
9  different than the sentence related to the
10  warrant? The sentence related to the stock
11  certificate says, "Prorated to the date of
12  employment ceases" whereas the sentence related
13  to the warrant talks about an annual event during
14  each year?
15  You would agree they are different,
16  would you not?
17  MR. BRENNEN: I object to your
18  characterization of what it says.
19  MS. JUNGHANS: I am saying what they
20  say.
21  MR. BRENNEN: No, you are not. You are

**Page 48**

1  saying how you would like to interpret it.
2  BY MS. JUNGHANS:
3  Q. You would agree they use different
4  words, would you not?
5  A. They use different words.
6  Q. But you think they have the same meaning
7  in spite of using different words?
8  A. Well, I believe that when it says the
9  warrant will vest so many shares during the year,
10  that during the year they are vesting during that
11  year.
12  Q. Okay. You have never talked to anybody
13  at Point Blank about whether they think the same
14  thing you think, have you?
15  A. No.
16  Q. And have you talked to anybody else,
17  excluding your attorney, about what those words
18  mean?
19  A. I have spoken to Mr. Price and Mr.
20  Krummel.
21  Q. Did you talk to them about that issue

**Page 49**

1  prior to the termination of your employment?
2  A. I believe we talked about it like when
3  we first got the agreement.
4  Q. You have told me a little while ago that
5  when you got the stock certificate or at some
6  point after you got the stock certificate you and
7  Mr. Price -- and was Mr. Krummel involved in
8  these conversations as well about the fact that
9  it was restricted stock rather than unrestricted
10  stock?
11  A. I can't remember if we -- I don't
12  believe we ever had a meeting about it or
13  anything like that.
14  Q. Did you talk to each of them, whether
15  together or separately? Each of Krummel and
16  Price?
17  A. Yes.
18  Q. And is it -- so it is fair to say that
19  all three of you prior to the termination of your
20  employment were aware that you had received
21  restricted stock rather than unrestricted stock?