217 A.2d 531
**(Cite as: 241 Md. 612, 217 A.2d 531)**

Court of Appeals of Maryland.

Ralph D. ROCKS et ux.
v.
J. William BROSIUS et al.

**No. 73.**

March 9, 1966.

Suit for specific performance as well as declaratory and other relief in connection with agreement to lease involving tract of land. The Circuit Court, Prince George's County, William B. Bowie, J., granted specific performance and held defendant lessees in contempt of interlocutory injunction and lessees appealed. The Court of Appeals, Barnes, J., held that sublease agreement which enabled parties to prepare, file and record plats for three sections, prepare and execute plats for two sections and prepare tentative plat for sixth section, which definitely fixed payment of rents on entire number of lots involved, which obligated lessees to proceed with preparation and recordation of plats and under which the terms of future subleases were to be those of plats already executed, was not too vague to be specifically enforced on ground that it did not definitely set forth manner in which subdivision was to be carried out or time of performance and that interlocutory injunction restraining lessees, against whom sublessees sought specific performance from making or executing any encumbrance, or taking other action, of record or otherwise, to affect conveyance in any manner of title to any portion of balance of tract involved did not preclude clearing of land by lessees for temporary haul road.

Portion of order declaring defendants in contempt reversed, remainder of order affirmed, and final decree affirmed and case remanded.

West Headnotes

**[1] Appeal and Error ☞153**
30k153 Most Cited Cases

**[1] Appeal and Error ☞154(1)**
30k154(1) Most Cited Cases

Right to appeal may be lost by acquiescence in, or recognition of, validity of decision below from which appeal is taken or by otherwise taking a position which is inconsistent with right of appeal.

**[2] Appeal and Error ☞125**
30k125 Most Cited Cases

Appeal will not lie from consent decree.

**[3] Landlord and Tenant ☞70**
233k70 Most Cited Cases

**[3] Landlord and Tenant ☞80(1)**
233k80(1) Most Cited Cases

**[3] Specific Performance ☞26**
358k26 Most Cited Cases

Where owners of fee simple executed lease for 35 years renewable in perpetuity with annual rent payable in monthly installments and lessees agreed to sublease entire parcel and to prepare and record plats of subdivision dividing parcel and sublessee paid lessees rent on all the lots, there were property interests existing both in lessees and sublessees and specific performance of sublease was not precluded on basis that property to be subleased was not in existence at time of execution of sublease.

**[4] Landlord and Tenant ☞80(1)**
233k80(1) Most Cited Cases

Although exact time of steps to be taken as agreed upon between lessees and sublessees as to recordation of future plats and execution of new subleases with respect to leased property were not specified in original agreement between parties, legal implication was that such steps would be taken within reasonable time.

**[5] Mortgages ☞298(1)**
266k298(1) Most Cited Cases

If time of payment is not stated in mortgage it is legal implication that it is to be paid within reasonable time.

**[6] Specific Performance ☞28(2)**
358k28(2) Most Cited Cases

Sublease agreement which enabled parties to prepare, file and record plats for three sections, prepare and execute plats for two sections and prepare tentative plat for sixth section, which definitely fixed payment of rents on entire number of lots involved, which obligated lessees to proceed with preparation and recordation of plats and under which the terms of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

future subleases were to be those of plats already executed was not too vague to be specifically enforced on ground that it did not definitely set forth manner in which subdivision was to be carried out or time of performance.

**[7] Contracts** ☞40
95k40 Most Cited Cases

Contract need not be evidenced by single instrument.

**[8] Contracts** ☞164
95k164 Most Cited Cases

Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing intention of parties in regard to single transaction, even though instruments were executed at different times and do not in terms refer to each other.

**[9] Equity** ☞107
150k107 Most Cited Cases

Where there had been no indication that lessors would not perform their obligations under lease, lessees had full leasehold estate in property, rights of lessors were not affected by litigation between sublessees and lessees, and any relief sought by bill of complaint was against lessees, lessors were not necessary parties defendant. Maryland Rules, Rule 885.

**[10] Pretrial Procedure** ☞171
307Ak171 Most Cited Cases
(Formerly 127k41 Discovery)

In absence of allegation of insolvency or any substantial proof of insolvency on part of one of sublessees seeking specific performance against lessees, refusal to require that sublessee produce his financial records and answer questions propounded to him in attempt to obtain such information was not an abuse of discretion. Maryland Rules, Rule 410a.

**[11] Appeal and Error** ☞71(3)
30k71(3) Most Cited Cases

Portion of order enjoining defendants from further interfering in any manner whatsoever with subject property until cause was heard on its merits was temporary and interlocutory in nature, but was appealable inasmuch as it did grant an injunction. Code 1957, art. 5, § § 6, 7, subds. (a, e); Maryland Rules, Rule 887.

**[12] Appeal and Error** ☞420
30k420 Most Cited Cases

On appeal from final decree, appellants were not required to mention, in notice of appeal, prior interlocutory order enjoining defendants from further interfering with subject property until cause was heard on its merits. Maryland Rules, Rule 887.

**[13] Appeal and Error** ☞870(1)
30k870(1) Most Cited Cases

Appeal from final decree brought before court every interlocutory order which had previously been entered in the action. Maryland Rules, Rule 887.

**[14] Injunction** ☞218
212k218 Most Cited Cases

Where terms of injunction are not specific and definite, defendant will not be punished for contempt. Maryland Rules, Rule BB78.

**[15] Injunction** ☞208
212k208 Most Cited Cases

Injunctive decree must not be broader than issue raised by pleadings. Maryland Rules, Rule BB78.

**[16] Injunction** ☞230(1)
212k230(1) Most Cited Cases

Generally, in proceedings to punish for contempt of injunctive order or decree, court will not expand language of decree by implication beyond meaning of terms of order or decree when read in light of issues and purpose for which suit was brought.

**[17] Specific Performance** ☞131
358k131 Most Cited Cases

Interlocutory injunction restraining lessees, against whom sublessees sought specific performance, from making or executing any encumbrance, or taking other action, of record or otherwise, to effect conveyance in any manner of title to any portion of balance of tract involved did not preclude clearing of land by lessees for temporary haul road. Maryland Rules, Rule BB78.

**[18] Easements** ☞2
141k2 Most Cited Cases

Owner of realty does not have easement in his own

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

lands since bundle of rights which adds up to ownership includes right corresponding to easement.

[19] Specific Performance ⚖129
358k129 Most Cited Cases

Damages resulting from delay in completion of home by sublessees as result of lessees' failure to perform and damage as result of lessees' clearing of temporary haul road because of improper performance of work itself and because sublessees had determined not to place a road in location of temporary haul road, were elements of damage consistent with relief by way of specific performance sought by sublessees.
*617 **533 John D. Gilmore, Jr., Hyattsville (Leo Wm. Dunn, Jr., and William V. Meyers, Hyattsville, on the brief), for appellants.

J. Nicholas Shriver, Jr., Baltimore (Cross, Shriver, Bright & Washburne, Baltimore, and Hal C. B. Clagett, Upper Marlboro, on the brief), for appellees.

Before PRESCOTT, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

**534 BARNES, Judge.

This appeal arises from a final decree passed on February 11, 1965 by Judge Bowie in the Circuit Court for Prince George's County granting specific performance, of, as well as declaratory and other relief in connection with, an agreement to lease, dated August 4, 1962 involving a tract of land containing 94.5036 acres lying to the north and south of Contee Road in Prince George's County, known as 'Briarwood.' Also involved is an order passed by Judge Bowie on January 11, 1965 holding the appellants in contempt of an interlocutory injunction dated and filed in this case on May 14, 1964.

'Briarwood,' the 94.5036 acre tract involved in this case was owned in fee simple by John W. Staggers and Ruth E. Staggers his wife (Staggers), on February 5, 1962. On that day *618 the Staggers executed a lease of 'Briarwood' to Prince-Mar Builders, Inc. (Prince-Mar), a Maryland corporation of which Ralph D. Rocks, one of the appellants, was president. By this lease, Prince-Mar held the leasehold interest in the land for 35 years 'renewable from term to term, as hereinafter set forth, in perpetuity, from the 1st day of March, 1962 * * *.' The rent received was $17,010.65 a year payable in even and equal *monthly* installments accounting from

March 1, 1962 over all discounts for taxes, assessments of every kind, and other public charges levied or assessed against the demised premises, all of which charges Prince-Mar, as lessee, covenanted to pay. There was a provision that if the rent was in arrears at any time and the default continued following 10 days written notice, the lessors could make distress for the rent, if in default for 60 days following written notice, the lessors could reenter and hold the demised premises and if in default for 6 months following 60 days written notice of the arrearage of rent, the lessors could reenter and hold the demised premises as if the lease had not been made. There was a specific covenant that the lessee, its successors or assigns would 'pay the aforesaid rent, taxes and assessments *when legally demandable*' (emphasis supplied). The lease also provided that during the original 35 year period, the lessee could by paying a renewal fine of $1.00 request a new lease for another 35 year term for the annual rental of $17,010.65 'adjusted upwards in the same proportions as the 'Consumer's Price Index for all Items for Moderate Income Families in Large Cities', as determined by the United States Department of Labor, Bureau of Labor Statistics, (or, if there be no such Consumer Price Index, then by the successor or the most nearly comparable successor index thereto), for the month of December next preceding the date on which the Lessee desires to renew said term has increased from such Consumer Price Index for December, 1961 and upon the same covenants and conditions as herein set forth, so that the demise hereby created may be renewable and renewed from time to time, forever.' There was a covenant that if during the original 35 year term, the lessee would pay the sum of $3900 an acre with all accrued rent to the lessors, then the demised property would be discharged from the payment of rent and the lessors *619 would convey the demised property to the lessee, its successors and assigns by a special warranty deed for a good and merchantable title in fee simple. After the expiration of the original 35 year period, there was a similar right of redemption for $3900 an acre adjusted upwards by the Consumer's Price Index formula already mentioned.

The lease further provided that the lessors, their heirs and assigns, would subordinate their interest to bona fide mortgages or deeds of trust obtained from recognized lending institutions 'for the purpose of financing constructive and permanent financing, or refinancing of improvements erected or to be erected on the demised premises' by the lessee, its successors and assigns and that the failure of the lessee, its successors or assigns, to make payments under such mortgages or deeds **535 of trust 'shall constitute a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

217 A.2d 531
(Cite as: 241 Md. 612, 217 A.2d 531)

Page 4

default under the terms of this lease' and the lessees, their heirs and assigns, at their option might (a) terminate the lease and reposses the property or (b) make the payments and charge them with interest at 6% per annum as additional rent immediately due and payable without notice.

By paragraph 10 of the lease, the lessors, for themselves, their heirs and assigns, covenanted with the lessee, its successors or assigns, 'that at the request of the Lessee its successors or assigns, they shall join with it in executing, acknowledging and delivering any and all documents required to effect any subdivision of the subject property, or any part thereof, into smaller parcels, including the dedicating of the public streets and rights of way and easements for public utilities required by such subdivision, * * *.'

In paragraph 11 of the lease there was a covenant that the lessors, their heirs and assigns, upon any subdivision into smaller parcels as the lessee, its successors or assigns, may desire, would enter into separate leases, completely independent of the leases on the remaining properties, containing the same covenants and pro rated rent. Paragraph 11 then continued: 'The Lessors, their heirs or assigns, shall join in such lease instruments as may be prepared by the attorneys for the Lessee, its successors or assigns, to effect a separate leasing of the smaller parcel or parcels * * *.' The recording charges for the cost of preparing the new leases were to be borne by the lessee.

**\*620** Attached as an exhibit was a metes and bounds description of Briarwood. The description is divided into three parts 1) Parcel A containing 35.0261 acres, 2) Parcels B and C containing 34.2981 acres, and 3) Parcel D containing 25.1794 acres. The total acreage described is 94.5036 acres. This lease was duly recorded among the land records of Prince George's County.

Prince-Mar on March 23, 1962 entered into a written, but unrecorded, agreement to lease Briarwood to J. William Brosius or assigns. Mr. Brosius, a builder of homes, gave his promissory note dated April 10, 1962 for $5000.00 payable to Prince-Mar or assigns within 60 days from date as a payment on account of the agreement to lease.

Prince-Mar, on April 25, 1962, by a deed duly recorded, conveyed its leasehold interest in 'Briarwood' to the appellants Ralph D. Rocks and Jean W. Rocks, his wife (the Rocks or the appellants) as tenants by the entireties for the residue of the term

of years yet to come, with the rights of renewal forever, subject to the payment of the annual rent received of $17,010.65 payable monthly in accordance with the lease of February 5, 1962.

On May 9, 1962, A. James O'Mara, a registered engineer, of the engineering firm of Greenhorne & O'Mara, Riverdale, Maryland, prepared a plan of Section One of Briarwood. His certificate indicates the source of title of Mr. and Mrs. Staggers and that the total area in Section One (I) [FN1] consists of 20.3945 acres. This area is divided into 52 lots. In the 'Owners' Dedication' signed by Mr. and Mrs. Staggers, as owners, and by the Rocks, as lessees, there is indicated their adoption of the plan of subdivision and the establishment of the building restriction lines, the drainage easements and the dedication of the streets to public use. There is also a recitation that 'There are no suits of [or] action, leases, liens or trusts on the property included in this plan of subdivision, except a certain lease and the parties **\*621** in interest thereto have indicated their assent.' **\*536** The plan for Section One (I) was approved by the Maryland-National Capital Park and Planning Commission (Planning Commission) and the Prince George's County Planning Board (Planning Board) on May 23, 1962 and was duly recorded thereafter.

> FN1. The Subdivision Plat spells out the numeral, but plaintiffs' Exhibit 1--a sketch showing the entire area divided into sections uses the Roman numerals. The Roman numeral will be placed in parentheses following the spelled-out numeral, as the decree uses the Roman numerals in describing the various sections.

On June 14, 1962, Mr. O'Mara certified a second plat for Section Two (II) of Briarwood containing 14.2915 acres divided into 39 lots. An identical 'Owners' Dedication' was signed by Mr. and Mrs. Staggers and the Rocks on June 12, 1962. The plat for Section Two (II) was approved by the Planning Commission and the Planning Board on June 20, 1962 and was duly recorded thereafter.

The total number of lots in Sections One (I), and Two (II) was 91. A Modification Agreement, dated July 11, 1962, and duly recorded, was entered into between Staggers and the Rocks whereby the 91 lots were severally leased in accordance with the terms of the original lease.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

On August 4, 1962, the Rocks as 'Lessors' entered into an agreement with J. William Brosius and Louis J. Brosius (Brosius), as 'Lessees' in regard to the entire 94.5036 acres of Briarwood. The agreement which was signed, sealed and acknowledged by all of the parties recited that the Rocks planned to subdivide the 94.5036 acres into approximately 255 lots and Brosius desired to lease each and all of the lots which the Rocks were willing to lease to Brosius upon the terms set forth. The agreement further recited that Brosius had deposited with the Rocks on March 23, 1962 the sum of $5000.00 'as an earnest money deposit to be held by the Lessors in pursuance of this agreement.'

Paragraphs 2 and 3 of the agreement provided as follows:

'2. The Lessors agree to prepare and cause to be recorded among the Land Records for Prince George's County, Maryland, a Plat, or Plats, of subdivision subdividing the said 94.5036 acre parcel of land into approximately 255 lots as herein above mentioned, 34.6860 acres thereof having been heretofore subdivided into 91 lots in accordance with plats of subdivision duly recorded among Land Records in Plat Book WWW-44, Plats No. 21 and 47.

*622 '3. Upon the recording of said plats the Lessors and the Lessees shall as and when each separate plat is recorded make and enter into a sub-lease agreement in the *exact form of the sub-lease agreement* made on even date herewith *applicable to the 91 lots* included in the plats heretofore recorded among the Land Records as aforesaid, the terms and conditions of each said sub- lease to be exactly those contained in the said agreement executed on even date herewith except for the property description.' (Emphasis supplied).

The agreement further provided that the Rocks would pay to Brosius one-half of the contribution required by the Washington Suburban Sanitary Commission in connection with the engineering for and installation of, the outfall sanitary sewer to service the lots into which the 94.5036 acres were to be subdivided, with certain exclusions; the Rocks agreed to cooperate with Brosius to effect a consolidation of any sub-leases created during the construction of residential dwelling houses and ground rent leases so that the Staggers would own a proportionate portion of the leases without any agreement to subject the interest therein to the lien of any mortgage and the Rocks and Brosius would own a proportion thereof; it was agreed that any sub-leases created by Brosius would contain a provision for redemption based on a capitalization of all rents

of 6%; it was also agreed that the earnest money of $5000.00 would be applied ratably to the first rent, or rents, due for each of the lots into which the 94.5036 acres would be divided; Brosius would pay the cost of recording the sub-leases; and, it was agreed that the unrecorded prior agreement of March 23, 1962 was cancelled.

**537 The earnest money of $5000.00 referred to in the agreement as having been deposited was the promissory note of April 10, 1962 payable to Prince-Mar which was payable 60 days from its date. Actually it was not paid until October 16, 1962 by a check to the Rocks at which time the Rocks returned the note marked 'Paid in full Thos. G. Martin, Secretary.'

By a Supplemental Agreement, dated August 6, 1962, (signed, sealed and acknowledged by the Rocks), the Rocks agreed with Brosius to subordinate their leasehold interest in the 94.5036 *623 acres to any first mortgage or first deed of trust 'securing an interim bona fide development loan on each group of lots, the proceeds of which loan * * * are to be used for the improvement of the lots * * *.' The subordination agreement further provided that the term of any such loan should not exceed 18 months and should be made by a responsible lending institution. There would be no personal liability on the loans by the Rocks, who would execute instruments required by the closing attorneys to subordinate their interest, and a default by Brosius in the repayment of any such loan 'shall constitute a default by the Lessees under each and all of the subleases by reason of which the Lessors shall have the right to reenter the premises and terminate each and all of said subleases.' It was also provided that the subordination agreement bound the Rocks, 'their heirs, administrators, and assigns and shall be deemed to run with and bind their interest in the 94.5036 acre parcel of land and the lots into which the same are subdivided in accordance with said agreement to lease.' As already indicated the subordination agreement was executed only by the Rocks.

On August 23, 1962, the Rocks, as lessors and Brosius, as lessees executed a Sublease and Deed of Assignment, recorded on October 3, 1962, which subleased the 91 lots in Sections One (I) and Two (II) already recorded for the 'rest and residue, save one day, of the term of years yet to come and unexpired in the 36 year term under the Original Lease.' Brosius was to pay a subrent of $132.00 for each lot annually accounting from April 1, 1963 and thereafter the subrents were payable semi-annually at

217 A.2d 531

(Cite as: 241 Md. 612, 217 A.2d 531)

$66.00 for each lot. Brosius had the right to redeem each lot for $2200.00 plus accrued rent to the date of redemption. The sublease provided that if one or more of the rents were in arrears the Rocks could make distress; if the arrears continued for 60 days, the Rocks could reenter and hold the premises until the arrearages were paid; and, if the arrears continued for 6 months the Rocks could reenter and hold the premises as if the sub-lease had never been made. Brosius agreed to pay 'the aforesaid rents, taxes and assessments when legally demandable.'

There was also a provision after the expiration of the original term for payment of rent with upward adjustment based *624 on the 'Consumer's Price Index for all Items for Moderate Income Families in Large Cities', at the time of renewal in proportion to the Index in December 1961, and a similar provision for upward adjustment after the original term for the $2200.00 redemption price. The Rocks convenanted to pay the Staggers $68.60 annually in equal monthly installments for each lot and represented that the lots could be redeemed under the original lease for $1486.54 plus accrued rent, subject to the same type of adjustment based on the Consumer's Index. The Rocks also agreed that during the term, they would subordinate their interest in the leased property to any interim construction loan obtained from a responsible lending institution for the purpose of erecting improvements on the property if the construction loan did not exceed 75% of the appraised value of the completed improvements as appraised by the lending institutions, and if the term of the loan did not exceed 18 months.

A question arose as to whether the payment of rent was to be made on all 255 lots on all of the 94.5036 acres or only **538 upon those lots in the subleases as and when executed. In the spring of 1963, by an exchange of correspondence, the Rocks and Brosius construed the agreement to lease as requiring the payment of rent for all 255 lots, accounting from October 1, 1962, and the rent was paid by Brosius on April 20, 1963 or 20 days after the due date of April 1, 1963.

The engineer's certificate on the plat for Section Three (III) was dated September 25, 1962. On this plat the Owners' Dedication, signed by the Staggers and the Rocks was dated September 26, 1962. The plat was approved by the Planning Commission and the Planning Board on October 17, 1962. It was recorded prior to the filing of suit. Section Three (III) showed a subdivision of 3 lots and a triangular outlet marked 'A'.

The relations between the Rocks and Brosius remained pleasant until at least October 3, 1963 when the attorney for the Rocks wrote Brosius as follows:

'I believe we have worked out our problems with Mr. Staggers and as a step toward documenting the leasing of the additional lots to be subdivided I would suggest that we proceed with preparation of the plat of the property, which should be recorded prior to *625 my making a lease agreement between Mr. and Mrs. Rocks and you and making the necessary modification to the Staggers lease agreement so that the lots will be leased on an individual basis.

'You will recall that we had an agreement with Mr. Staggers to the effect that we would either screen plant a lot for a distance of 50 feet opposite the new entrance way to his property or in the alternative give him one of the lots in the tier of lots lying adjacent to Contee Road so that he could control the appearance of the entrance way across from his property.

'If you are now ready to proceed with the development of the lots lying on the south side of Contee Road, I think we should proceed with the recording of the subdivision plat. If the above meets with your approval, I will appreciate your instructing Greenhorne & O'Mara to proceed accordingly so that that various documents can be prepared and executed.'

The trial court found that 'at some point after October 3, 1963 and by November 1, 1963, or within a matter of 28 days, the Rocks had a complete change of mind, and it is fair to conclude that this must have had some connection with a change in the general construction picture, wherein the land must have been recognized by the Rocks as being far more valuable than the $2200.00 per lot figure placed upon the lots by the terms of the sublease.'

In any event, on November 1, 1963, the rent for October 1, 1963 in the amount of $16,830.00 not having been paid, counsel for the Rocks wrote Brosius notifying them of their election to reenter the premises and of the termination of the lease agreement for failure to pay the rent past due. Also on November 1 Brosius had forwarded a check for $8000.00 currently dated and one dated November 8 for $8830.00. The two letters crossed in the mail. Mr. Rocks returned the checks in a letter dated November 4. Brosius on November 8 mailed a certified check for $16,830.00 for the October 1, 1963 rent, but this was returned by Mr. Rocks in a letter of November 15 in which Mr. Rocks contended that he 'was reliably informed that there are existing defaults in the terms and conditions of *626 the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

217 A.2d 531

(Cite as: 241 Md. 612, 217 A.2d 531)

several deeds of trust.' This certified check and a statement dated November 20, 1963 from the Loyola Federal Savings and Loan Association (Loyola Federal), the lending institution making the construction loans, that the Brosius' accounts 'are current' were forwarded to counsel for the Rocks. Counsel for the Rocks returned the certified check in his letter of November 25 and on December 4 counsel for Brosius wrote counsel for the Rocks indicating that the actions of the Rocks were a breach of the various agreements and subleases and that **539 court action would have to be initiated. The letter continued as follows:

'The plats for Sections IV and V of Briarwood have been in your hands for a number of weeks. It is apparently your intention not to execute these and thereby prevent recordation. We hereby formally demand that these plats, now in your possession, prepared by Greenhorne and O'Mara for Sections IV and V of Briarwood be executed by the original Lessors (Staggers), by you as Lessors to the Messrs. Brosius and forwarded to them at their address in Frederick, Maryland for their execution preliminary to recordation. We further demand that you instruct Greenhorne and O'Mara to prepare plat plans in accordance with the agreement of August 4, 1962 for the balance of the 94.5036 acres in the Briarwood tract and that these additional plat plans be signed by both the Staggers and you and sent to the Brosius brothers for their execution. Finally, we demand that in accordance with paragraphs 2 and 3 of the agreement of August 4, 1962, you enter, as Lessors, into the enclosed sublease and deed of assignment which has been executed by the Messrs. Brosius, as Lessees.

'If we do not hear from you affirmatively by Monday, December 9, 1963, with regard to these demands, it will be necessary for us to follow the only remaining course of action open to us--that is initiating legal action.'

Counsel for the Rocks then contended that there was a default for the failure to pay the 1964 taxes 'when legally demandable.' *627 The exhibits show that these taxes in the amount of $1667.63 were paid on December 31, 1963.

The present suit for specific performance, a declaratory judgment, damages for delay in performance, and for an interlocutory injunction, was filed on January 14, 1964. Also on that day, upon a petition of Brosius, the Circuit Court permitted the payment by Brosius of $6006.00 to the clerk for the rent due on lots occupied by Brosius.

After the Rocks filed their answer, the Circuit Court after hearing, issued an interlocutory injunction restraining the Rocks and Prince-Mar from the following:

'1. Obstructing, interrupting or interferring in any way with the leasehold title of Plaintiffs or any one claiming by through or under Plaintiffs in and to the parcel of land described and referred to in a sub-lease and deed of assignment relating to 34.6860 acres of land in Prince George's County, Maryland dated August 23, 1962 and recorded among the land records of Prince George's County in Liber 2737 Folio 405, and upon any sale of an improved lot from said parcel of land Defendants shall promptly comply with the applicable terms of (a) an agreement to lease dated August 4, 1962 and recorded among the land records of Prince George's County in Liber 2737 Folio 399 and (b) the sub-lease and deed of assignment of August 23, 1962 first above referred to.

'2. Making or executing, of record or otherwise, any encumbrance, or taking any other action, of record or otherwise, to affect conveyance in any manner of the title to any portion or all of the parcel of land containing the balance of the entire tract of 94.5036 acres which is the subject matter of and is described and referred to in the aforesaid August 4, 1962 agreement to lease which is recorded as aforesaid in Liber 2737 Folio 399 of the land records of Prince George's County except subject to and in complete acknowledgment of all of the rights of Plaintiff as set forth in said Agreement of August 4, 1962; * * *.'

*628 The injunction was effective upon posting of $1000 bond by Brosius and was subject to a hearing on an application for dissolution of the injunction upon 10 days notice to the Rocks and Prince-Mar. The **540 facts in regard to the alleged violation of this injunction will be given later when that issue is considered.

At the hearing on the merits held January 28, 1965 the only testimony given was that of J. William Brosius, which is, of course, uncontradicted. The documents mentioned above, and others were offered in evidence. The Rocks offered certified copies of various deeds of trust in evidence.

In addition to the above facts, Mr. Brosius testified that Mr. Rocks told him on two occasions: 'I am a wealthy man and I can carry this a whole lot further than you can. You can't afford to fight me, and I will carry it as far as necessary, and if we have to appeal it, we will appeal it. * * * [H]e said that he was going to carry this to the enth degree, he was a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

217 A.2d 531                                                                                                    Page 8
(Cite as: 241 Md. 612, 217 A.2d 531)

wealthy man, and that he would break me if necessary.'

At the argument, after the Chancellor indicated that the three excuses advanced in defense of the Rocks were without merit, counsel for the Rocks argued for the first time that the agreement to lease of August 4, 1962 (prepared by counsel for the Rocks) was unenforceable by Brosius because of the indefiniteness of its terms. The Chancellor indicated that this defense was neither mentioned in the pleadings nor in the opening statement of counsel.

The bill of complaint was dismissed as to Prince-Mar.

In a comprehensive and well considered opinion, Judge Bowie concluded that there was no merit to any of the defenses advanced on behalf of the Rocks and that Brosius was entitled to relief. The Chancellor signed a decree on February 11, 1965 which provided that:

1. The Rocks perform without further delay their obligations under the Agreement to Lease dated August 4, 1962 by executing and recording the development plans already prepared by the engineers for Sections IV and V of Briarwood and in the possession of the Rocks.

2. The Rocks execute and file for record the development plan for Section VI of Briarwood to be in substance in the *629 form presented to the court at the contempt hearing on November 23, 1964.

3. As the plats for Sections IV, V and VI were recorded, the Rocks will execute appropriate subleases exactly like the sublease of Sections I and II dated August 23, 1962, except as to the description, so that all of the 94.5036 acres of Briarwood would be ultimately fully platted and recorded.

4. The matter of damages for (a) the contempt previously adjudged, and (b) for the wrongful eviction from all of Briarwood be deferred for later determination.

5. The Rocks execute any necessary other instruments and documents required to effectuate the Agreement to Lease, including subordination agreements and documents required by the Sanitary Commission or the Department of Public Works.

6. The Rocks comply with the Agreement to Lease and the sublease of August 23, 1964 by executing

deeds when required at the time of settlement or when redemption of lots are made.

7. There be an accounting as to the money paid into court.

8. The provisions of the Agreement to Lease are clear, definite and enforceable.

9. The bond for the Interlocutory Injunction is discharged.

10. The Rocks will pay the costs.

The Rocks, on February 23, 1965, filed an order entering an appeal to this Court 'from the decree entered in the above entitled action on February 11, 1965.'

The Rocks stated in their brief: 'No appeal is taken from the decree as it applies **541 to the 91 lots of land sub-let by the Appellants dated August 23, 1962.'

The questions presented for our decision are:

I. Have the Rocks by abandoning their appeal to Section One (I) and Two (II) of Briarwood, foreclosed this appeal as to the rest of Briarwood?

II. Was the Agreement to Lease of August 4, 1962 specifically enforceable?

III. Were the attempted reentry and termination of the lease by the Rocks justified (a) by the failure of Brosius to pay rent in time? (b) by the alleged default in accounts at Loyola Federal? or (c) by the failure to pay real estate taxes prior to December 31, 1963?

*630 IV. Did the Chancellor err in denying the Rocks discovery of documents and other data in regard to Brosius' financial condition?

V. Was the ruling of the Chancellor on contempt appealable, and if so, did the Chancellor err in holding the Rocks in contempt?

VI. Is Brosius entitled to damages in addition to specific performance and declaratory relief?

I.

In the appellants' brief, the Rocks stated: 'No appeal is taken from the decree as it applies to the 91 lots of land sub-let by the Appellants by agreement dated

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

217 A.2d 531                                                                    Page 9
(Cite as: 241 Md. 612, 217 A.2d 531)

August 23, 1962.' The appellees earnestly contend that this is the abandonment of the appeal so far as Sections One (I) and Two (II) are concerned and, inasmuch as the obligation of the Rocks by the agreement of August 4, 1962 is an entire one for a plat or plats subdividing the entire 94.5036 acres into approximately 255 lots, of which 34.6860 acres were already subdivided by the plats for Sections One (I) and Two (II), there is a recognition of, and acquiescence in, the validity of the decree resulting in a waiver of the right to appeal from that decree.

[1][2]    The right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal. See Bowers v. Soper, 148 Md. 695, 130 A. 330 (1925) involving an appellant who sought the distribution of funds in accordance with an audit and attempted to appeal from the order finally ratifying the auditor's report and account. See also State, Use of Shipley v. Walker, 230 Md. 133, 186 A.2d 472 (1962) and Turner v. Washington Suburban Sanitary Commission, 221 Md. 494, 158 A.2d 125 (1960) in which we held that if a party accepted the amount of a remittitur, he could not on appeal challenge the order granting the remittitur. It is also well settled that an appeal will not lie from a consent decree. Mercantile Trust Co. v. Schloss, 165 Md. 18, 166 A. 599 (1933). It can be argued, however, that upon consideration of the whole contractual arrangement between the parties, and the signing and recordation *631 of the plats for Sections One (I) and Two (II) there was a severable execution by the parties of an otherwise unenforceable contract and an *executed* part of that contract cannot be challenged by the parties even though the remaining portion of the contract may be successfully challenged by the Rocks. As we are of the opinion that the contract as a whole is specifically enforceable, we prefer to rest our decision on the merits and, therefore, do not find it necessary to decide this interesting point raised by Brosius in regard to the waiver or abandonment of the entire appeal so far as the enforceability of the agreement of August 4, 1962 is concerned.

## II.

The Rocks challenge the specific enforceability of the agreement of August 4, 1962 on two grounds: (a) that the property **542 to be conveyed was 'non-existent' at the time of the execution of the agreement, remained 'non- existent' at the time of filing suit and the holders of the fee simple title were not parties to the suit, and (b) the agreement is too vague for specific enforcement in that neither the

agreement nor extrinsic evidence indicates the manner in which the subdivision is to be carried out or the time within which the agreement is to be performed.

(a)

[3]    The Rocks raise the point that the agreement of August 4, 1962 may not be specifically enforced because the property was 'non-existent' for the first time on this appeal. The point was not referred to in the pleadings or in the argument in the trial court. Assuming, but not deciding--in view of Maryland Rule 885--that the point is properly before us, we are of the opinion that it is without merit. It seems clear to us that the Rocks obtained the leasehold estate in Briarwood by the Lease Agreement of February 5, 1962. This instrument was effective as a lease of the 94.5036 acres for a *definite term* of 35 years, renewable, as provided in the lease, forever. The rent received was $17,010.65 payable in monthly installments accounting from March 1, 1962. There were provisions for apportionment of the ground rent as well as the usual provisions for distress, reentry and forfeiture if the rent received was not paid. The Staggers also agreed to warrant the property and execute such further *632 assurances of the property as might be required. The instrument was duly recorded. This type of leasehold estate is well recognized in Maryland and has long been used in this State and in the Province of Maryland as a result of the provision in the Charter granted by King Charles I to Cecelius Calvert, Lord Baltimore, in creating the Province of Maryland, that the Statute of Quia Emptores [FN2] should not apply in the Province. For an interesting discussion by Judge Chesnut of the Maryland ground rent system, its creation and its various legal incidents, with a review of the Maryland cases, see Jones v. Magruder, 42 F.Supp. 193, 195-197 (1941). See also 38 C.J.S. Ground Rents § 2 c(2), pages 1090-1091.

FN2.    Statute of Westminster III, 18 Edw. 1, C. 1 (1290 A.D.).

Both the Staggers and the Rocks acknowledged that the Rocks were the lessees of Briarwood. In all of the recorded subdivision plats, the Staggers signed as 'owners' and the Rocks as 'lessees.' It is apparent that the Rocks had an estate in the land which *required* their 'assent to the plan of subdivision' as the plats recite on their face.

There seems to be little question that the 'property',

217 A.2d 531                                                                                                      Page 10
**(Cite as: 241 Md. 612, 217 A.2d 531)**

i. e., the unemcumbered leasehold estate of the
Rocks, exists. The Rocks had the right to sublease
the property and to agree to do this. In the agreement
of August 4, 1962, the Rocks did agree to sublease to
Brosius the entire 94.5036 acre parcel and to prepare
and record plats of subdivision dividing the parcel
into approximately 255 lots, reciting that plats of
subdivision for 34.6860 into 91 lots had already been
recorded and giving their recordation references. The
sublease of August 23, 1962 was made pursuant to
the agreement of August 4, 1962 and set out the
amount of the subrents on the 91 lots already platted.
Paragraph 3 of the agreement of August 4, 1962
provided that subleases for plats to be made and
recorded for the remaining lots would have the same
terms and conditions as contained in that sublease
except for the property description. The agreement
of August 4 and the sublease of August 23 are to be
construed together and made clear and definite the
terms of the contractual arrangement between the
parties.

The correspondence between counsel for the Rocks
and Brosius **\*633** between July 20 and October 3,
1963 indicates that the **\*\*543** Rocks understood that
Brosius had legal rights in all of the lots. For
example, in the letter of July 23, 1963 counsel for the
Rocks stated, in part:
   'We have no question with respect to *our legal
   rights* in the matter as to the property lying south of
   Contee Road [FN3] and will, when and if
   necessary assert *our and your rights* positively but
   we believe to do so before we have concluded our
   negotiations [with the Staggers] might prove
   hurful.' (Emphasis supplied).

         FN3. The land lying to the south of Contee
         Road combines Sections One (I), Two (II)
         and Three (III) of Briarwood.

Even more importantly, Brosius paid the Rocks, and
the Rocks had demanded rent on *all 255 lots* not only
with respect to the original deposit of $5000.00 but
also for the later rent payments made on April 20,
1963.

Then too, on October 3, 1963, counsel for the Rocks
wrote Brosius that the problems with the Staggers
had been worked out and if Brosius was ready to
proceed with the development of the lots on the south
side of Contee Road 'I think we should proceed with
the recording of the subdivision plat.' He then
requested Brosius to instruct Greenhorne and O'Mara
to proceed accordingly 'so that the various documents

can be prepared and executed.'

There were property interests existing in both the
Rocks and Brosius and this was clearly
acknowledged by the Rocks.

The Rocks rely on a possible alternative holding in
Ward v. Newbold, 115 Md. 689, 694-695, 81 A. 793,
795 (1911). The *Newbold* case involved a contract of
sale between the fee simple owner of land in
Baltimore City and a purchaser in which payment
was to be made in part by two ground rents to be
created but in regard to which no *term* was stated.
The contract also required the building of 2 two-story
dwelling houses containing 6 rooms each, without
stating the depth, size or character of the houses to be
built. This Court held that the contract could not be
specifically enforced because its terms were not
sufficiently certain in that no term of the ground rents
was given and there were no provisions in regard to
the depth, **\*634** size and character of the dwellings to
be erected. Judge Pearce, for the Court, did indicate
as an additional reason for his holding that the ground
rents to be created did not exist when the contract of
sale was made and that specific performance of an
agreement to convey non-existence property would
not be granted, citing two cases--one involving a
patent which the defendant did not own, the other,
stock in a corporation not organized at the time suit
was filed--as authority for that statement.

*Newbold* is readily distinguishable from the case at
bar in which the term of the ground rents and
subrents is clearly given and there are no provisions
involved in regard to the erection of specific houses.

The case at bar, in regard to certainty of terms of the
ground rent or subrent, is analogous to the decision of
the Court in Serio v. Von Nordeck, 189 Md. 388, 56
A.2d 41 (1947) which involved an agreement to sell a
tavern property in Baltimore City to the tenant 'for
$20,500 subject to a ground rent of $90.00 per year
for 99 years, renewable forever.' The seller raised the
same defense of 'non existent property and relied on
the *Newbold* case. The Court held that the bill of
complaint of the purchasers stated a good cause of
action for specific performance. Judge Markell, for
the Court, stated at page 393 of 189 Md., pages 42-43
of 56 A.2d:
   'Defendants also contend that the subject matter of
   the contract, *viz.*, a leasehold estate in the property,
   is nonexistent and a court of equity 'will not decree
   specific performance of an agreement to convey
   property which has no existence'. Ward v.
   Newbold, 115 Md. 689, 694, 81 A. 793, 795,
   Ann.Cas.1913A, 919. In substance and in form,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

this contention is without merit. In substance, speaking **544 colloquially, it is no more difficult to enforce a contract to 'sell,' subject to a ground rent, than a contract to sell, subject to a purchase money mortgage. In form, speaking technically, it is no more difficult to enforce a contract to lease than a contract to sell. Schluderberg v. Dietz [156 Md. 547, 144 A. 774], supra; Read Drug & Chemical Co. v. Nattans [129 Md. 67, 98 A. 158], supra. Whether the consideration for the lease consists *635 of rent only or of rent plus a lump sum 'purchase price' makes no difference.

Ward v. Newbold, supra, does not support defendants' contention. In that case the vendors agreed to sell land and execute a deed to the vendee, to be held in escrow; the vendee agreed to pay the purchase price by (a) building houses (of unspecified size and plan) on the land, (b) 'creating ground rents' (i. e., leases for an unspecified term from the vendee to unascertained lessees) on the properties and (c) conveying the ground rents to the vendors. The contract was held not to be specifically enforceable because the term of the leases was unspecified; an additional reason mentioned was the fact that in the circumstances mentioned the contract involved the future creation of rents. Whatever the exact scope of the decision, it is not now in point.'

(b)

Rocks also contends that the agreement of August 4, 1962 is too vague to be specifically enforced because it does not definitely set forth the manner in which the subdivision is to be carried out or the time of performance. We do not agree.

On this aspect of the case, the maxim 'Id certum est quod certum reddi potest', or, as translated into English, 'That is certain which may be rendered certain' should clearly apply.

[4][5] It is true that the exact time of the subsequent steps to be taken as agreed upon between Rocks and Brosius so far as the recordation of future plats and the execution of new subleases are concerned, is not specified in the agreement of August 4, 1962. Under these circumstances the legal implication is that these steps would be taken within a reasonable time. Lawson v. Mullinix, 104 Md. 156, 64 A. 938 (1906). The same rule applies when the time of payment is not stated in a mortgage. Farrell v. Bean, 10 Md. 217 (1856). Judge Boyd, for the Court in Mullinix, supra, stated:

"Very recently, in Farrell v. Bean, 10 Md. 223, this court has said: 'When no particular time of payment is limited in a mortgage, it is to be paid in

a *636 reasonable time. And if the payment is not so made the mortgagee is entitled to a foreclosure." In Williamson v. Neeves, 94 Wis. 656, 69 N.W. 806, it was held that the fact that no time was fixed for the conveyance of land was immaterial, because the legal implication would be that the conveyance was to be made within a reasonable time. Such time as was really necessary for the preparation of the deed, examination of the title, etc., would be allowed, and a court of equity would see that such reasonable time was allowed.' (P. 169 of 104 Md., p. 943 of 64 A.).

[6] The Rocks are in a difficult position to urge upon us that the agreements which their counsel drew are not enforceable because of vagueness when they were sufficiently definite to enable to parties to prepare, file and record the plats for Sections One (I), Two (II) and Three (III), prepare and execute the plats for Sections Four (IV) and Five (V) and prepare a tentative plat for Section Six (VI). The Rocks, as we have indicated, have abandoned their appeal as to the 91 lots covered by the plats for Sections One (I) and Two (II). In defending against the alleged contempt, the Rocks urged that the plat for Section Six (VI) was effective and binding on the parties. We can only **545 conclude that the Rocks recognized that the terms were certain and definite.

So far as the payment of the rent is concerned the agreement of August 4, 1962 and the sublease of August 23, 1962 definitely fixed the payment of rents on the entire number of 255 lots to begin on October 1, 1963. Rent was paid and accepted on that basis and was to be paid currently every 6 months on the basis of $132.00 a year for each lot covering the 255 lots--or if the engineers so determine after the completion of the entire subdivision, 259 lots.

In regard to the time of filing the remaining plats for subdivision, it should be remembered that the Rocks had the obligation and power to proceed with the preparation and recordation of those plats. The terms of future subleases were to be those (except for the description) of the plats already executed and recorded. The terms were therefore certain and the time of performance was within the control of the Rocks by their *637 performance of their obligation. See Trotter v. Lewis, 185 Md. 528, 535, 45 A.2d 329, 333 (1946) where we stated:

'[W]e hold that, where a contract of sale does not show an intention that the purchaser is to have an extension of credit, the contract may be specifically enforced although it does not fix a definite time when the transaction is to be consummated, because the time of settlement can be made certain

217 A.2d 531                                                                    Page 12
**(Cite as: 241 Md. 612, 217 A.2d 531)**

*by an offer to deliver the deed or by a tender of the purchase price.* (Emphasis supplied).

Then too, Brosius, having the absolute right of redemption under the agreement of August 4, 1962 and the redemption price of $2200.00 a lot having been established by the sublease of August 23, 1962, Brosius, after demand upon the Rocks and a tender of the purchase price, could have acquired all of the rights of the Rocks in the property subject to the rights of the Staggers.

[7][8]  The trial court, in our opinion, properly construed all the documents together as part of a single transaction constituting one contract for the subdivision and development of the Briarwood tract. A contract need not be evidenced by a single instrument. Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction. This is true even though the instruments were executed at different times and do not in terms refer to each other.  See Kurz v. United States, 156 F.Supp. 99 (S.D.N.Y. 1957); In re Cooper's Estate, 195 Kan. 174, 403 P.2d 984 (1965); International Milling Co. v. Hachmeister, 380 Pa. 407, 110 A.2d 186 (1955); Doss Oil Royalty Co. v. Lahman, Okl., 302 P.2d 157 (1956); Levinson v. Linderman, 51 Wash.2d 855, 322 P.2d 863 (1958); Neville v. Scott, 182 Pa. Super. 448, 127 A.2d 755 (1956).  See also 17A C.J.S. Contracts § 298, pages 128-132.

[9]  Assuming, without deciding, that the question is properly before us as it does not appear to have been raised before the Chancellor, see Maryland Rule 885, in our opinion, it was not necessary that in Staggers be parties to the present suit in *638 order to enable the Chancellor to grant specific performance. There had been no indication that the Staggers would not perform their obligations under the lease of February 5, 1962. The Rocks had the full leasehold estate in the property and the contractual relations were between the Rocks and Brosius. The rights of the Staggers are not affected by the decree passed in this case. There is no reason to believe that they will not fully perform their obligations as owners of the fee simple interest.  The relief sought by the bill of complaint was against the Rocks. The Staggers were not necessary parties defendant. As Chief Judge Brune, for the Court, stated in Klein v. Dove, 205 Md. 285, 296, 107 A.2d 82, 88 (1954):

'The relief sought was against the defendants, and we believe that an effective **546 decree can be, and was, entered without the joinder of the holder of that record title. Construing the decree, as we

do, in accordance with the objectives stated in the bill of complaint, as determining rights and obligations only as between the plaintiffs and the defendants, and not as determinative of or as impairing any rights of the record title holder, we regard that person as only a formal or nominal party, and hence the record title holder need not have been joined as a party.  Miller, Equity Procedure, Section 25.'

III.

The Rocks first contended before the Chancellor that the Rocks' purported 'reentry' and 'termination' of the agreements between the Rocks and Brosius were justified by the failure of Brosius to pay the rent due on October 1, 1963 and this is stated in the letter of counsel for the Rocks dated November 1, 1963. The Rocks secondly contended that the 'reentry' and 'termination' were justified by alleged 'existing defaults in the terms and conditions of of the several deeds of trust' as stated in the letter of November 15, 1963 from the Rocks to Brosius.  The deeds of trust referred to were those of Loyola Federal, the lending institution which made all of the construction loans on Briarwood.

It is not clear that the Rocks press these contentions before us on this appeal, but, inasmuch as they are not specifically *639 abandoned and are considered in the brief of the appellees, we will briefly dispose of them.

As the Chancellor pointed out, the remedies of the sublessor under the agreement of August 4, 1962 and the sublease of August 23, 1962 upon default in the payment of rent were (1) to make distress (2) if the arrears continued for 60 days to reenter and hold the premises until the arrearages of rent and expenses incurred by the default were paid or (3) if the arrears were not paid for 6 months, to reenter and hold as if the sublease had not been made.  The first remedy is not involved as no distress proceedings were instituted. The rent in arrears was tendered and the tender refused by the Rocks well within the 60 day period so that there was no right of reentry under either the second or third remedies given by the agreements.

As to any alleged existing defaults in the deeds of trust, there were none as the letter of November 20, 1963 from Loyola Federal clearly shows.

The Rocks' third contention is that the Rocks as sublessors may 'reenter' and 'terminate' because the taxes on Briarwood were not paid until December 31,

217 A.2d 531
(Cite as: 241 Md. 612, 217 A.2d 531)

1963. This argument is based on the theory that in the Subordination Agreement of August 6, 1962 which was executed *only* by the Rocks and was not signed by Brosius, it was provided that a 'default by the Lessees, or their assigns, in the *repayment* of any such loan, or loans, shall constitute a default by the Lessees under each and all of the sub-leases by reason of which the Lessors shall have the right to reenter the premises and terminate each and all of said subleases' (emphasis supplied); the sublessees, Brosius, have assented to this by acquiescence by not objecting to the terms prior to 'termination'; the non-payment of taxes on October 1, 1963 was a default in the deeds of trust giving the trustee power to accelerate and exercise the power to sell in view of the provision 'in the event there is a default in any payment * * * provided in any prior recorded trust * * * or prior liens of any kind including taxes' the lending institutions may accelerate and exercise the power to sell; and, that it is necessary for the sublessors as the original lessees to protect themselves in view of the provisions for forfeiture in the original lease of February 5, 1962.

**\*640** In the first place, the obligation of the original lessees, the Rocks and their assigns, and of the sublessees, Brosius, and their assigns, was set forth in identical language in the original lease and in the sublease 'to pay the aforesaid rents, taxes **\*\*547** and assessments *when legally demandable*.' (Emphasis supplied). As the Chancellor pointed out below and as counsel for the Rocks admitted at the argument before the Chancellor, the taxes in question were not 'legally demandable prior to January 1, 1964 and it is uncontradicted that Brosius paid the taxes on December 31, 1963 before they were 'legally demandable.' In short, Brosius did not breach the covenant in regard to the payment of taxes.

In the second place, if we assume, *arguendo*, that Brosius was bound by the provision of the Subordination Agreement of August 6, 1962--which was not signed by Brosius--that 'obligation' was not to default 'in the repayment' of any construction loan. As we have seen, Loyola Federal certified that there was no default in its loans, and in the absence of a default in the repayment of the loans there can be no justified 'reentry' or 'termination'.

The Chancellor was correct in rejecting these three contentions of the Rocks and the purported 'reentry' and 'termination' were not justified.

IV.

Under the unusual facts in this case, we are of the opinion that the Chancellor did not err in denying the Rocks discovery of documents and other data in regard to Brosius' financial condition.

Maryland Rule 410 a in regard to the scope of the examination of a deponent provides that 'Unless otherwise ordered by the court, a deponent may be examined, either orally or upon written questions, regarding any matter, not privileged, which is *relevant to the subject matter involved in the pending action* * * *.' (Emphasis supplied).

The Rocks demanded that Brosius produce financial records in regard to the project being constructed on Briarwood and in regard to the solvency of Brosius. Brosius, on advice of counsel, declined to produce the financial records or answer questions in regard to the matters mentioned. The refusal and **\*641** unanswered questions were referred to the trial court to compel production and answers. The Chancellor ruled that *at that time* the documents need not be produced nor the questions answered as their relevancy did not appear and their production would harass Brosius. The Chancellor, however, made it clear that 'if at the time of the hearing the Court should feel * * * that it was necessary for us to have some proof of financial ability, if it were pertinent to the issues involved here, that then we would require it * * *.'

At the trial, however, the Rocks introduced no evidence that Brosius was insolvent or otherwise unable to perform the obligations of the sublessee. There is no allegation of insolvency in the answer of the Rocks to the bill of complaint. Brosius, although late in paying the October 1, 1963 rent and not having paid the taxes until the day before they were legally demandable, always had paid his indebtedness and was not in default under the deeds of trust. Brosius had deposited into the Registry of the Circuit Court the accruing rent and was not in default on any of its obligations under the agreements at the time of trial.

The only relevance of the financial data was to show that Brosius was *unable to perform* his obligations. The proof showed that he was able to perform them and the Rocks did not offer any evidence to show that he was not able to perform.

The case of Evergreen Amusement Corporation v. Pacheo, 218 Md. 230, 145 A.2d 774 (1958), relied on by the Rocks, presented quite a different factual situation from that presented by the case at bar. In *Evergreen* it was established at the trial that a tenant seeking a declaratory decree that it had not breached

a lease was shown not to have paid its taxes when due; had not installed a drainage pipe it was obligated to install; had given checks for rent which had been returned by the bank **548 marked 'insufficient funds' (the bank having stated that it would be useless to redeposit the checks); had all of its assets subject to conditional sales contracts or mortgages; had open judgments of record against it; and, had its gate receipts attached. The Court held that this evidence established the tenant's insolvency and the forfeiture of the lease was justified. No facts of this type-- readily available by inspection of public records or inquiry--were presented in the case at bar.

[10]   *642 In the absence of an allegation of insolvency or any substantial proof of insolvency, we are of the opinion that the Chancellor did not abuse his discretion in refusing to require Brosius to produce his financial records and answer the questions propounded to him by counsel for the Rocks attempting to obtain information. In any event, in view of the Chancellor's statement that he would require the production of financial data and the answering of questions in regard to this issue if the issue became relevant, the Rocks have suffered no prejudice by the Chancellor's ruling.

V.

We have concluded that the order of January 11, 1965 adjudging the Rocks to have committed a civil contempt in allegedly violating the interlocutory injunction passed on May 14, 1964, is properly before us on this appeal and that the Chancellor erred in holding that the Rocks violated the provisions of the interlocutory injunction.

In the bill of complaint of Brosius, filed January 14, 1964, it was prayed that the Circuit Court issue an interlocutory injunction requiring that until the trial and determination of the suit:  1) the 'Defendants shall not obstruct, interrupt or interfere with the *leasehold title* of the Plaintiffs * * * in and to said parcel consisting of 34.6860 acres divided into 91 lots' (emphasis supplied) 2) 'the Defendants shall not obstruct, interrupt or interfere in any way with the right of the Plaintiffs to acquire *leasehold title* to the balance of said 94.5036 acre tract under the terms of the Agreement to Lease dated August 4, 1962;' (emphasis supplied) and 3) upon the sale of lots in the 34.6860 acre tract the defendants will promptly comply with all of the terms of the agreement of August 4, 1962 and the sublease of August 23, 1962. After the defendants answered and after holding a hearing, the Chancellor signed an interlocutory injunction on May 14, 1964, effective upon the

posting of a $1000.00 bond 'to compensate Defendant(s) for damages which may result if this restraint is proved to be wrongful and to remain in effect until further Order of this Court after the determination of the merits of the action', restraining the Rocks, Prince-Mar and their agents, successors and assigns as we have already set forth.

*643 The interlocutory injunction was subject to a hearing on an application for a dissolution upon 10 days notice served at any time upon the plaintiffs by the defendants. Brosius duly posted the required $1000.00 bond.

On October 7, 1964, Brosius filed a petition to punish the Rocks and Prince- Mar, the defendants, for contempt of the interlocutory injunction. After reciting paragraphs 1 and 2 of the interlocutory injunction, it was alleged in the petition that beginning on or about September 21, 1964 and continuing until the present time, the defendants or their agents 'have forceably entered upon a portion of the land which is the subject of the aforesaid agreement to lease to Plaintiffs, and, accordingly, a portion of the land covered by the aforesaid Interlocutory Injunction, and have graded a sixty (60) foot wide right of way through the tract, and in the course of such clearing, they have destroyed, damaged and removed valuable trees, reducing thereby the value of the premises, and further, Defendants have so graded the right of way as to remove a portion of a hilltop and thereby change the contour of the land in such a way as to interfere with Plaintiffs' **549 planned use of the tract.' It was further alleged in the petition that in performing the acts set forth above, the defendants 'have cleared such right of way without the consent of the Plaintiffs herein, and further, that clearing such right of way is contrary to and interferes with the planned use to be made of the tract by Plaintiffs, and, further, that the existence of a graded right-of-way across the portion of the tract constitutes an encumbrance on the premises and restrict the use of which it can be put, and further, that the existence of such graded right-of-way adversely affects Plaintiffs' ability to convey its rights in and to the tract.' Brosius prayed in the petition that 1) an order be issued to the defendants to show cause why they should not be adjudged in a civil contempt for violating the interlocutory injunction, 2) the court 'adjudge the Defendants, its officers, agents, servants and employees in civil contempt for violation as aforesaid of the Order of this Court for an Interlocutory Injunction dated May 14, 1964, and with respect thereto award to Plaintiffs damages including but without limiting the generality hereof, damages for Court costs and counsel fees' and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

217 A.2d 531                                                                    Page 15
(Cite as: 241 Md. 612, 217 A.2d 531)

3) for other and further relief.

*644 The Rocks, on October 23, 1964 filed a 'response' to the show cause order answering the petition of Brosius. The Rocks admitted that they had graded a 60 foot right of way through one of the unsubdivided parcels of land subject to the agreement of August 4, 1962 of which the plaintiffs 'have not been in possession thereof at any time.' The answer or 'response' further alleged that the 60 foot right of way 'connects two portions of the public streets known as Briarwood Drive, which portions of said drive have heretofore been dedicated to public use and lie on either side of said undivided parcel of land; and they are informed that before anyone can develop the said unsubdivided portion of land the public authorities having jurisdiction thereover will require that a sixty-foot strip of land be dedicated to public use connecting the same portions of Briarwood Drive Lying on either side of the said unsubdivided parcel of land.' Any civil contempt is denied and the Rocks alleged that prior to grading the 60 foot right of way, they consulted counsel who advised them that in his opinion 'the acts done by them do not in anywise effect their ability to convey the title of any portion of the unsubdivided parcel of land.' A copy of a letter from counsel to the Rocks, dated August 12, 1964 and giving this opinion, was filed as an exhibit.

The Chancellor held a hearing on the petition, show cause order and answer on November 23, 1964. Substantial testimony was taken and a number of documentary and other exhibits were offered in evidence. The evidence indicated that the Rocks owned and were developing a parcel of land lying to the northeast of proposed Section Six (VI) known as 'Mistletoe Manor' which was being improved by apartment buildings known as 'Fox Rest.' For convenience the Rocks cleared a 60 foot right of way as a 'temporary haul road,' for the hauling of materials. The 60 foot right of way thus cleared apparently followed the outlines of Briarwood Drive shown on the preliminary plat for Section Six (VI) of Briarwood and would connect the dedicated portion of Briarwood Drive on Mistletoe Manor with the dedicated portion of Briarwood Drive on Section One (I) of Briarwood. Mr. Rocks testified that the public authorities would require that the proposed portion of Briarwood Drive appearing on the preliminary plan for Section Six (VI) be dedicated *645 to public use so that there would be complete 'circulation' for the accommodation of fire equipment and to connect with Contee Road. James O'Mara, a civil engineer and land planner testified that the Planning Commission had indicated 'they wanted to have a connection with the Briarwood (Drive) in Briarwood

Subdivision so that they would have a dedicated street running from Route 197 all the way to Contee Road.' This would give better access to the contemplated public **550 school in the area 'so they could bring school buses from Contree Road of Laurel-Bowie Road, either way.'

The Rocks owned some land south of Contree Road. Mr. Rocks believed that the temporary haul road would not only convenience him but would be a benefit to Brosius. Brosius disputed that the 'temporary haul road' would be any benefit to him. On the contrary, he testified that he had intended to abandon the portion of Briarwood Drive where the Rocks had cleared the 60 foot right of way; that the Rocks had damaged him by removing fill which Brosius could have used in his own development; that the Rocks had destroyed valuable trees useful in Brosius' contemplated construction; that a storm water sewer had been improperly constructed; and, that the brush, trees, etc., had not been properly disposed of by the Rocks. Although Brosius gave some figures of alleged damage, he was not able to give full and comprehensive evidence establishing his alleged losses. Evidence was also given of a reasonable counsel fee for Brosius in connection with the contempt proceeding.

The Rocks never did use the 'temporary haul road' as they did nothing in regard to it after they were served with the petition to punish for contempt and show cause order of October 7, 1964.

The Chancellor filed a memorandum and an order on January 11, 1964, in part, as follows:
'After considering all testimony taken in open Court and the Memoranda submitted by Counsel for all parties, the Court finds that:
'1. The defendants are technically in contempt of the court order of May 14, 1964, by reason of their cutting *646 and grading the roadway through the property involved in this proceeding.
'2. The plaintiffs have failed to establish entitlement to damages herein at this stage of the proceedings.
'3. The plaintiffs are denied recovery for counsel fees.
'Accordingly, it is this 11th day of January, 1965, ORDERED that the defendants are in contempt of the Court's order of May 14, 1964, and are enjoined from further interfering in any manner whatsoever, with the subject property, until this cause is heard on its merits, reserving to the plaintiffs at that time the right to show damages, if any, by reason of the cutting and grading, the defendant to be held for any damage up to the time

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

of the hearing to be held on the merits of this cause, by reason of the drainage situation caused by its past actions. Should drainage correction be necessary to avoid damage prior to said hearing, this Court shall be petitioned promptly for that purpose by the defendants herein.'

Brosius indicated in his brief and argued before us (A) that the Chancellor's ruling of the civil contempt is not appealable and if appealable, (B) it was proper. We do not agree.

A.

[11]    The order of January 11, 1965 was interlocutory in nature. Although the Chancellor declared that the defendants were in contempt of the interlocutory injunction of May 14, 1964, it was an alleged civil contempt and no damages were assessed by the court. On the contrary, the issue of damages was expressly reserved for determination at a later date. The portion of the order of January 11, 1965 enjoining the defendants 'from further interfering in any manner whatsoever, with the subject property until this cause is heard on its merits,' is obviously temporary and interlocutory in nature. By virtue of Code (1957) Art. 5, § 7, Subsections (a) and (e), the Rocks might have appealed from the order of January 11, 1965 as it did 'grant an injunction' even though it was interlocutory and not *647 final and it did declare the Rocks guilty **551 of a contempt. Generally an appeal to this Court from a court of equity may only be taken from a 'final decree, or order in the nature of a final decree.' Code (1957) Art. 5, § 6. It is only from the interlocutory orders specifically mentioned in § 7, that any appeal lies to this Court from interlocutory orders. Maryland Rule 887 provides:

'On an appeal from a final judgment, every interlocutory order which has previously been entered in the action shall be open to review by this Court unless an appeal has theretofore been taken from such interlocutory order and been decided on the merits by this Court.'

In Save-Mor Drugs, Bethesda, Inc. v. Upjohn Company, 225 Md. 187, 170 A.2d 223 (1961), we held that on an appeal from an order requiring a defendant to pay the plaintiff a certain sum as damages resulting from a civil contempt, the defendant could raise the question of the propriety of the finding by the Chancellor that the defendant had violated the interlocutory injunction previously issued under the Maryland Fair Trade Act, Code (1957) Art. 83, § § 102-110. Chief Judge Brune, after a review of the prior Maryland cases, stated for the Court:

'Whatever the law may be in other jurisdictions or may previously have been in this State * * * it is clear that under Code (1957), Art. 5, § 7(e), which is derived from Ch. 593 of the Acts of 1927, an interlocutory order entered by a court of equity 'remedial in its nature, adjudging in contempt of court any party to a cause or any person not a party thereto' is appealable (subject to an exception not here relevant). The appellee does not contend otherwise, but the fact an interlocutory order is appealable does not define the scope of the matters open on appeal.

'The appellant, Save-Mor, could have appealed from the order granting the interlocutory injunction, but it was not bound to do so, and it could bring up for *648 review the questions which it might have so presented on appeal from the final decree. Maryland Rule 887; Washington Cleaners & Dyers v. Albrecht, 157 Md. 389, 146 A. 233.' (P. 193-194 of 225 Md.; p. 227 of 170 A.2d).

[12][13]    The Rocks were not required to mention the order of January 11, 1965 in the notice of appeal as contended by Brosius. The appeal from the final decree of February 23, 1965 brought before the Court 'every interlocutory order which has previously been entered in the action' (emphasis supplied) by virtue of Maryland Rule 887. Cf. Lippy v. Masonheimer, 9 Md. 310 (1856) in which our predecessors held that a defendant who failed to answer and against whom an interlocutory decree was passed could nevertheless successfully challenge the interlocutory decree upon an appeal from the final decree. We are of the opinion that the interlocutory order of January 11, 1965 is properly before us.

B.

The Rocks do not challenge the propriety of the issuance of the interlocutory injunction of May 14, 1964. They contend that their actions in September and October of 1964 in grading a 'temporary haul road' did not violate the interlocutory injunction. We agree.

[14]    Maryland Rule BB78 in regard to the form and scope of orders for an injunction provides, in part, as follows:

'a.    Form--Contents.'
An order granting an injunction shall set forth the reasons for its issuance; shall be *specific in terms*; and *shall describe in reasonable detail*, and not by reference to the complaint or other document, *the act sought to be required or commanded or*

*restrained or forbidden.*' (Emphasis supplied).

**552 This Rule (and its predecessor General Equity Rule), is declaratory of the chancery practice. See Miller, Equity Jurisprudence, § 589, page 697. Where the terms of an injunction are not specific and definite, a defendant will not be punished for contempt. *649Wells v. Osborne, 204 Md. 375, 104 A.2d 599 (1954). See also Newell v. Dundalk Co., 149 Md. 182, 131 A. 148 (1925). See 43 C.J.S. Injunctions § 206, pages 931-935.

[15] It is well established that an injunctive decree must not be broader than the issue raised by the pleadings. Chesapeake etc. R. R. Co. v. Richfield Oil Corp., 180 Md. 192, 23 A.2d 677 (1942), cert. den., 316 U.S. 698, 62 S.Ct. 1297, 86 L.Ed. 1768 (1942).

[16] It is the general rule in the United States that in proceedings to punish for the contempt of an injunctive order or decree that the courts will not expand the language of the decree by implication beyond the meaning of the terms of the order or decree when read in light of the issues and the purpose for which the suit was brought. Chief Judge Thomsen of the United States District Court for District of Maryland expressed the general rule in Carter Products Inc. v. Colgate-Palmolive Company, 164 F.Supp. 503, 524 (1958), as follows:

"In contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought, and the facts found must constitute a plain violation of the decree so read.' Terminal R. R. Ass'n of St. Louis v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 8, 69 L.Ed. 150. Courts do not make a 'strained and extreme construction' to spell out contempt of court. National Labor Relations Board v. Standard Trouser Co., 4 Cir., 162 F.2d 1012, 1015.'

The *Carter Products* case was affirmed by the United States Court of Appeals for the Fourth Circuit in Carter Products, Inc. v. Colgate-Palmolive Company, 269 F.2d 299 (1959). The rule in Maryland is the same as the general rule. Bosley v. Susquehanna Canal, 3 Bland 63 (1829). See Burnham v Burnham, 154 Md. 349, 352, 140 A. 361, 362 (1928).

[17] In prayer for relief III, 2, of the bill of complaint, which we have already quoted in full, it was prayed that the interlocutory injunction, would, *pendente lite*, restrain the defendants from obstructing, interrupting or interfering with the right of Brosius '*650 to acquire *leasehold title* to the balance of the 94.5036 acre tract (which includes Section Six (VI)) under the terms of the agreement of August 4, 1962. After the hearing, the Chancellor issued the interlocutory injunction. We have already quoted paragraphs 1 and 2 of the interlocutory injunction. Paragraph 1 restrains the defendants from obstructing, interrupting or interfering in any way with the leasehold title of the plaintiffs in the 34.6860 acre tract and paragraph 2 (the one involved in the contempt proceeding) restrains the Rocks from 'making *or executing any encumbrance*, or taking other action, of record or otherwise, *to affect conveyance* in any manner *of the title* to any portion of the balance of the 94.5036 acre tract, except subject to and in complete acknowledgment of all of the rights of Brosius set forth in the agreement of August 4, 1962.' (Emphasis supplied)

The language of the interlocutory injunction is intended to prevent the Rocks, *pendente lite*, from placing an encumbrance upon the title, whether of record or otherwise, which, if in the hands of a bona fide purchaser might frustrate the final decree of the court granting specific performance. This is what the interlocutory injunction states; it is what the bill of complaint prayed for in its prayer for relief III; it is what is suggested by the small bond of $1000.00. The language of **553 the interlocutory order of May 14, 1964 *does not* enjoin the defendants from 'interfering in any manner whatsoever, with the subject property until this case was heard on the merits' as was provided in the interlocutory injunction of January 11, 1965.

[18] There are two types of encumbrances: 1) those affecting title, and 2) those affecting the physical condition of the property. In 42 C.J.S. Incumbrance or Encumbrance, page 551, it is stated:

'Encumbrances * * * generally * * * are of two kinds: (1) Those which affect the title. (2) Those which affect only the physical condition of the property. A mortgage or other lien is a fair illustration of the former; a public road or a right of way of the latter.'

*651 Brosius suggests that the words of 'record *or otherwise*' would broaden the scope of the word 'encumbrance' to include an encumbrance affecting the physical condition of the property. This argument, however, overlooks the next phrase '*to affect conveyance in any manner of the title* to any portion or all' of the balance of the 94.5036 acre tract. The words 'or otherwise' relate to encumbrances affecting the conveyance of title other than of record, such as subleases for less than a term of 7 years which by virtue of Code (1957) Art. 21, § 1 are not required to be recorded. It would be a strained

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

construction indeed to give the words 'or otherwise' the meaning of an encumbrance affecting the physical condition of the property without reference to the title of the property. In our opinion, counsel for the Rocks was justified in advising his clients that the proposed clearing of the land for a 'temporary haul road' would not violate the interlocutory injunction of May 14, 1964, as this temporary haul road could not be construed to be any implied grant of an easement of way as suggested by Brosius. The Rocks were the leasehold owners of the land over which the temporary haul road was erected and they also owned Mistletoe Manor, the land to the northeast of the haul road. An owner of realty 'does not have an easement in his own land since the bundle or rights which adds up to ownership includes the right corresponding to the easement.' Dalton v. Real Estate & Improvement Co., 201 Md. 34, 46, 92 A.2d 585, 591 (1952). There was no writing evidencing such a purported easement as would be required for a grant of this interest in land by the subsection 4 of Section IV of the Statute of Frauds. 29 Charles II, Chapter 3, 2 Alexander's British Statutes, (Coe's Ed.), pages 689, 690, 703-705. The temporary haul road had not been used at all by the Rocks because of the filing of the petition to punish for contempt and was, of course, not used adversely for the 20 year period necessary for an easement by prescription. See Dalton v. Real Estate & Improvement Co., supra.

The Chancellor was able to grant effectively the specific performance to which Brosius was entitled, so that it is apparent that the purpose of the interlocutory injunction of May 14, 1964 was not frustrated or impaired by the clearing of the temporary *652 haul road. The Chancellor relied on the preliminary plat for Section Six (VI) in order to give specific performance for that portion of Briarwood. The Rocks had the power and the duty under the agreement of August 4, 1962 to prepare such a plat which admittedly shows Briarwood Drive over Section Six (VI) in substantially the location of the temporary haul road. The Rocks merely followed the preliminary plat on which specific performance is granted. The clearing of the temporary haul road in no way prevented a transfer of the Rocks' leasehold title to Brosius.

We conclude that the clearing of the temporary haul road did not violate the provisions of the interlocutory injunction of May 14, 1964 and the Chancellor was in error in finding that the Rocks were guilty of a 'technical violation' of that injunction. That portion of the order of **554 January 11, 1965 reciting that the defendants were in contempt of the court's order of May 14, 1964, will

be reversed.

## V.

We will now consider whether Brosius is entitled to damages in addition to the relief of specific performance and declaratory relief given by the decree of February 11, 1965.

[19] Brosius is not entitled to damages for any alleged violation of the interlocutory injunction of May 14, 1964 as we have held that the Rocks did not violate that interlocutory injunction. Cf. Save-Mor Drugs, Bethesda, Inc. v. Upjohn Co., supra. This, however, does not completely dispose of the question of damages as Brosius in paragraph I, 4, of the prayers for relief in the bill of complaint claimed damages resulting from the delay in the completion of any home resulting from the Rocks' failure to perform, and prayed for other and further relief. In addition, as we have indicated, Brosius claims that he was damaged as a result of the Rocks' clearing of the temporary haul road because of improper performance of the work itself and also because Brosius had determined not to place Briarwood Drive in the location of the temporary haul road. Both elements of damages are consistent with relief by way of specific performance. We considered the question of damages resulting from delay in a specific performance case in Miller v. Talbott, 239 Md. 382, 211 A.2d 741 (1965). We held in Talbott that the *653 plaintiff could claim damages for delay in conveying the subject property under a prayer in the bill of complaint for other and further relief. We quoted with approval from Pomeroy's Treatise on Equity Jurisprudence (5th ed. 1941), Vol. 1, § 237b as follows:

'As an outgrowth of the doctrine that a court of equity, when jurisdiction is once assumed on equitable grounds, will adjudicate all matters properly presented and actually involved in the case at hand, it is ordinarily held that where the case is a proper one for specific performance the chancellor may, as an ancillary to the relief given, decree compensation or damages. Hence, having jurisdiction for the purpose of specifically enforcing performance of a contract, the chancellor has full jurisdiction, in addition to decreeing specific performance, to award such legal damages as have resulted from delay in performance of the contract.'

We are of the opinion that damages allegedly resulting from the clearing of the temporary haul road are similar to damages resulting from delay. See 81 C.J.S. Specific Performance § 162, pages 769-770 where it is stated:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

'In an otherwise proper case the plaintiff may in addition to securing specific performance recover damages for delay in performance or for injury to the freehold. * * *

'The purchaser may be entitled to damages for injury to the freehold by the vendor's, or, under certain circumstances, a third person's improper acts or neglect. The right of plaintiff purchaser to recover for waste has been denied, however, where defendant has placed improvements on the land greater in value than the amount of the damage caused by the waste.'

See Lynch v. Wright, 94 F. 703 (Cir.Ct. S.D.N.Y.1899); Murdock v. Pope, Colo., 396 P.2d 841 (1964); Reinink v. Loozenoord, 370 Mich. 121, 121 N.W.2d 689 (1963); Bostwick v. Beach, 105 N.Y. 661, 12 N.E. 32 (1887); Caveny *654 v. Asheim, 202 Or. 195, 274 P.2d 281 (1954); Bright v. James, 35 R.I. 492, 87 A. 316 (1913); Taylor v. Highland Park Corporation, 210 S.C. 254, 42 S.E.2d 335 (1947); Latimer v. Marchbanks, 57 S.C. 267, 35 S.E. 481 (1900); **555Mayer v. Manufacturers Trust Co., 11 Misc.2d 359, 170 N.Y.S.2d 43 (Sup.Ct. 1957). See also Annot., Depreciation pending specific performance, 105 A.L.R. 1421; Annot., Specific performance: compensation or damages awarded purchaser for delay in conveyance of land, 7 A.L.R.2d 1204, 1231-1233.

In our opinion the alleged damages resulting from the clearing of the temporary haul road as contended for by Brosius may properly be raised, like a claim of damages for delay in performance, under the prayer for other and further relief in the bill of complaint. As the Chancellor has reserved the question of damages in paragraph 4 of the decree of February 11, 1965, not only for damages resulting from the contempt (which are eliminated by our decision) but also as to 'the wrongful eviction of defendants from all of Briarwood', we will remand the case for the determination by the Chancellor of any damages allegedly resulting (1) from delay in performance or (2) from the clearing of the temporary haul road over Section Six (VI) either resulting from alleged improper clearing, removal of fill, installation of storm-water sewers or other alleged improper conduct, or resulting from an abandonment of the location of Briarwood Drive over Section Six (VI) by Brosius. The Chancellor will, of course, consider whether and to what extent, if any, Brosius may have benefitted from the clearing of this portion of Section Six (VI).

The portion of the order of January 11, 1965, declaring that the defendants are in contempt of the lower court's order of May 14, 1964 reversed, the remaining portion of the order of January 11, 1965 and the final decree of February 11, 1965 affirmed, and the case remanded to the *655 trial court for further proceedings in accordance with this opinion, the appellants to pay nine-tenths of the costs and the appellees to pay the remaining one-tenth of the costs, future costs attendant upon the remand of the case to abide the result in, and the determination by, the trial court.

217 A.2d 531, 241 Md. 612

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

204 A.2d 537                                                                    Page 1
(Cite as: 236 Md. 525, 204 A.2d 537)

**C**

Court of Appeals of Maryland.

WHEATON TRIANGLE LANES, INC.
v.
Nicholas E. RINALDI et al.

No. 52.

Nov. 13, 1964.

Action by lender against corporation for $4,000 loaned and not repaid wherein corporation filed third-party claim against its former president for that sum on theory that the $4,000 had erroneously been repaid to president. The Circuit Court for Montgomery County, Thomas M. Anderson, J., entered judgment for third-party defendants on ground that the third-party claim was barred by a settlement agreement and releases, and corporation and its sole stockholder appealed. The Court of Appeals, Marbury, J., held that release saving and excepting from its operation obligations specifically provided to be assumed in settlement agreement showed intention not to relieve party of obligation arising under his representation and warranty in settlement that liabilities he had incurred for account of corporation other than those recorded in ledger of corporation did not exceed $250 in total amount, and claim of corporation for the $4,000 loan which was not shown on ledger entry was not barred by settlement agreement and release.

Judgment on third-party claim reversed; judgment entered for third-party plaintiff.

West Headnotes

[1] Contracts ⊱147(3)
95k147(3) Most Cited Cases

Intention of parties to contract must be gathered from the contents of the document itself and not by consideration of the provisions separately.

[2] Release ⊱25
331k25 Most Cited Cases

Release is to be construed according to intention of the parties and object and purpose of the instrument, and that intent will control and limit its operation.

[3] Compromise and Settlement ⊱12
89k12 Most Cited Cases

Release saving and excepting from its operation obligations specifically provided to be assumed in settlement agreement showed intention not to relieve party of obligations arising under his representation and warranty in settlement agreement that liabilities he had incurred for account of corporation other than those recorded in ledger of corporation did not exceed $250 in total amount, and claim of corporation for $4,000 which had been loaned to it but received by party and which was not shown on ledger entry was not barred by settlement agreement and release.

[4] Contracts ⊱166
95k166 Most Cited Cases

Where writing refers to another document, the other document is to be interpreted as part of the writing.
*527 **537 William D. Donnelly, Bethesda, for appellant.

Francis W. Taylor, Silver Spring, for appellees.

Before HENDERSON, C. J., and PRESCOTT, MARBURY, SYBERT and OPPENHEIMER, JJ.

MARBURY, Judge.

In May, 1961, the capital stock of Wheaton Bowling and Recreational Center, Inc., later known as Wheaton Triangle Lanes, Inc. (Wheaton), was owned fifty per cent **538 each by brothers LeRoy M. Rinaldi (LeRoy) and Nicholas E. Rinaldi (Nicholas). They also owned the same ratio of stock interest in two other corporations, Rinaldi Enterprises, Inc. (Rinaldi), and Queenstown Duck Pin Bowl, Inc. (Queenstown). There were intercorporation account balances and both of the stockholders were substantial creditors of Wheaton. Disagreements had arisen between the two brothers and they agreed to separate their interests.

On May 18, 1961, the brothers entered into an agreement for settlement of their differences and for separation of their ownerships. In substance, Article A of this agreement provided that Nicholas should become the owner of all the stock of Queenstown, and that all debts owed by that corporation to LeRoy or the other two corporations should be payable to Nicholas; that LeRoy should become the owner of all of the stock of Wheaton and Rinaldi corporations, and that all debts of those two corporations owed to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

204 A.2d 537
(Cite as: 236 Md. 525, 204 A.2d 537)

Nicholas or to Queenstown should be payable to LeRoy; and that LeRoy should pay Nicholas $85,000. The agreement also included the specific representation and warranty of Nicholas that any liabilities that he had incurred for the account of Wheaton and Rinaldi and not recorded on their ledgers did not exceed $250. It is significant that the agreement stated that: 'Representations and warranties made in this agreement shall survive settlement.' Article C of the agreement provided for exchanges of releases by the parties and all the corporations. A modifying agreement dated August 15, 1961, amended Article A to make a note for $100,000 *528 the cash consideration, to postpone settlement to September 1, 1961, and to make Article A of the original agreement conclusive and binding on all parties. Final settlement was effected on October 4, 1961, and general releases executed which provided that the obligations assumed and the rights of indemnity arising out of the settlement agreement should be fulfilled.

Glenmont Lanes, Inc. (Glenmont), in June 1960 was owned fifty per cent by Nicholas and fifty per cent by Alphonse E. Leemans. On June 7, 1960, Glenmont loaned Wheaton $4,000 evidenced by a check, and since this amount has never been repaid, Glenmont filed a declaration against Wheaton on May 17, 1962, to recover the loan. The defendant, Wheaton, filed its plea and counterclaim; and after trial, judgment was rendered for the plaintiff Glenmont, both on the original declaration for $4,000 and on the counterclaim, which judgment is not the subject of this appeal.

Defendant, Wheaton, as a third-party plaintiff in the same proceeding filed a third-party claim against Nicholas and Queenstown, of which Nicholas was also president. The third-party claim for money had and received alleged that if any money had been loaned by Glenmont, it had been paid over to Nicholas as president of Wheaton for it, but he had never paid such money over to Wheaton or accounted for it; that he had instead caused a $4,000 check payable to Wheaton to be recorded on the books of that corporation as a debt owing to Nicholas individually. The claim alleged that because the obligation had been incorrectly credited as owed to Nicholas, the amount of the debt had been mistakenly repaid by Wheaton to Nicholas by direct payments or by payments made by Queenstown, charged to Wheaton, as an account receivable on the books of Queenstown and reimbursed to Queenstown in the settlement of accounts between the two corporations as part of the settlement agreement. The third-party defendant pleas of Queenstown and Nicholas each

relied on the releases given by Wheaton in consummation of the settlement agreement. The plea of Nicholas also relied on an assignment of all the claims of Wheaton against Queenstown.

At the trial on the original declaration and the third-party claim, the evidence showed that the Glenmont check for $4,000 *529 dated June 7, 1960, payable to Wheaton was signed by Nicholas and bore no endorsement **539 by Wheaton, but that Wheaton's depository bank had affixed the endorsement: 'Credited To The Account of The Within Named Payee     ENDORSEMENT     GUARANTEED SUBURBAN TRUST COMPANY WHEATON, MARYLAND.' The check was brought to the Wheaton office by Nicholas, who was at that time president of both corporations, but he could not remember to whom he gave it. The ledger entry on Wheaton's books for the $4,000 loan did not show a liability to Glenmont, but rather a credit for the same amount to Nicholas. At the time of the delivery of the releases and consummation of the settlement agreement, according to LeRoy's testimony, he did not know of the claim of Glenmont for the asserted $4,000 loan. In Wheaton's checkbook, there appeared on a stub a deposit entry: 'n/r-6/8 $4,000.00' the initials meaning Nicholas Rinaldi. Wheaton's bookkeeper, Mrs. Santini, testified that she did not remember who told her to make the entry. Both Nicholas and LeRoy denied directing her to make it. The bank statement of Wheaton for the period of May 31, 1961 to June 30, 1961, showed the deposit in its account on June 9 of $4,000 with the notation 'N/R'. The certified public accountant for Wheaton testified that he placed those initials on the bank statement, and that it meant that Nicholas had put the $4,000 into the bank account. He explained that he asked Nicholas if he had put that sum in the bank, and he said: 'Yes, I put it in,' and this notation 'N/R' meant that the money came from Nicholas individually, and not from Glenmont. There were four repayments to Nicholas in the total amount of the $4,000 loan within two months after it was deposited in the account of Wheaton. All of the checks were signed by Nicholas, either as president of Wheaton or Queenstown, and all were payable to Nicholas E. Rinaldi.

The order of the trial court on November 18, 1963, concerning the third party proceedings, entered judgment for the third-party defendants, Nicholas and Queenstown, and against the third-party plaintiff, Wheaton. In the trial judge's opinion the decision was based on the ground that Wheaton's claim was barred by the settlement agreement and releases. This judgment *530 gives rise to the present appeal,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

in which Wheaton argues that the trial court erred as a matter of law in failing to give effect to the saving and excepting language of the releases upon which it based judgment for Nicholas and Queenstown.

The releases upon which the court below relied each contained substantially identical excepting clauses:
'* * * saving and excepting from the operation hereafter, however, and preserving the obligations specifically provided to be assumed in, and the rights of indemnity arising in accordance with or pursuant to, the Settlement Agreement and supplemental Agreement between Nicholas E. Rinaldi, Francis W. Taylor and LeRoy M. Rinaldi, both dated May 18, 1961, and/or any modification or amendment thereof signed by the same and/or additional parties.'

The agreement of settlement of May 18, 1961, provided in paragraph 6, entitled Representations and Warranties of Nicholas:
'Nicholas represents and warrants that any liabilities or obligations, secured or unsecured, that he has incurred or caused to be incurred for the account of the Wheaton Corporation or the Rinaldi Corporation, other than those presently recorded in the ledgers of the respective corporations, do not exceed $250.00 in total amount.'
In the same agreement, paragraph 7 entitled Settlement states:
'Under this Article A, settlement shall take place sixty days from the date hereof or such earlier day as arrangements for the required financing make possible. * * * Representations and **540 warranties made in this agreement shall survive settlement.'
In Article C, provisions were made for exchange of the releases as part of the settlement.

[1][2] The general principle in the construction or interpretation of contracts is that the intention of the parties must be gathered from the contents of the document itself and not by consideration *531 of the provisions separately. Coopersmith v. Isherwood, 219 Md. 455, 150 A.2d 243; Hart v. Hart, 165 Md. 77, 166 A. 414; Hartford Accident Co. v. W. & J. Knox Net & Twine Co., 150 Md. 40, 132 A. 261. Further, the rule enunciated in releases is stated by this Court in Shriver v. Carlin & Fulton Co., 155 Md. 51, 64, 141 A. 434, 440, 58 A.L.R. 767: '* * * The equitable rule now prevails, and a release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation."

[3][4] The language of the releases involved in this

case showed that the intention of the parties was not to relieve the third-party defendant, Nicholas, of the obligation arising under his representation and warranty in the settlement agreement. It is a long recognized rule that where a writing refers to another document, that other document is to be interpreted as part of the writing. Kirby & McGuire v. Board of Ed., 210 Md. 383, 123 A.2d 606; Lednum v. Barnes, 204 Md. 230, 103 A.2d 865; Ray v. William G. Eurice & Bros., 201 Md. 115, 93 A.2d 272. Under these circumstances we consider the settlement agreement and releases together. The erroneous credit and payments in favor of Nicholas, on which Wheaton's third party claim is based, and the erroneous omission to give proper book credit to Glenmont, are all part of the same mistake of fact, e. g., the identity of the true creditor of Wheaton on the loan of $4,000. Thus giving effect to all portions of the instruments and due regard to their objects and purposes, we hold that the settlement agreement and releases do not destroy the third-party claim of Wheaton. The trial court was in error in ruling that since there was a final settlement, the burden was on the third-party plaintiff to show that there was fraud on the part of the third-party defendants in order for it to recover against them. Maryland Rule 886a. The third-party claim was within the exception stated in the releases, so judgment should have been entered for the third-party plaintiff. The result of the trial court's finding in favor of the third-party defendants on the third-party claim meant that appellees were absolved from the obligation to repay the loan which was due Glenmont, but which was erroneously credited as being due Nicholas and subsequently repaid to him; and as a result of the judgment on the *532 original declaration, Wheaton had to pay again the amount of the loan to Glenmont.

Judgment on third-party claim in favor of third-party defendants, Nicholas E. Rinaldi and Queenstown Duck Pin Bowl, Inc., appellees, reversed; and judgment entered in favor of third-party plaintiff, Wheaton Triangle Lanes, Inc., appellant, against the appellees in the amount of $4,000, with interest from November 18, 1963. Costs on this appeal to be paid by appellees.

PRESCOTT, J., concurs in the result.

204 A.2d 537, 236 Md. 525

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

369 A.2d 1017.
21 UCC Rep.Serv. 721
(Cite as: 279 Md. 531, 369 A.2d 1017)

**EXHIBIT 33B**

**C**

Court of Appeals of Maryland.

MARYLAND SUPREME CORPORATION
v.
The BLAKE COMPANY.

**No. 144.**

March 1, 1977.

Subcontractor sued general contractor in general assumpsit and general contractor filed counterclaim against subcontractor for breach of contract. The Circuit Court, Washington County, Irvine H. Rutledge, J., entered judgment on counterclaim in favor of general contractor and, before dcision on appeal by subcontractor to Court of Special Appeals, a writ of certiorari was granted. The Court of Appeals, Orth, J., held that letter which general contractor received from subcontractor, which stated that quotation was 'on ready mix for the above mentioned project,' and which asserted that 'the price will be guaranteed to hold throughout the job' was no more price quotation or invitation to negotiate, but was an assurance that if general contractor was successful on its bid on project it could obtain concrete from subcontractor necessary for job at place stated in letter and, as such, constituted an 'offer' which, if accepted by general contractor, could be converted into a contract of sale, that finding that contract was accepted by general contractor was not clearly erroneous, and that circumstances served to establish a mutuality of obligation so as to make contract binding, but that in view of an inadequate record, it was necessary to remand case for purpose of determining whether subcontractor waived defense of statute of frauds by failing to raise it properly by law and, if not waived, whether contract was unenforceable under statute except as to concrete received and accepted by general contractor and, if unenforceable, whether subcontractor was precluded by doctrine of equitable estoppel from asserting statute.

Remanded.

West Headnotes

**[1] Contracts ⛏️16**
95k16 Most Cited Cases

An "offer" is not defined in Uniform Commercial Code and, hence, courts wishing to determine meaning of same must look to common law and law merchant. Code, Commercial Law, § § 1-103, 2-101 et seq.

**[2] Contracts ⛏️15**
95k15 Most Cited Cases

An essential feature of every contract is the parties' mutual assent.

**[3] Contracts ⛏️16**
95k16 Most Cited Cases

It is usually necessary for one of the parties to propose to the other a promise which he will make for a certain consideration or to state the consideration which he will give for a certain promise, and that promise will then become the offer.

**[4] Contracts ⛏️16**
95k16 Most Cited Cases

An offer is always a conditional promise and, though it may become a contract, it must be distinguished from other conditional promises only because the performance of condition in an offer is requested as agreed exchange or return for promise or its performance, thereby giving offeree a power, by complying with request, to turn promise in offer into a contract or sale.

**[5] Contracts ⛏️9(1)**
95k9(1) Most Cited Cases

An offer must be definite and certain.

**[6] Sales ⛏️22(1)**
343k22(1) Most Cited Cases

**[6] Sales ⛏️23(1)**
343k23(1) Most Cited Cases

To be capable of being converted into a contract of sale by an acceptance, an offer must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract. Code, Commercial Law, § § 1-103, 2-101 et seq.

**[7] Contracts ⛏️16**
95k16 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

369 A.2d 1017.                                                                              Page 2
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

**[7] Sales** 🔑**22(1)**
343k22(1) Most Cited Cases

A mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on happening of a particular event or in return for something to be received does not amount to an offer but may be converted into a contract of sale by an acceptance. Code, Commercial Law, § § 1-103, 2-101 et seq.

**[8] Sales** 🔑**22(1)**
343k22(1) Most Cited Cases

A mere quotation or statement of a price or prices and an invitation to enter into negotiations are not offers which may be turned into binding contracts of sale upon acceptance; such proposals may be merely suggestions to induce offers by others. Code, Commercial Law, § § 1-103, 2-101 et seq.

**[9] Sales** 🔑**53(2)**
343k53(2) Most Cited Cases

Question whether an offer is made so as to be converted into a contract of sale upon acceptance is dependent on intention of parties and, being such, depends on facts and circumstances of particular case. Code, Commercial Law, § § 1- 103, 2-101 et seq.

**[10] Sales** 🔑**32**
343k32 Most Cited Cases

Letter which general contractor received from subcontractor, which stated that quotation was "on ready mix for the above mentioned project," and which asserted that "the price will be guaranteed to hold throughout the job" was no mere price quotation or invitation to negotiate, but was an assurance that if general contractor was successful on its bid on project it could obtain concrete from subcontractor necessary for job at place stated in letter and, as such, constituted an "offer" which, if accepted by general contractor, could be converted into a contract of sale. Code, Commercial Law, § § 1-103, 2-101 et seq., 2-306(1).

**[11] Contracts** 🔑**15**
95k15 Most Cited Cases

Mutual assent which is the essential feature of every contract is crystallized when there is a knowing and sufficient acceptance to a certain and definite offer.

**[12] Sales** 🔑**1(1)**
343k1(1) Most Cited Cases

A contract of sale may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes existence of contract. Code, Commercial Law, § § 2-204(1, 2), 2-206, 2-206(1)(a).

**[13] Sales** 🔑**1(1)**
343k1(1) Most Cited Cases

An agreement sufficient to constitute a contract for sale may be made even though moment of its making is undetermined. Code, Commercial Law, § § 2-204(1, 2), 2-206, 2-206(1)(a).

**[14] Sales** 🔑**22(3)**
343k22(3) Most Cited Cases

**[14] Sales** 🔑**23(3)**
343k23(3) Most Cited Cases

Unless otherwise unambiguously indicated by language or circumstances, an offer to make a contract of sale shall be construed as inviting acceptance in any manner and by any medium reasonable in circumstances. Code, Commercial Law, § § 2-204(1, 2), 2-206, 2-206(1)(a).

**[15] Sales** 🔑**52(5.1)**
343k52(5.1) Most Cited Cases
          (Formerly 343k52(5))

Findings that verbal acceptance by general contractor of subcontractor's offer to supply concrete for project at a "guaranteed" price was reasonable under circumstances and that conduct of parties, particularly that of subcontractor when delivering concrete and that of general contractor in accepting and paying for it, recognized existence of a contract of sale were not clearly erroneous. Code, Commercial Law, § § 2-204(1, 2), 2-206, 2-206(1)(a).

**[16] Sales** 🔑**60**
343k60 Most Cited Cases

A course of performance is always relevant to determine meaning of a sales agreement. Code, Commercial Law, § § 1-205(1, 3), 2-202, 2-204(3), 2-208, 2-208(1), 2-301.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

369 A.2d 1017.                                                          Page 3
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531,  369 A.2d 1017)**

[17] Sales ⛌52(5.1)
343k52(5.1) Most Cited Cases
          (Formerly 343k52(5))

General background of circumstances, terms of offer
accepted, course of dealing between parties, and
course of performance by them served to establish
that subcontractor was obligated to sell and deliver
concrete to general contractor on project and that
general contractor was obligated to accept from
contractor, at price of $21 per yard, all concrete
required for project. Code, Commercial Law, § § 1-
205(1, 3), 2-202, 2-204(3), 2-208, 2-208(1), 2-301.

[18] Sales ⛌1(4)
343k1(4) Most Cited Cases

Even if offer by subcontractor to supply general
contractor with concrete for project did not expressly
call for subcontractor to furnish all of the concrete,
lack of that term did not render sales contract
resulting from offer and acceptance fatally defective
where course of dealing between parties showed that
they contemplated that subcontractor was to furnish
all of the concrete and that general contractor was to
accept the same. Code, Commercial Law, § § 1-
205(1, 3), 2-202, 2-204(3), 2-208, 2-208(1), 2-301.

[19] Sales ⛌87(1)
343k87(1) Most Cited Cases

It could be rationally inferred from conduct of
general contractor in submitting to letting party name
of subcontractor as supplier of concrete that general
contractor construed sales contract between parties to
call for subcontractor to supply, and for general
contractor to accept, concrete for whole job. Code,
Commercial Law, § § 1-205(1, 3), 2-202, 2-204(3),
2-208, 2-208(1), 2-301.

[20] Frauds, Statute Of ⛌85
185k85 Most Cited Cases

[20] Frauds, Statute Of ⛌89(1)
185k89(1) Most Cited Cases

[20] Frauds, Statute Of ⛌95(2)
185k95(2) Most Cited Cases

Contracts for sale of goods at a price of $500 or more
are unenforceable by way of action or defense unless
there is some writing sufficient to indicate that a
contract of sale has been made between parties and
signed by party against whom enforcement is sought;

there is an exception with respect to goods for which
payment has been made and accepted or which have
been received and accepted. Code, Commercial Law,
§ 2-201.

[21] Frauds, Statute Of ⛌89(1)
185k89(1) Most Cited Cases

Contract of sale with respect to cement to be supplied
by subcontractor and accepted by general contractor
was enforceable under statute of frauds, in any event,
with respect to concrete which general contractor
received and accepted, but question remained
whether contract was enforceable as to balance of
concrete required for project so that subcontractor
could be held liable for loss to general contractor
resulting from breach. Code, Commercial Law, § 2-
201.

[22] Appeal and Error ⛌1106(2)
30k1106(2) Most Cited Cases
          (Formerly 30k106(2))

It was necessary, in face of an inadequate record, to
remand case for determination whether subcontractor
waived defense of statute of frauds with respect to
counterclaim filed against it by general contractor for
breach of contract and, if not waived, whether
contract between parties was unenforceable as to
concrete which was not otherwise received and
accepted by general contractor and, if unenforceable,
whether subcontractor was precluded by doctrine of
equitable estoppel from asserting statute. Code,
Commercial Law, § 2-201.
  **1020 *533 Daniel W. Moylan, Hagerstown
(William P. Nairn and Irving M. Einbinder and
Byron, Moylan & Urner, Hagerstown, on the brief),
for appellant.

 John A. Latimer, Jr. and John J. Dean, Hagerstown
(Evan Crossley, Hagerstown, on the brief), for
appellee.

 Argued before MURPHY, C. J., and SINGLEY,
SMITH, DIGGES, LEVINE, ELDRIDGE and
ORTH, JJ.

ORTH, Judge.

 Maryland Supreme Corporation (Supreme) sued
Blake Company (Blake) in general assumpsit in the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

369 A.2d 1017.                                                                                              Page 4
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

Circuit Court for Washington County claiming $6,000 damages. Blake filed a counterclaim against Supreme for $12,590.24 as damages for breach of contract. The court, sitting without a jury, found that Supreme owed Blake $6,590.24 and a judgment was entered under the counterclaim in favor of Blake against Supreme in that amount with costs. Supreme appealed to the Court of Special Appeals. We granted a writ of certiorari before decision by that court.

We are called upon to decide whether there was a contract for sale of goods between Supreme and Blake, and if there was, the extent to which it was enforceable.

I

The controversy stemmed from the construction of the Western Heights Middle School. In such a building project there are basically three parties involved: the letting part, who calls for bids on its job; the general contractor, who makes a bid on the whole project; and the subcontractors, who bid only on that portion of the whole job which involves the field of its specialty. **1021 The usual procedure is that when a project is announced, a subcontractor, on his own initiative or at the general contractor's request, prepares an estimate and submits a bid to one or more of the general contractors *534 interested in the project. The general contractor evaluates the bids made by the subcontractors in each field and uses them to compute its total bid to the letting party. After receiving bids from general contractors, the letting party ordinarily awards the contract to the lowest reputable bidder.[FN1]

FN1. This analysis of the construction industry's method of operation is taken from The 'Firm Offer' Problem in Construction Bids and the Need for Promissory Estoppel, 10 Wm. & Mary L.Rev. 212 (1968).

II

From the evidence adduced, it is manifest that the usual method of operation in the construction industry was followed in the construction of the Western Heights Middle School. The letting party, the Board of Education, advertised for bids for the construction of the School. Blake was one of the general contractors who responded. Supreme, a manufacturer of ready mixed concrete, learned

through a trade journal what general contractors had bid on the job. After examining the specifications relating to concrete for the project, Supreme, as a subcontractor, wrote the interested general contractors with reference to supplying the concrete required. Its letter to Blake, dated 11 March 1975, read:

The Blake Company

P. O. Box 47

Hagerstown, Maryland 21740

Attention: Mr. Vernon Tetlow

Re: Western Heights Middle School
Dear Sirs:
We are pleased to submit a quotation on ready mix for the above mentioned project.
Please take note that the price will be guaranteed to hold throughout the job.
*535 3,000 p.s.i. concrete $21.00 per yard, net
Hope that you are successful in your bid and that we may be favored with your valued order.

Yours very truly,

MARYLAND SUPREME

CORPORATION

/s/ Ben Wicklein

Sales Representative
Blake was the successful bidder. About 24 May 1975, fifty-nine days after the bids were opened, it was informed that it had been awarded the job as general contractor. There was no written notification by Blake to Supreme that Supreme would supply the concrete. Vernon L. Tetlow, Blake's Engineering Manager, testified that he notified subcontractors 'as soon as we get a contract that they are going to get one.' He verbally notified Benjamin F. Wicklein, Supreme's salesman, that Supreme was to furnish the concrete for the job. "Ben' always asked me 'Are we good on that job? Are we going to furnish that job?' I said, 'Yes, give me a mix design.' Like we always do.' That was the way he had notified Supreme on other jobs for which Supreme was to supply the concrete.

On 27 May a quality control engineer of Supreme wrote Blake, at Wicklein's request, submitting a concrete mix design and test data in order to obtain

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

369 A.2d 1017.                                                                Page 5
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

the approval of the concrete by the architect as required by the specifications. Wicklein said that he knew when the test data was submitted that Blake was the general contractor for the project. The specifications for the project included a provision that within forty-eight hours after the bids were opened the three lowest bidders must submit a list of subcontractors to the Board of Education. Thereafter, the successful bidder **1022 had to obtain the approval of the Board of Education before changing any subcontractor, and, in the case of concrete, new test data would have to be submitted and approved. In complying with the requirement to name its subcontractors, Blake gave Supreme as the supplier of *536 the concrete, and Supreme was so listed in the contract to build the School.

The Engineering Manager for Blake, Tetlow, explained why there was no formal written contract with Supreme. With some subcontractors, for example the electrical subcontractor, Blake 'would furnish . . . a finite-to do all the electrical work complete for 'X' amount of dollars' and enter into a written contract. This cannot be done, said Tetlow, with suppliers of material like stone on the slab, rough lumber or concrete. There is never a written contract covering all the concrete to be furnished '(b)ecause there is no finite amount of money that I can write it for, because we are working with a variable on the quantity of the concrete that's going to be delivered; the same way with rough lumber or stone.' He explained that you work it on 'a neat yardage, but some would spill over, so I couldn't write a purchase order (to over the entire job).' Therefore, according to Kenneth Lee Wilson, Supreme's Sales Manager, and Wicklein, the procedure in ordering concrete was that 'the job superintendent would order what he needed for the next day either by calling our ready mix mispatcher for 10 yards or 20 yards or whatever' or, when Wicklein was on the job site, the superintendent would tell Wicklein.

For a time all went well. Supreme began delivering concrete to the job on 11 July 1975, and it is obvious that the procedure outlined by Wilson and Wicklein was followed. As shown by Supreme's ledger sheets listing invoices to Blake, deliveries were made a number of times a day on various days to supply the concrete to be poured from time to time.[FN2] Supreme billed Blake at the rate of $21 per yard in accordance with its letter of 11 March 1975, and the parties were apparently content.

FN2. Through 29 October 1975 some 132 deliveries of various amounts of concrete were made covering about 13 days. Each delivery was represented by a separate invoice.

Trouble brewed in late October. On 24 October 1975 Supreme wrote Blake: 'Due to numerous increases in the cost of cement and other raw materials absorbed by our company since our last increase, we are forced to raise our *537 ready mix prices effective November 1, 1975. . . . We regret we are unable to give any protection on jobs in progress.' The price of the kind of concrete required for the School was increased to $27 per yard. The letter was signed for Supreme by its Sales Manager, and he testified that it was a form letter sent to all of Supreme's customers. Blake responded. Under date of 12 November 1975, its Engineering Manager wrote Supreme:

I have received your form letter dated October 24, 1975. I assumed then and will continue to assume that this was meant for projects that you have not made a commitment and not, therefore, Western Heights Middle School for which the concrete price is guaranteed for the project duration.

If this is incorrect, correspond directly by letter to our office that you intend to default your contract.

As a result of the letter of 12 November, Russell R. Reed, Jr., President of Supreme, called on M. William Dutton, Jr., President of Blake 'to further amplify the fact that we were forced to raise our prices and to indicate to him that we would be most delighted to deliver concrete to the . . . School at the price of $27.00'. Dutton testified that Reed explained to him the necessity for the increase in price, intimating that otherwise Supreme might have to discontinue business. Dutton told Reed that Blake could not accept the increase 'because we had bid the job on firm prices.' **1023 With 2000 to 2500 yards of concrete yet to pour, the $6 per yard increase represented a considerable amount, and thee was talk 'in the field' that the price 'might even go to $29.00.' During Reed's testimony, the court asked him: '(W)hen you raised the prices, was it that you felt . . . there was no guarantee or that under the law you were advised that you could any way?' Reed replied: 'Our increase, it wasn't because of any legal inquiry that we had made, sir, we just had high costs and we raised the prices.' He added: 'And, we felt like there was no contractual obligation in a long term on this project.' On cross-examination, however, he was referred to the letter *538 of 11 March 1975 to Blake from Wicklein, who, Reed conceded, was authorized

to 'quote projects', which quoted the price of $21 per yard. Pointing out that the letter said that the price was 'guaranteed to hold throughout the job', counsel for Blake asked: 'Now, Mr. Reed, you've been in this business and you've dealt with the Blake Company for a number of years on many projects, what does that mean to you?' Reed replied: 'It would normally mean that you would do it for the whole job.'

As of 1 November 1975, Supreme charged Blake $27 a yard for concrete delivered to the job. Supreme's last delivery was on 13 November. Blake purchased concrete thereafter from two other firms. The evidence is undisputed, however, that it could do so only upon first obtaining the approval of the architect for the Board of Education after submitting new test data on the concrete to be so purchased. Blake received the necessary approval. Even though the concrete to finish the job was purchased at the lowest price obtainable, it cost Blake $12,590.24 more than it would have cost at the original price of $21 a yard. Blake withheld $6,000 from the amount Supreme claimed was due for the concrete which it delivered.

### III

Supreme advances four contentions on appeal:
  (1) There was no offer made by Supreme.
  (2) Assuming there was an offer, there was no acceptance by Blake.
  (3) Assuming there was an offer and an acceptance, there was no valid contract.
  (4) Assuming there was a valid contract, it was only partially enforceable.

### The Offer

[1] It is manifest that what was involved here was a sale of goods within the contemplation of the Maryland Uniform Commercial Code-Sales (hereinafter cited as UCC) Maryland Code (1975), Commercial Law, Title 2. 'Offer', *539 however, is not defined in the UCC, and with respect to it we look to the common law and the law merchant. UCC s 1-103.

[2][3][4] "An essential feature of every contract is the parties' mutual assent . . .." Peer v. First Fed. S. & L. Ass'n, 273 Md. 610, 614, 331 A.2d 299, 301 (1975). Thus, it is usually necessary for one of the parties to propose to the other a promise which he will make for a certain consideration, or to state the consideration which he will give for a certain promise. The promise is an offer. "An offer necessarily looks to the future. It is an expression by

the offeror of his agreement that something over which he at least assumes to have control shall be done or happen or shall not be done or happen if the conditions stated in the offer are complied with. Unless the statement gives to the person to whom it is addressed an assurance that, on some contingency at least, he shall have something, the statement is not an offer." Williston on Contracts, s 24A (3rd ed. Jaeger 1957) (hereinafter cited as Williston). So, an offer is always a conditional promise and it may become a contract. It is distinguished from other conditional promises 'only because the performance of the condition in an offer is requested as the **1024 agreed exchange or return for the promise or its performance, thereby giving the offeree a power, by complying with the request, to turn the promise in the offer into a contract of sale'. Williston, s 25.

[5][6][7][8][9] An offer must be definite and certain. Peoples Drug Stores v. Fenton, 191 Md. 489, 494, 62 A.2d 273 (1948). To be capable of being converted into a contract of sale by an acceptance, it must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract. Accordingly, a mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer. Thus, a mere quotation or a statement of a price or prices and an invitation to enter into negotiations, are not offers which may be turned into binding contracts upon acceptance. Such proposals may be merely suggestions to induce offers by others. See Williston, *540 ss 31-33: 17 Am.Jur.2d, Contracts ss 31- 33 (1964); 67 Am.Jur.2d, Sales ss 73-75 (1973). What this all boils down to is expressed in 17 Am.Jur.2d, Contracts s 33 (1964):

> From the nature of the subject, the question whether certain acts of conduct constitute a definite proposal upon which a binding contract may be predicated without any further action on the part of the person from whom it proceeds, or a mere preliminary step which is not susceptible, without further action by such party, of being converted into a binding contract, depends upon the nature of the particular acts or conduct in question and the circumstances attending the transaction. It is impossible to formulate a general principle or criterion for its determination.

Therefore, in its final determination, the question of whether an offer was made seems to be one dependent on the intention of the parties, and, being such, it depends on the facts and circumstances of the particular case. The UCC changes none of these

369 A.2d 1017.

Page 7

21 UCC Rep.Serv. 721

**(Cite as: 279 Md. 531, 369 A.2d 1017)**

principles of law. 67 Am.Jur.2d, Sales s 74 (1973).

[10] Supreme's proposal was evidenced by its letter of 11 March 1975 to Blake. Supreme would now have it be merely a price quotation, and claims that did not contain many of the essential terms of an offer 'such as the qualify and quantity of the product to be supplied, the number and dates of the deliveries, the terms of payment, the costs of shipment and the time for performance.' We do not agree. Considered in light of the facts and circumstances, the trial court could have found, as it obviously did, that the letter of 11 March 1975 constituted a definite and certain offer with the intent that, if accepted, it would result in a contract. By the letter, Supreme proposed to furnish Blake with ready mix 3000 p. s. i. concrete at $21 per yard, net, in such quantity as Blake required for the Western Heights Middle School project. The language in the letter stating the quotation was 'on ready mix for the above mentioned project (Western Heights Middle School)', and asserting that 'the price will **541** be guaranteed to hold throughout the job' (emphasis supplied) may be considered as measuring the quantity of the concrete by the requirements of the buyer, as recognized in UCC s 2-306(1). The contingency was that Blake be the successful bidder. If Blake were awarded the general contract for the construction of the School and accepted Supreme's offer, there would be a binding contract. When viewed with reference to the method of operation of the construction industry and the prior course of dealings between Supreme and Blake, it is manifest that Supreme's letter was no mere price quotation or invitation to negotiate. It gave Blake the assurance that if Blake were the general contractor on the School project Blake could obtain from Supreme the concrete necessary for the job at $21 **1025** per yard. Thus, it was an offer, and the trial court did not err in so considering it.

The Acceptance

[11] The mutual assent which is the essential feature of every contract is crystallized when there is a knowing and sufficient acceptance to a certain and definite offer. Peer v. First Fed. S. & L. Ass'n, supra, 273 Md. at 614, 331 A.2d 299. Supreme urges that even if it made a certain and definite offer, there was no valid acceptance by Blake so as to give rise to a binding contract. It puts the issue in the context of Maryland Rule 886 and asserts that the judgment of the lower court on the evidence that there was an acceptance was clearly erroneous and should be set aside. We have no difficulty in determining that the lower court was not clearly wrong in ruling that

Blake accepted Supreme's offer.

[12][13][14] As we have indicated, what is involved here is the sale of goods within the contemplation of the UCC. We start, therefore, with the basic principles that the contract may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract, and that an agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. UCC s 2-204(1) and (2). The Official Comment to subsection (1) states that **542** 'appropriate conduct by the parties may be sufficient to establish an agreement.' We also note that unless otherwise unambiguously indicated by language or circumstances, '(a)n offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances.' UCC s 2-206(1)(a). The Official Comment to s 2-206 observes:

Any reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable. Former technical rules as to acceptance . . . are rejected and a criterion that the acceptance be 'in any manner and by any medium reasonable under the circumstances,' is substituted.

[15] The trial court found as a fact that Blake 'promptly notified Supreme of its successful bid, and verbally accepted Supreme's offer', that Blake 'began ordering as concrete was needed, and continued to do so until it received a letter from Supreme dated October 24, 1975 (raising the price),' and that 'Supreme and Blake had several times done business before, and . . . that the procedure in this case was as it had always been before.' There was credible evidence to support these findings. Applying the applicable statutory provisions of the UCC to these facts leads to the conclusion that the verbal acceptance by Blake of Supreme's offer was reasonable in the circumstances, that Blake did so accept it, and that the conduct of the parties, particularly that of Supreme in delivering concrete and that of Blake in accepting and paying for it, recognized the existence of a contract. There being legally sufficient evidence for the court as the trier of fact to find that Blake accepted Supreme's offer, that judgment on the evidence was not clearly erroneous. Delmarva Drill Co. v. Tuckahoe, 268 Md. 417, 424, 302 A.2d 37 (1973); Knowles v. Binford, 268 Md. 2, 10-12, 298 A.2d 862 (1973).

The Contract

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Supreme declares that, even assuming that there was an offer by Supreme and an acceptance by Blake, the trial court **\*543** was wrong in concluding that there was a binding contract between Supreme and Blake. Supreme's point is that there was 'a lack of mutuality of obligation.' It now characterizes Blake's obligation under the contract created from the acceptance of Supreme's offer of 11 March 1975 as 'an illusory promise'. It claims: 'Blake was not obligated to utilize Supreme as its exclusive **\*\*1026** supplier of concrete in the Western Heights Middle School project. Indeed, it was not obligated to purchase any of the concrete from Supreme.' We do not see it that way.

[16] We look again to the UCC. Section 2-301 provides: 'The obligation of the seller is to transfer and deliver and that of the buyer to accept and pay in accordance with the contract.' The Official Comment explains: 'In order to determine what is 'in accordance with the contract' . . . usage of trade, course of dealing and performance, and the general background of circumstances must be given due consideration in conjunction with the lay meaning of the words used to define the scope of the conditions and duties.'[FN3]  UCC s 2-208(1) provides:

> FN3.  UCC s 1-205(1) defines 'course of dealing' as 'as sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.' Subsection (3) provides that '(a) course of dealing between parties . . . (gives) terms of an agreement.' The Official Comment states that 'course of dealing may enter the agreement either by explicit provisions of the agreement or by tacit recognition of the agreement or by tacit recognition of the agreement.' Although under subsection (1) it is restricted literally, to a sequence of conduct between the parties previous to the agreement', according to the Official Comment, the provisions of s 2-208 make it clear that a sequence of conduct after or under an agreement may have equivalent meaning.

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in

without objection shall be relevant to determine the meaning of the agreement.

The Official Comment observes that '(t)he parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best **\*544** indication of what that meaning was. . . . Under this section a course of performance is always relevant to determine the meaning of the agreement.' See UCC s 2-202 which includes that even a final written expression of the agreement may be explained or supplemented by course of dealing or by course of performance. Finally, UCC s 2-204(3) declares:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

[17] There being an offer and acceptance which gave rise to a contract, it was, pursuant to UCC s 2-301, the obligation of Supreme to transfer and deliver the concrete and that of Blake to accept and pay for the concrete 'in accordance with the contract'. The kay is what was 'in accordance with the contract'. We think that the trial court could properly determine that (in accordance with the contract here) Supreme was obligated to sell and deliver to Blake, and Blake was obligated to accept from Supreme, at the price of $21 per yard, all the concrete required in the construction of the Western Heights Middle School under Blake's contract with the Board of Education. The court could reach this determination by considering, pursuant to the applicable provisions of the UCC, the general background of circumstances, the terms of the offer accepted, the course of dealing between the parties, and the course of performance by them.

The general background of circumstances was that the transaction was between a general contractor and a subcontractor. The evidence showed that both had been in business a number of years, and it is a rational inference that they were thoroughly experienced in their respective areas and well familiar with the method of operation of the construction industry. **\*\*1027** There was no intimation of importuning, coercion, duress or undue adhesion. Supreme sought the sale on its own initiative and succeeded in obtaining it on the terms it proposed.

[18] **\*545** The offer by Supreme submitted a price on concrete 'for the above mentioned project', that is the Western Heights Middle School and guaranteed the price to hold 'throughout the job.' Although it did

369 A.2d 1017.
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

not in precise words specify that it was to supply all the concrete, that implication was surely there. But even if it be deemed that the offer did not expressly call for Supreme to furnish all of the concrete, the lack of that term, as we have indicated, did not render the resulting contract fatally defective.

The course of dealing between the parties showed that they contemplated that Supreme was to furnish all the concrete. There was evidence that the procedure here followed with respect to the sale of concrete by Supreme to Blake was the same as that which they had followed on prior jobs. There was evidence that Wicklein, Supreme's salesman, would always ask Blake's Engineering Manager: 'Are we good on that job' Are we going to furnish that job? (emphasis supplied). The Engineering Manager would always reply to the effect: 'Yes, give me a mix design.' The architect when asked if there were two concrete suppliers on other Board of Education projects, said that he only had knowledge of his firm's jobs with the Board and as to those, he did not recall any in which there was more than one concrete supplier. In short, there was indication that in the course of dealing between Blake and Supreme when Supreme was the subcontractor selling the concrete to Blake as the general contractor, Supreme furnished all the concrete required for the project.

[19] With respect to the course of performance, Blake, complying with the specifications to submit to the Board of Education a list of subcontractors, gave Supreme as the subcontractor to supply the concrete. It is a rational inference that Blake construed the contract to call for Supreme to be the concrete subcontractor for the whole job. Supreme was the only concrete manufacturer Blake submitted. Blake was not free to purchase concrete from another supplier without first obtaining the approval of the Board of Education upon the submission of new test data. Even more significant is that until Blake deemed the **\*546** contract breached, it called only upon Supreme to furnish the concrete, and until Supreme raised the price, it, in fact, was the sole supplier of concrete for the project. Blake made its needs known from day to day, and Supreme filled the orders, making some 132 deliveries in four months.

We conclude that the trial court could have properly found that there was mutuality of obligation 'in accordance with the contract.' It, therefore, did not err in ruling that there was a binding contract.[FN4]

FN4. We have resolved the case sub judice

under the Maryland Uniform Commercial Code-Sales because the transaction was for a sale of goods. A question as to what status the bid between the subcontractor and the general contractor occupies may also arise when the subcontract involves goods and services in circumstances that the UCC would not apply. See The 'Firm Offer' Problem in Construction Bids and the Need for Promissory Estoppel, 10 Wm. & Mary L.Rev. 212, 213 (1968), and Schultz, The Firm Offer Puzzle: a Study of Business Practice in the Construction Industry, 19 U.Ch.L.Rev. 237 (1952).

The Statute of Frauds

Supreme contends: 'Blake cannot enforce a contract with Supreme beyond the amount of concrete actually accepted and paid for because Blake has failed to produce a memorandum of any such purported contract sufficient to satisfy the Statute of Frauds.'

[20][21] The 'Statute of Frauds' to which Supreme refers is that set out in **\*\*1028** UCC s 2-201. It covers contracts for the sale of goods for the price of $500 or more.[FN5] Patently, therefore, the contract between Supreme and Blake was subject to its provisions. It declares, with designated exceptions, such contracts to be unenforceable by way of action or defense **\*547** unless there is some writing sufficient to indicate that a contract of sale has been made between the parties and signed by the party against whom enforcement is sought. One of the exceptions is with respect to goods for which payment has been made and accepted or which have been received and accepted. UCC s 2-201(3)(c). Thus, as Supreme recognizes, the contract was enforceable, in any event, with respect to the concrete which Blake received and accepted. The question is whether the contract was enforceable as to the balance of the concrete required for the project so that Supreme would be liable for the loss to Blake resulting from the breach.

FN5. The original Statute of Frauds, 29 Chas.Cap. 3 became effective in Maryland in 1677, and, except for statutory modifications in regard to the sale of goods, has remained in its original form in this State since its effective date. Its provisions were continued in Maryland after the

369 A.2d 1017.                                                    Page 10
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

American Revolution by virtue of the provisions of the Constitution of 1776 and subsequent constitutions. See Constitution of Maryland, 1867, Declaration of Rights, Article 5. The Seventeenth Section of the Statute of Frauds, concerned with the sale of goods, wares and merchandise of the value of five pounds sterling and upwards, provided by its terms that part payment or part delivery would remove the transaction from the provisions of the statute. The Seventeenth Section was thereafter modified by the Uniform Sales Act and the Uniform Commercial Code. Kline v. Lightman, 243 Md. 460, 470-472, 221 A.2d 675 (1966). Today, the provisions of UCC s 2-201, as now in effect, are controlling with respect to the requirements of a writing for the sale of goods.

Supreme argues that there was no writing signed by it sufficient to satisfy the statute and that none of the exceptions, other than that as to goods received and accepted, applied to take the contract out of the statute. Blake claims that the statute was satisfied and that even if it were not, Supreme was precluded from its operation by the doctrine of equitable estoppel.

In finding that 'Blake accepted the offer and that a binding contract was made,' the lower court in its memorandum opinion did not touch on the question of the Statute of Frauds. According to the court, Supreme's contentions were '(1) The offer was never accepted (2) The contract was void because it was in violation of the Commercial Code'. (emphasis supplied). The only reference to the UCC in the court's memorandum was to s 2-205 concerning 'firm offers' which the court found was inapplicable because of the acceptance of the offer. The transcript of the proceedings gives no indication that the issue of the Statute of Frauds was represented to the trial court, and arguments of counsel wee not transcribed. At the close of all the evidence the court instructed counsel 'to submit briefs within a week.' They were not transmitted to us with the record. We do not know whether the issue of the Statute of Frauds was presented to the lower court and, ordinarily we would not decide any point which did not plainly appear by the record to have been tried and decided by the trial court. Maryland Rule 885. Blake, however, does **\*548** not suggest in its brief that the point was not raised below but answers it on the merits.

[22] As issues of fact are involved, it appears to us that the purposes of justice will be advanced by permitting further proceedings in the cause pursuant to Maryland Rule 871. We order the case remanded to the Circuit Court for Washington County for further proceedings as if no appeal had been taken and the judgment from which the appeal was taken had not been entered. Upon remand, the lower court shall conduct further proceedings. It shall, by the introduction of additional evidence or otherwise as may be necessary to **\*\*1029** make factual findings and reach conclusions of law, determine:

(1)

Whether Supreme waived the defense provided by UCC s 2-201 by failing to raise it properly below. See Grauel v. Rohe, 185 Md. 121, 124, 43 A.2d 201 (1945); Double-E Sportswear Corp. v. Girard Trust Bank, 488 F.2d 292 (3rd Cir. 1973).

(2)

If such defense was not waived, whether the contract between Supreme and Blake was unenforceable under UCC s 2-201 except to the concrete received and accepted by Blake under the contract.

As to sufficiency of writing, see Alaska Ind. Fish. Mkg. Ass'n v. New England Fish Co., 15 Wash.App. 154, 548 P.2d 348 (1976); Alice v. Robett Mfg. Co., Inc., 328 F.Supp. 1377 (N.D.Ga. 1970) aff'd. 445 F.2d 316 (5th Cir. 1971); Southwest Eng. co., Inc. v. Martin Tractor co., Inc., 205 Kan. 684, 473 P.2d 18 (1970).

As to the quantity of goods, see **\*549**Riegel Fiber Corp. v. Anderson Gin Co., 512 F.2d 784 (5th Cir. 1975); Fortune Furniture Co., Inc. v. Mid- South Plastic Co., Inc., 310 So.2d 725 (Miss. 1975); Port City Const. Co., Inc. v. Henderson, 48 Ala.App. 639, 266 So.2d 896 (1972); Hankins v. American Pac. Sales Corp., 7 Wash.App. 316, 499 P.2d 214 (1972).

As to confirmation of contract, see Ace Concrete Products Co. v. Rodgers Const. Co., 69 Mich.App. 610, 245 N.W.2d 353 (1976); Doral Hosiery Corp. v. Sav-A-Stop, Inc., 377 F.Supp. 387 (E.D.Pa.1974); Fort Hill Lumber Co. v. Georgia-Pacific Corp., 261 Or. 431, 493 P.2d 1366 (1972); Azevedo v. Minister, 86 Nev. 576, 471 P.2d 661 (1970); Reich v. Helen Harper, Inc., 3 UCC Rep. 1048 (Civ.Ct.N.Y.C. 1966).

As to admission of existence of contract, see Reissman International Corp. v. J. S. O. Wood Products, Inc., 10 UCC Rep. 1165 (N.Y.Civ.Ct.1972).

As to part performance, see In re Augustin Bros.

369 A.2d 1017.
21 UCC Rep.Serv. 721
**(Cite as: 279 Md. 531, 369 A.2d 1017)**

Co., 460 F.2d 376 (8th Cir. 1972). Generally, see J. White & R. Summers, Uniform Commercial Code (West 1972) s 2-1 through s 2-5; R. Anderson, Uniform Commercial Code (2d ed. 1972) s 2-201: 1-2-201: 53; A. Squillante & J. Fonseca, 2 Williston on Sales (4th ed. 1974) s 14-1 through s 14-9.

(3)

If the contract was unenforceable under UCC s 2-201, whether Supreme was precluded by the doctrine of equitable estoppel from asserting the statute.

See Dahl v. Brunswick Corp., 277 Md. 471, 487, 356 A.2d 221 (1976); **\*550**Kline v. Lightman, 243 Md. 460, 474-475, 221 A.2d 675 (1966); Dangerfield v. Markel, 222 N.W.2d 373 (N.D.1974); J. White & R. Summers, Uniform Commercial Code (West 1972) s 2-6; Note, Statute of Frauds-The Doctrine of Estoppel and the Statute of Frauds, 10 Mich.L.Rev. 170 (1967); Comment, Equitable Estoppel and the Statute of Frauds in California, 53 Cal.L.Rev. 590 (1965).

We observe that this opinion is conclusive as to the points finally decided herein.

CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO ABIDE THE RESULT.

369 A.2d 1017, 279 Md. 531, 21 UCC Rep.Serv. 721

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

396 A.2d 1090
(Cite as: 284 Md. 402, 396 A.2d 1090)

**EXHIBIT 33C**

☞

Court of Appeals of Maryland.

Richard M. PORTER

v.

GENERAL BOILER CASING CO., INC.

No. 80.

Feb. 5, 1979.

Employee brought action against employer for workmen's compensation benefits based on District of Columbia statute, as allegedly provided for in employer's collective bargaining agreement with employee's union. The Circuit Court, Charles County, Vincent J. Femia, J., rendered summary judgment in favor of employer and employee sought further review to the Court of Special Appeals. On writ of certiorari, Court of Appeals, Smith, J., held that material issue of genuine fact existed as to whether employer, which did not sign collective bargaining agreement with employee's union containing provision requiring employer to pay workmen's compensation benefits based on District of Columbia statute, accepted terms of agreement by its conduct, precluding summary judgment in favor of employer.

Reversed and remanded.

West Headnotes

[1] Contracts ☜188
95k188 Most Cited Cases

Generally, one cannot be held to a contract to which he is not a party; however, a party may later accept or adopt a contract and thus be bound by it.

[2] Contracts ☜22(1)
95k22(1) Most Cited Cases

Acceptance of a contract can be accomplished by acts as well as words; no formal acceptance is required.

[3] Contracts ☜22(3)
95k22(3) Most Cited Cases

Notification of acceptance is not essential to formation of a contract.

[4] Contracts ☜35
95k35 Most Cited Cases

A signature is not required in order to bring a contract into existence nor is a signature always necessary to execution of a written contract.

[5] Contracts ☜35
95k35 Most Cited Cases

Purpose of a signature on a contract is to demonstrate "mutuality or assent" which could as well be shown by conduct of contracting parties.

[6] Contracts ☜35
95k35 Most Cited Cases

Generally, unless contracting parties agree on necessity of signatures at time of their assent or as a condition modifying that assent, a signature is not required to form a valid written contract.

[7] Labor Relations ☜246
232Ak246 Most Cited Cases

If employer's actions were sufficient to constitute acceptance of collective bargaining agreement, that acceptance would extend to all provisions of that written agreement.

[8] Contracts ☜22(1)
95k22(1) Most Cited Cases

Silence may operate as an acceptance to an offer; where services are rendered under such circumstances that party benefited thereby knows terms on which they are being offered he receives benefit of services in silence, having had a reasonable opportunity to express his rejection of offer, he has assented to terms proposed and thus accepts offer.

[9] Judgment ☜185(6)
228k185(6) Most Cited Cases

If there is a conflict between inferences to be drawn from evidence before court, summary judgment is not proper. Maryland Rules, Rule 610.

[10] Judgment ☜181(21)
228k181(21) Most Cited Cases

Material issue of genuine fact existed as to whether employer, which did not sign collective bargaining agreement with employee's union containing provision requiring employer to pay workmen's compensation benefits based on District of Columbia statute, accepted terms of agreement by its conduct,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

396 A.2d 1090                                                              Page 2
**(Cite as: 284 Md. 402, 396 A.2d 1090)**

precluding summary judgment in favor of employer on employee's claim for workmen's compensation benefits based on District of Columbia rate. Maryland Rules, Rule 610.

**\*\*1091 \*403** Robert G. Samet, Rockville (Ashcraft, Gerel & Koonz, Rockville, on the brief), for appellant.

Edwin T. Steffy, Jr., Baltimore (Hooper, Kiefer & Cornell, Baltimore, on the brief), for appellee.

Argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

SMITH, Judge.

We shall here hold that a trial judge erred in granting a motion for summary judgment in that he failed to note that inferences could be drawn from that which was before him contrary to the position of the party in whose favor summary judgment was entered. Thus, the matter could only be resolved by trial.

Appellant, Richard M. Porter (Porter), was injured on the job while employed by appellee, General Boiler Casing Co., Inc. (General). General has its headquarters in North Carolina.[FN1] It specializes in "lagging" boilers in power plants. ("Lagging" consists in covering a boiler with heat-insulating material.) It was a subcontractor in connection with the construction of the nuclear power plant at Calvert Cliffs in Calvert County.

> FN1. All of the facts related here are gleaned from the deposition of General's comptroller, to which reference will be made later in this opinion, the exhibits to that deposition, or the pleadings.

General wrote to Local Union No. 602 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada**\*404** (AFL-CIO) (the union) on April 25, 1973, requesting a supply of current reporting forms for that union together with "a copy of the Current Agreement." The letter advised, "Our Company will begin work in your State in the near future and will have need of this information." On May 21, 1974, it addressed another letter to the union stating that General was "a subcontractor for Bechtel Corporation at the Calvert Cliffs Nuclear Power

Plant," that the schedule called for it "to start on June 20, 1974," and that General desired a copy of the local's "current contract regarding wages, fringes, subsistence, if any, and reporting forms." The then current contract of the union was supplied in each instance. This contract was one between the Mechanical Contractors D. C. Association, Inc., and the union covering the period September 1, 1972, through April 31, 1975. This union had jurisdiction over steamfitters working in Calvert County.

**\*\*1092** In July 1974 General sent a superintendent and an assistant superintendent to the Calvert Cliffs job site. In accordance with its usual practice of hiring through local unions in the area in which the current job site was located, workmen were hired by General through the union. Wages, both regular and overtime, were paid pursuant to the provisions of the collective bargaining contract previously forwarded to General. General also paid money into various fringe benefit funds established by the union for its members, including health and welfare, pension, apprenticeship, industry, and vacation funds. Most of these contributions were not deducted from hourly wages of employees, but were amounts required by the terms of the collective bargaining agreement to be paid over and above such hourly wages.

Porter was injured on the job. He sought and was awarded compensation under the Maryland Workmen's Compensation Act. Employers by the terms of the agreement with the union are required "to carry adequate workmen's compensation insurance written in such a manner as to provide the same benefits as provided by the District of Columbia Workmen's Compensation Act," which is more generous in its provisions than the Maryland statute.

Porter sued General in equity when he did not receive **\*405** compensation as specified in the District of Columbia law. He sought damages on the basis of the difference between the District of Columbia and Maryland rates for two periods of time. His final prayer was for "an order of specific performance requiring (General) to pay (Porter) what (had) accrued . . . and to continue paying (Porter) at (the District of Columbia rate) until his temporary partial disability cease(d)." The bill of complaint included an allegation that on the date of Porter's injury General "was party to a valid and binding contract with Steamfitters Local Union #602," and that under "a so-called excess coverage agreement in effect on the date of (Porter's) injury between (General) and the said union, of which (Porter) was at the time of his injury and still is a member, (Porter)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

396 A.2d 1090

(Cite as: 284 Md. 402, 396 A.2d 1090)

became entitled to receive compensation payments at the same rates as if he was injured in the District of Columbia." The answer of General denied all allegations in the bill of complaint other than the injury by Porter in the course of his employment.

General moved for summary judgment. In addition to the usual allegation "(t) hat there (was) no genuine dispute as to any material fact as to the issues giving rise to (the) Motion" and that General was "entitled to judgment as a matter of law," the motion said that General was not a party to any contract with the union in question as alleged in the bill of complaint. Appended to the motion was an affidavit by General's president saying that he was aware of all contracts between his company and labor unions; that his company was not a party to any contract with this particular union and had never been a party to such contract; that the union was based in the District of Columbia; that the union's contract, as would appear by photostats attached, was with the Mechanical Contractors District of Columbia Association, Inc.; that General was not a signatory to the contract; that General had never been a member of the association; and "that at the time of (Porter's) injury, he was employed by (General) solely for work in the State of Maryland, specifically on a project at Calvert Cliffs, Lusby, Maryland."

Porter immediately countered by serving notice of his intention to take the deposition of the comptroller of General. *406 Porter then petitioned for an extension until January 11, 1978, in which to answer the motion for summary judgment. He gave as his reason the scheduling of the deposition on December 9, 1977. Oddly enough, the record does not disclose that any extension was granted. However, the deposition was filed on January 6.

Appended as exhibits to the deposition of General's comptroller, in addition to the two letters which we have already mentioned, was correspondence between the comptroller and the attorney for Porter. The first was a letter from Porter's attorney to the comptroller dated November 7, 1974. It referred to Porter's injury on September 6, **1093 1974; the amount he was receiving under the Maryland Workmen's Compensation Act; the benefits specified in the union agreement "even where his injury occurs in Maryland or Virginia"; the amount to which Porter would have been entitled under the District of Columbia act; that counsel had "been advised by (General's) insurance carrier that the policy does not carry an endorsement providing for these excess benefits"; and that as a consequence Porter was obliged to look directly to General. The letter

indicated it was intended to confirm a recent telephone conversation and that it was the attorney's "understanding that (the comptroller) intend(ed) to discuss this matter with (General's) insurance agent . . . ." Counsel requested a reply after this conversation had taken place. January 9, 1975, brought a second letter from the attorney to the comptroller seeking advice as to "what position General . . . or (its) insurer intend(ed) to take with regard to the excess benefits to Mr. Porter." Thereafter the attorney wrote yet another letter to the comptroller saying that after his most recent telephone conversation with the comptroller the attorney "advised the local office of Lumbermens Mutual Casualty Company that (General's) local agent had written the excess benefits policy retroactive," but that "(i)n checking this matter (it was) learned the policy was written but to begin on January 11, 1975." The comptroller was advised that obviously "Porter would not be covered by such a policy" and thus it would be necessary to look to General "for payment of these excess *407 benefits." The comptroller was requested to review his file and to "giv(e counsel the comptroller's) thoughts on this matter as soon as possible." Counsel twice wrote to the comptroller asking whether he had had the opportunity to discuss the matter with General's insurance agent. Finally, on April 11 the comptroller replied:

> Regarding the retro-insurance for Mr. Porter, our insurance agent informed us that it did not start until January 1, 1975. We need to establish a settlement with Mr. Porter for his losses from September 6, 1974, to the time he was able to return to work or January 1, 1975 whichever was first. We need a certified doctor's statement informing us when Mr. Porter was able to return to work.
>
> The loss settlement will be the difference between what the law requires and the actual payment our insurance company paid. Also, please send proof that Mr. Porter is entitled to the maximum payment under the workmens compensation law.

Counsel forwarded the requested information but this apparently brought no response because on June 30 he advised the comptroller that he had heard nothing from him subsequent to counsel's letters of April 15 and April 18. He then requested information "as to (the) company's position on payment of temporary total disability benefits," with the statement then made that it was his intent to sue if payments were not begun within the next 20 days.

The comptroller's deposition disclosed that he was responsible for "all the financial aspects" of General. He said that General customarily hired local steamfitters and other craftsmen needed for its

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

projects at the time its participation in a specific project began. He described the process:

> Well, usually a job steward (of the union local) is on the job and (General's job superintendent) just go(es) up there and (he) tell(s) him (General) need(s) a certain amount of men, and the men come to the job and we hire them.

**\*408** One of the comptroller's duties was to prepare cost estimates for bids on projects. In this regard he would contact union locals and determine what the applicable wage rates would be. His purpose in examining such local agreements was to calculate what it would cost General, including fringe benefits, to hire these men. He referred to certain union forms filled out by payroll clerks relative to this particular job and checked by the comptroller each month. These disclosed payments "for the fringe benefits (about which the comptroller had been) speaking . . ., welfare, pension, industry funds." He said that when the company goes into an area to do work where there is an existing local collective **\*\*1094** bargaining agreement General does not sign the agreement but obtains copies of the local agreements with the intention of abiding by the wage rates, the welfare fund rates, the pension fund rates, the apprentice fund rates, and other payroll fringe benefits. He was asked why his company would voluntarily contribute these amounts and replied, "(B)ecause the men would walk off the job, probably. . . . I would guess they would strike, we are dealing with union people." The record also reflects from the examination of the comptroller by Porter's counsel:

> Q So, essentially, you are aware that in order to get these union employees to come out and work for you on the job site, you have to pay them the wages and the fringes provided for in the union contract, is that correct?
> A Yes.
> Q That if you were to stop paying it or cut their wages, zip, you would lose them, is that correct?
> A Sure.
> Q Now, if the union were to find out that you weren't deducting these amounts and contributing them into their funds, they would withdraw their employees, wouldn't they?
> A Sure, I guess.

In due season Porter filed an answer to the motion for **\*409** summary judgment. It alleged that there was a genuine dispute between the parties as to a material fact and:

> That although the signature of the defendant was never affixed to the contract upon which this suit is based, the defendant, by its conduct, clearly manifested its intention to be bound by the terms of

the contract, and subsequently adhered to the same in all material respects, save the clause upon which this suit is based.

The trial judge at the hearing on the motion for summary judgment asked counsel to tell him "where (there) was ever an implied meeting of the minds between (Porter) and (General). Between the union and (General)." Ultimately, in granting General's motion for summary judgment, he said:

> The company did everything they could to comply with the union contract, was not in my thinking, impliedly, make them impliedly a party to the contract that existed long before they even came to this state. I do not I just don't see that they have adopted that contract. They are not a party to it. They tried to comply with it so they could use union members, that is fine. But I just don't see how that creates a contract between them and the union without some sort of signature, without some sort of, more of a formative statement we intend to adopt your contract.

[1][2][3] Before we reach the issue of summary judgment here, we must first take a look at contract law. The general rule is that one cannot be held to a contract to which he is not a party. Snider Bros., Inc. v. Heft, 271 Md. 409, 414, 317 A.2d 848 (1974), and Crane etc. Co. v. Terminal etc. Co., 147 Md. 588, 593, 128 A. 280 (1925). However, a party may later accept or adopt a contract and thus be bound by it. Snider 271 Md. at 414, 317 A.2d 848 and Stavrou v. Beacon Supply, 249 Md. 451, 456, 240 A.2d 278 (1968). Thus, what constitutes acceptance becomes the threshold question. Acceptance can be accomplished by acts as well as words; no formal acceptance is required. **\*410** Duplex Envelope Co. v. Balto. Post Co., 163 Md. 596, 605, 163 A. 688 (1933). Notification of acceptance is not essential to the formation of a contract. Chesapeake, etc. v. Manitowoc, 232 Md. 555, 567, 194 A.2d 624 (1963).

Two of our prior cases well illustrate conduct which will demonstrate acceptance. In Snider the appellant sought to recover commissions for procuring leases for a shopping center pursuant to a written contract. One of the appellees moved for summary judgment, alleging that she had not been a signatory to the contract with the appellant and that, therefore, the contract was not binding upon her. The motion was granted by the trial court. On appeal we said that there was sufficient evidence that she had "adopted or assented to" the contract. The relevant factors were that (1) she signed one of the leases procured by the appellant and (2) she signed a subsequent contract **\*\*1095** which modified the earlier contract, the one

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

396 A.2d 1090
(Cite as: 284 Md. 402, 396 A.2d 1090)

at issue. We held the latter action to be "an express adoption of the earlier contract," Id. 271 Md. at 414, 317 A.2d at 852, and thus she was bound to that contract.

In Duplex the defendant signed a written contract and sent it to the plaintiff. The plaintiff wrote a letter to the defendant accepting the contract and stating modifications as to prices. The Court said the two writings constituted a new offer. It held that the trial judge erred in taking the case from the jury because the defendant received and kept the two writings, the plaintiff delivered as per the contract, and the defendant accepted such items. Judge Parke observed for the Court, "(A)n acceptance may be indicated by acts as well as by words." 163 Md. at 605, 163 A. at 691.

[4][5][6] The trial judge referred to the fact that there was no signature on a contract between General and the union. It should be noted that a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract. The purpose of a signature is to demonstrate "mutuality or assent" which could as well be shown by the conduct of the parties. 17 C.J.S. Contracts S 62 at 732 (1963). " So far as the common law is concerned, the making of a valid contract requires no writing whatever; and even if there is a writing, there need be no *411 signatures unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent." 1 A. Corbin, Contracts s 31 at 114 (1963). This general rule has been accepted in Maryland. See Goszka v. Kleis, 163 Md. 167, 170, 161 A. 170 (1932). There the four plaintiffs owned land as tenants in common. Two of the plaintiff owners signed a written contract by which they were buying a business in Annapolis from defendants. It required the defendants to purchase land in Baltimore owned by the four plaintiffs. The plaintiffs fully performed. The defendants refused to perform as to the Baltimore land. The trial court sustained a demurrer to the bill of complaint of the plaintiffs for specific performance. Judge Parke said for the Court:

It is true that the contract was certainly signed by but one of the tenants in common, and not by his wife, who is named in the body of the instrument as one of its parties. The contract, however, was accepted by the other parties in its incomplete form, and partly performed by the party signing, and the defendants have received and enjoy the benefits of this performance, and, under such circumstances, a court of equity would disregard the plainest requirements of justice and ignore a situation replete with equity if it should refuse

specific performance on the ground of the incompleteness of the agreement. Pomeroy on Specific Performance (3rd Ed.), sec. 145. (Id. at 170, 161 A. at 171.)
Accordingly, this Court reversed.

[7] As these cases illustrate, a party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract. "The rule (that an offer may be communicated by conduct or by words, but must be communicated) does not mean that all the terms of the offer must be actually known by the offeree. A man may give his assent to terms when the knowledge of them is merely imputed to him, upon the general principle that notice is often *412 equivalent to knowledge." W. Brantly, Law of Contract s 11 at 24 (2d ed. rev. 1922). "The acceptance of a paper which purports to be a contract sufficiently indicates an assent to its terms whatever they may be, and it is immaterial that they are, in fact, unknown." 1 S. Williston, Contracts s 90 A at 292-93 (3d ed., W. Jaeger 1957). Therefore, if General's actions were sufficient to constitute acceptance, that acceptance would extend to all the provisions of the written contract.

[8] Silence can also operate as acceptance. Where "services are rendered under such circumstances that the party benefited thereby knows the terms on which they are being offered (, i)f he receives the benefit of the services in silence, when he had a reasonable opportunity to express his rejection of the offer, he is assenting to the **1096 terms proposed and thus accepts the offer." Corbin, Op. cit., s 75 at 321.

With that background we turn to an examination of the principles relative to summary judgment. Under Maryland Rule 610 one moving for summary judgment alleges "that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law." The judge considering the motion is to render judgment "forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." As Judge Orth said for the Court in Washington Homes v. Inter. Land Dev., 281 Md. 712, 717-18, 382 A.2d 555, 557-558 (1978), "(i)n considering the matter, the duly shown facts which would be admissible in evidence and all reasonable inferences deducible therefrom must be considered in a light most favorable to the party opposing the motion and against the party making the motion. (Citing cases.)" In this instance General was making the motion. It

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

follows, therefore, that the evidence in the deposition and exhibits and the reasonable inferences which might be derived therefrom must be considered in a light most favorable to Porter.

**\*413** [9] Years ago in Tellez v. Canton R.R., 212 Md. 423, 129 A.2d 809 (1957), Judge Niles said for the Court:

The function of the summary judgment procedure is not to try the case or to decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly. (Id. at 430, 129 A.2d at 813.)

We repeated this statement in Washington Homes, 281 Md. at 716, 382 A.2d 555, citing Lipscomb v. Hess, 255 Md. 109, 118, 257 A.2d 178 (1969). The function of the trial judge on such a motion is said to be much the same as that which he performs at the close of all the evidence in a jury trial when motions for a directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury or is to be decided by the court as a matter of law. Washington Homes 281 Md. at 716, 382 A.2d 555; Lynx, Inc. v. Ordnance Products, 273 Md. 1, 8, 327 A.2d 502 (1974); and Salisbury Beauty Schools v. St. Bd., 268 Md. 32, 41, 300 A.2d 367 (1973). Moreover, "even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." Fenwick Motor Co. v. Fenwick, 258 Md. 134, 138, 265 A.2d 256, 258 (1970), and cases there cited. It follows, accordingly, that if there is a conflict between the inferences which may be drawn from that before the court, summary judgment is not proper.

[10] The trial judge made it abundantly plain that in his opinion in order for General to be bound it was necessary that there be a contract between General and the union with a signature, something "more of a formative statement (from General to the union that) we intend to adopt your contract." In response to this statement the transcript discloses:

MR. SAMET (counsel for Porter): Your Honor doesn't feel if the party is aware that the other side assumes they are in the contract, knowing full well that the party is being misled and that his contract is manifesting his assent to the terms of the contract, **\*414** he cannot thereby become a party, he has to actually sign something or say he adopts it. If his conduct shows that he adopts, shows that he adopts the contract.

THE COURT: Your perception of His Honor's feelings are one hundred percent correct; yes, that is exactly right. You couched it in better language than I did, Mr. Samet.

MR. SAMET: Thank you, Your Honor.

THE COURT: Motion for summary judgment granted.

In Rooney v. Statewide Plumbing, 265 Md. 559, 290 A.2d 496 (1972), we said:

(W)hen the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact. **\*\*1097** This showing must be by facts which would be admissible in evidence. Such a material fact must be one the resolution of which will somehow affect the outcome of the case. Parklawn v. Nee, 243 Md. 249, 254, 220 A.2d 563 (1966). (Id. at 563-64, 290 A.2d at 499.)

The response of Porter to the motion for summary judgment said there was a genuine dispute between the parties as to a material fact and, as we have previously indicated, claimed that General, "by its conduct, clearly manifested its intention to be bound by the terms of the contract, and subsequently adhered to the same in all material respects, save the clause upon which this suit is based." The response of Porter was accompanied by the deposition of General's comptroller and certain exhibits to it by way of correspondence, all intended to support this latter contention. The deposition and exhibits were clearly admissible in evidence. The comptroller was the one who had been directly involved on behalf of General with the union. It was he who prepared cost estimates for bids on projects. He likewise was involved in the exchange of letters between General and Porter's attorney. His testimony clearly indicated General's contribution in accordance with the union **\*415** contract to various trust funds maintained by the union for the benefit of its members, a form of fringe benefit. He specifically testified that when General went into an area it obtained information from the union locals in order that it might abide by agreements relative to fringe benefits. He said he was well aware that in order to get these union employees to come to General's jobsites to work it was necessary that union wages and fringe benefits be paid, that if General were to stop paying such benefits it would lose these employees. General's affidavit confined itself to a statement that it had not been "a signatory to said labor contract (or) . . . a member of Mechanical Contractors District of Columbia Association, Inc. . . . ." The testimony of General's comptroller in the deposition and the exhibits filed with it are susceptible of an inference that General intended to be bound by all provisions of the union

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**(Cite as: 284 Md. 402, 396 A.2d 1090)**

contract. This would have included providing workmen's compensation benefits on the basis of the District of Columbia statute, a form of fringe benefit. In fact, the correspondence between General and Porter's attorney is susceptible of an inference that it was an oversight that General did not have an insurance policy providing District of Columbia benefits. It would appear that General "locked the stable door after the horse was stolen" by taking out insurance subsequent to Porter's injury to provide such benefits. In these circumstances the case should have gone to trial. Then the trier of fact would determine whether it was General's intent to be bound by the union contract. Therefore, the trial judge erred.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE, GENERAL BOILER CASING CO., INC.

396 A.2d 1090, 284 Md. 402

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works