581 A.2d 846                                                    Page 1
(Cite as: 84 Md.App. 702, 581 A.2d 846)

18A

▷

Court of Special Appeals of Maryland.

METROPOLITAN LIFE INSURANCE
COMPANY
v.
PROMENADE TOWERS MUTUAL HOUSING
CORPORATION.

No. 94, Sept. Term, 1990.

Nov. 8, 1990.

Borrower brought action for declaratory and injunctive relief against lender, seeking determination that borrower could prepay indebtedness under deed of trust notes prior to maturity. The Circuit Court, Montgomery County, William M. Cave, J., granted summary judgment for borrower, and lender appealed. The Court of Special Appeals, Cathell, J., held that: (1) deed of trust notes which did not contain provision permitting prepayment did not allow indebtedness to be prepaid without consent of lender, and (2) subsequent note and deed of trust, which purported to restate promissory note in full, did not incorporate by reference prepayment provisions from prior note.

Reversed.

West Headnotes

[1] Perpetuities ⟶6(1)
298k6(1) Most Cited Cases

Invalid restraint on alienation is generally determined by nature of restraint, not by manner in which restraint is created, and thus unreasonableness of restraint exists whether it is written or presumed.

[2] Contracts ⟶143(3)
95k143(3) Most Cited Cases

[2] Contracts ⟶236
95k236 Most Cited Cases

Basic principle of contract law is that party to contract does not have any unilateral right to modify, and courts may not redraft, agreement merely because it turns out to be disadvantageous.

[3] Payment ⟶7
294k7 Most Cited Cases

When contract of indebtedness does not contain provision permitting prepayment, that indebtedness may not be prepaid by borrower without consent of lender unless statute provides otherwise.

[4] Mortgages ⟶298(1)
266k298(1) Most Cited Cases

Borrower was not entitled to prepay indebtedness under deed of trust notes prior to maturity, where notes were silent as to prepayment, and lender did not give consent to prepayment.

[5] Appeal and Error ⟶841
30k841 Most Cited Cases

Clearly erroneous standard of review was inapplicable when reviewing trial court's holding that amended instrument which purported to restate promissory note in full incorporated by reference prepayment provisions from prior note, where there was no dispute of fact. Md.Rule 8-131(c).

[6] Appeal and Error ⟶842(8)
30k842(8) Most Cited Cases

[6] Contracts ⟶176(1)
95k176(1) Most Cited Cases

Construction of written contract is matter of law to be resolved by trial judge, and Court of Special Appeals will review it accordingly.

[7] Contracts ⟶143(2)
95k143(2) Most Cited Cases

Test for ambiguity in contract is whether terms are reasonably susceptible to two or more meanings.

[8] Contracts ⟶152
95k152 Most Cited Cases

Undefined contractual terms must be ascribed their ordinary meaning.

[9] Mortgages ⟶306
266k306 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

581 A.2d 846
**(Cite as: 84 Md.App. 702, 581 A.2d 846)**

Page 2

"In full," within modification agreement for deed of trust notes stating that consolidated note shall be read and deemed to read "in full" certain language, would be given its dictionary definition of complete and giving all details, since term was not defined in agreement.

**[10] Mortgages ☞306**
266k306 Most Cited Cases

"Modify," within meaning of modification agreement which stated that parties desired to "modify" consolidated note and consolidated deed of trust, would be given its dictionary definition of to alter, to change in incidental or subordinate features, to enlarge or extend, to amend, or to limit or reduce, where term was undefined in agreement.

**[11] Mortgages ☞306**
266k306 Most Cited Cases

"Amend," within meaning of modification agreement amending consolidated deed of trust note, would be given its dictionary definition of to change for better by removing defects or faults, since term was not defined in agreement.

**[12] Mortgages ☞306**
266k306 Most Cited Cases

"Amendment," within meaning of modification agreement amending consolidated deed of trust note, would be given its dictionary definition of altering by modification, deletion, or addition, since term was not defined in agreement.

**[13] Mortgages ☞306**
266k306 Most Cited Cases

Subsequent promissory note and deed of trust, which purported to restate promissory note in full, did not incorporate by reference prepayment provisions from prior note.

**[14] Contracts ☞143(3)**
95k143(3) Most Cited Cases

When terms of contract are clear and unambiguous, trial court may not rewrite them, even to avoid hardship to parties.

**847 *704 Charles A. Trainum, Jr. (John F. Hyland, Jr., Christopher J. Kersting, Trainum, Snowdon, Holland, Hyland & Deane, P.C., on

brief), Washington, D.C., for appellant.

*705 G. Vann Canada, Jr. (Miles & Stockbridge, on brief), Rockville, for appellee.


Argued before MOYLAN, WENNER and CATHELL, JJ.


CATHELL, Judge.

Metropolitan Life Insurance Company ("Metropolitan") appeals from an order of the Circuit Court for Montgomery County which granted summary judgment for **848 Promenade Towers Mutual Housing Corp. ("Promenade"). [FN1] The trial court, in granting Promenade's Motion for Summary Judgment, found that a subsequent note and deed of trust incorporated prior notes and a deed of trust by reference. The trial court also found, contrary to what it believed the law to be, that a debtor has a right to prepay a note and deed of trust even when the instruments are silent and do not expressly grant that right. The issues as necessarily modified are: [FN2]

> FN1. This appeal is illustrative of the adage that, as Polonius advised his son Laertes, it is better to "neither a borrower nor a lender be." W. Shakespeare, *Hamlet* Act I, scene III 75.

> FN2. We have reversed the sequence of issues presented in the appellant's brief, so that we may initially address a matter of apparent first impression in Maryland.

1. Did the trial court err in holding that as a matter of law a promissory note can be prepaid at any time unless the note explicitly prohibits prepayment?
2. Did the trial court err in holding that an instrument, as amended, which purported to restate a promissory note in full nevertheless incorporated by reference prepayment provisions from the prior note?

We hold that the trial court erred in its findings on both issues and reverse. We first address the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

581 A.2d 846                                                                                   Page 3
**(Cite as: 84 Md.App. 702, 581 A.2d 846)**

pertinent facts.

### THE FACTS

Promenade is the owner of a 24-acre tract of land
in Montgomery County containing one thousand
seventy-one *706 (1,071) apartments. Promenade
is a successor in interest to Landcon Associates
Phase One ("Landcon"). While the tract was
owned by Landcon, it encumbered the tract by
executing two separate deed of trust notes and a
deed of trust creating liens on the property. The
two deed of trust notes and deed(s) of trust were
then, by virtue of an agreement, consolidated into
one indebtedness in the amount of $23,000,000
secured by one note and one deed of trust. [FN3]

> FN3. As far as we can discern, the Record
> Extract does not contain a copy of this
> "consolidated note."

Thereafter in 1980, the parties (or their
predecessors in interest) modified the consolidated
note and deed of trust ("First Modification"). This
First Modification contained the following clause:
> From and after July 1, 1989, Borrower shall have
> the right to prepay, without the imposition of any
> prepayment fee, the entire unpaid principal sum
> evidenced by this Note, but no part thereof....
> There shall be no right of prepayment prior to
> July 1, 1989.

The interest rate stated in the First Modification
was fourteen percent (14%).

Thereafter in 1986, the note and deed of trust were
again modified and amended by express agreement
of the parties ("Second Modification"). The
Second Modification provided that:
> 3. The Consolidated Note is hereby modified
> *and amended* so that, from and after the date of
> this Agreement, the Consolidated Note shall read
> *and be deemed to read in full* as follows....
> [Emphasis added]

The stated interest rate was 11.875%. That rate, of
course, was a substantial reduction from the
previous 14%. The Second Modification omitted
the previous express right of prepayment; thus the
Second Modification contains no prepayment *707
provision. [FN4] Subsequently, Promenade sought

to refinance the project and informed Metropolitan
of its desire to prepay the indebtedness.
Metropolitan informed Promenade that it would not
permit the prepayment of the indebtedness prior to
maturity.

> FN4. This Second Modification was not a
> short form modification. It restated in
> full, as amended, the promissory note, and
> that amended note was actually executed
> within the body of the agreement.

Promenade filed for declaratory and injunctive
relief to resolve the issues alleging that the position
taken by Metropolitan constituted an unreasonable
restraint of alienation in respect to real property.
During the course of the proceedings in the trial
court, Promenade also raised the issues of the
intention of the parties, construction of **849 the
agreement, and incorporation by reference. [FN5]

> FN5. These issues, though not addressed in
> Promenade's Complaint for Declaratory
> Judgment, Mandatory Injunction and other
> Relief, were raised in its Memorandum of
> Points and Authorities in Support of
> Motion for Summary Judgment.

### I
May the indebtedness evidenced by a promissory
note and deed of trust be
prepaid at the sole option of the borrower when
the instruments contain no
provision for prepayment?

Appellee understandably urges us to hold that such
prepayment is permitted without penalty where the
instrument is silent. It asserts that a contrary
holding would create an unreasonable restraint on
alienation. It further suggests that its entreaties in
that regard are not grounded in the law of contracts,
but in the "public policy of the State of Maryland."
In support, Promenade cites several irrelevant
Maryland cases holding that certain restraints on
alienation are unreasonable and thus void as against
public policy. [FN6]

> FN6. The cases cited are *Northwest Real*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Estate Company v. Serio,* 156 Md. 229, 144 A. 245 (1929); *Gischell v. Ballman,* 131 Md. 260, 101 A. 698 (1917); *Clark v. Clark,* 99 Md. 356, 58 A. 24 (1904); *Stansbury v. Hubner,* 73 Md. 228, 20 A. 904 (1890). *Northwest* involved a provision that expressly prohibited a reconveyance without the consent of a prior owner; *Gischell, Clark* and *Stansbury* all involved a fee simple (or equivalent) devise in a will with a subsequent express limitation against reconveyance. The nature of the restraint in each of these cases was found to be unreasonable--not the method in which the restraint was created. None of these cases have even a remote connection with the issues in the case at bar.

**\*708** Promenade concedes that the majority rule is that "absent an express contractual reservation of a right of prepayment, a borrower does not have the unilateral right to retire a mortgage debt prior to maturity." It nevertheless argues that, whereas the Maryland courts have never addressed this issue, we should adopt the minority rule stated in the singular case of *Mahoney v. Furches,* 503 Pa. 60, 468 A.2d 458 (1983), which held that, absent a clause regarding prepayment, a right of prepayment presumptively existed. Promenade asks us to adopt this minority rule and reject the majority rule "as no longer applicable in modern real estate financing." [FN7]

> FN7. We fail to perceive why the majority rule is any less applicable under current real estate financing involving institutions and/or commercial parties than it was under the real estate financing practices of prior times.

### The Majority Rule

A brief review of the cases confirms our belief that the rule described, *supra,* by Promenade and relied upon by Metropolitan, sometimes referred to as the rule of "perfect tender in time," has been a part of the common law throughout this century and is equally applicable in the "modern" world of real estate financing. At common law, in the absence of a provision allowing prepayment, a presumption

exists that the payee is under no obligation to accept payment prior to maturity. *MacIntyre v. Hark,* 528 So.2d 1276 (Fla.Dist.Ct.1988). [FN8] Some jurisdictions do not **\*709** allow prepayment even if the borrower offers to pay the full amount of interest. *See, e.g., Westminster Investing Corp. v. Equitable Assn. Soc. of U.S.,* 443 F.2d 653 (D.C.Cir.1970) (dictum); **\*\*850** *McCausland v. Banker's Life Ins. Co.,* 110 Wash.2d 716, 757 P.2d 941, 944 (1988). [FN9] This is true even where a borrower attempts to use an "acceleration on default" clause, similar to the one in the note *sub judice,* to force a prepayment by defaulting on installment payments and then demanding an acceleration. In such a case, the prepayment clause will be interpreted to confer only on the lender an option to accelerate the note's maturity. *Peter Fuller Enterprises, Inc. v. Manchester Savings Bank,* 102 N.H. 117, 152 A.2d 179 (1959). Even when a purchase contract provided that a sum was to be paid by a definite time "if not sooner paid," it has been held that a prepayment right was not conferred. *Kruse v. Planer,* 288 N.W.2d 12 (Minn.1979). *See also Mandella v. Russo,* 294 So.2d 598 (La.App.1974).

> FN8. *See also Hanson v. Fox,* 155 Cal. 106, 99 P. 489 (1909); *Lazzareschi Inv. Co. v. San Francisco Federal Savings & Loan Ass'n,* 22 Cal.App.3d 303, 99 Cal.Rptr. 417 (1971); *Atlantic Life Ins. Co. of Richmond v. Wolf,* 54 A.2d 641 (D.C.1947) (neither borrower nor lender has right to advance the maturity date); *Carpenter v. Winn,* 39 Colo.App. 238, 566 P.2d 370 (1977); *In re Agostini,* 42 Del. 347, 33 A.2d 306 (1943) (same); *McCarty v. Mellinkoff,* 118 Cal.App. 11, 4 P.2d 595 (1931) (lender had the right to refuse to accept payment prior to maturity); *Baldwin v. Corcoran,* 320 Mo. 813, 7 S.W.2d 967 (1928); *Wilson v. Corcoran,* 73 Mont. 529, 237 P. 521 (1925); *Goetz v. Hubbell,* 66 N.D. 491, 266 N.W. 836 (1936); *Henderson v. Guest,* 197 Okl. 443, 172 P.2d 605 (1946) (rule is that the parties may not demand or require acceptance of prepayment prior to date of maturity); *Wilson v. Holyfield,* 227 Va. 184, 313 S.E.2d 396 (1984) (analogizing lack of prepayment provision to lack of clause requiring security); *Peryer v.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Pennock,* 95 Vt. 313, 115 A. 105 (1921). *But see Skyles v. Burge, infra,* where a Missouri court appears to be accepting the *Mahoney* rationale.

FN9. "In the case of a debt secured by mortgage, as in the case of any other debt, the debtor has no right to insist upon making payment before the maturity of the debt, even though he tenders the principal and also the interest calculated up to the time of maturity." 5 H. Tiffany, *Law of Real Property* 488 (3d ed. 1939). (footnotes omitted)

Even where a statute prohibits prepayment penalties, appellate courts have refused to require prepayment. In *Hatcher v. Rose,* 97 N.C.App. 652, 389 S.E.2d 442 (1990), the statute stated that "[n]o prepayment fees shall be contracted ... otherwise a lender and a borrower may agree on any *710 terms as to the prepayment of a home loan." The court held:

[The statute] only prohibits prepayment *penalties* on certain home loans; it does not address the issue of prepayment of the loan itself. If the General Assembly ... intended to amend the common law regarding prepayment of loans where the loan agreement is silent, they could have used the straightforward and unequivocal language subsequently enacted....

*Id.* 389 S.E.2d at 444. (Emphasis in original)

The justification for this rule is that if the lender is forced to accept prepayment which it did not bargain for, it would be exposed to a lesser than anticipated rate of return, possibly adverse tax consequences, and added reinvestment costs. *Warrington 611 Associates v. Aetna Life Ins.,* 705 F.Supp. 229 (D.N.J.1989); *Northway Lanes v. Hackley Union National Bank and Trust Co.,* 334 F.Supp. 723 (W.D.Mich.1971), *aff'd,* 464 F.2d 855 (6th Cir.1972). *See also* 3 R. Powell, *Powell on Real Property* § 37-279, par. 460 [3] (1987) (the basis for this traditional rule is that the lender is entitled to the agreed upon interest over the term of the loan). Thus, when sophisticated parties bargain in a commercial setting, the lender may refuse to accept prepayment unless the contract so allows. [FN10] *Houston North Hospital Properties v.*

*Telco Leasing, Inc.,* 680 F.2d 19, *aff'd,* 688 F.2d 408 (5th Cir.1982) (applying Illinois law); *CHG International, Inc. v. Barclays Bank,* 897 F.2d 1479 (9th Cir.1990) (applying Washington State law).

FN10. The text writers generally agree that "it has thus become very common for mortgage documents to provide for a prepayment privilege in order to counter the common law rule that prepayment is not allowed unless the parties expressly agree to it in the mortgage or in subsequent negotiations." 3 R. Powell, *Powell on Real Property* § 37-279, par. 460 [3] (1987).

### The Minority Rule

The minority rule is stated in *Mahoney v. Furches,* 468 A.2d 458 (Pa.1983). In reviewing that case, we are constrained *711 to address what we perceive to be contradictions in the Pennsylvania Court's rationale. That court states:

We may agree that the use of the mortgage for private investment purposes is increasing and may also support a policy encouraging such use. To do so, however, we need not embrace the conclusion reached by the Connecticut court and ignore other important considerations merely to accommodate this trend. Rather, and indeed because of this increased use of the mortgage as an investment instrument, we must consider the policy encouraging such use in light of the implications it might have on the free alienability of land--a consideration we feel is the dominant one, since the fundamental purpose of the mortgage note in most instances is to secure a debt **851 incurred in the purchase of land from which the debt arises rather than to secure investment income for the mortgagee.[ [FN11]]

FN11. The Connecticut case referred to is *Dugan v. Grzybowski,* 165 Conn. 173, 332 A.2d 97 (1973).

* * * * * *

Taking cognizance of the general policy in this Commonwealth and elsewhere against restraints on alienation, we find it would be against such

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

581 A.2d 846
(Cite as: 84 Md.App. 702, 581 A.2d 846)

Page 6

policy to presume, simply from the absence of a clause so allowing, that a mortgagor could not pay off his debt and alienate his land as he so desired. Instead, *we think it wiser to raise a presumption of a right to prepayment of the note where a mortgage is silent as to that right.* This presumption could be rebutted by showing a contrary intent mutually manifested by the parties. Such a presumption would not work a hardship on the mortgagee since, in virtually all instances, he is the drafter of the mortgage note and can thus include within the note a clause stating that the note is not subject to prepayment. This would put the mortgagor on notice that he will in all probability be restrained from selling the land for the duration of the term. If he signs the note containing *712 such a provision, he will then be bound by it even though it may restrain his right to its sale or use.

*Id.* at 461. (Emphasis added)

[1] We understand the Pennsylvania decision to mean that an express provision prohibiting prepayment would not be an unreasonable restraint on alienation while an implied prohibition, due to the instrument's silence on prepayment, would be. It is our understanding that, *contrary to Mahoney,* an invalid restraint on alienation is generally determined by the nature of the restraint, not by the manner in which the restraint is created. The *Mahoney* court held that, where a mortgage note is silent as to the right of prepayment, there arises a presumption that the debt may be prepaid. It did so on the basis that the method of prohibition of prepayment, *i.e.,* silence, created an invalid restraint on alienation. [FN12] While we are sympathetic with and cognizant of the effects of such clauses, the unreasonableness, if any, of a restraint exists whether it is written or presumed. We note also that the *Mahoney* court apparently revised or significantly modified prior Pennsylvania decisions in its ruling. [FN13]

FN12. We emphasize that these types of agreements are not silent on the matter of payment. The manner of payment is expressly set out. The interpretation placed upon the language of payment by the Pennsylvania court inserts different and contradictory language in the parties' agreement based upon the creation of a

presumption from nothing--*i.e.,* silence.

FN13. The Superior Court of Pennsylvania in *Beth-June, Inc. v. Wil-Avon Merchandise Mart, Inc.,* 211 Pa.Super. 5, 233 A.2d 620 (1967), citing *Hensel v. Cahill,* 179 Pa.Super. 114, 116 A.2d 99 (1955), stated:
However, a mortgage which is payable within a certain number of years, if it calls for installments in an amount which will evenly amortize the debt throughout the term of the obligation does not afford a mortgagor the right of prepayment, and the installments are the minimum which must be paid and the maximum which must be accepted by the mortgagee. The *Mahoney* court quoted the above passage before holding to the contrary.

The only other decision we have been able to discover, indicating an acceptance of the *Mahoney* holding, is the *713 intermediate appellate court decision of the Missouri Court of Appeals in *Skyles v. Burge,* 789 S.W.2d 116 (Mo.1990). That court gave the issue an evolutionary treatment, tracing it from English law. The Missouri court suggested that prior to the 19th century, prepayment was not prohibited when the instrument was silent; this was described in ancient times as "the law of the 'gage.' " That court then discussed the "Welsh mortgage," which contained no payment provisions at all, before it finally acknowledged that "[s]ince the early nineteenth century, the general rule has been that a debtor cannot, without the lender's consent, prepay a mortgage debt." *Id.* at 118. The Missouri court then described the early case of *Abbe v. Goodwin,* 7 Conn. 377 (1829) as embracing the rule of "perfect tender in time," which the court read as **852 holding that a mortgagee could not even be compelled to accept, in advance, payment in full including future interest, absent permitting provisions.

After accepting that the "perfect tender in time" rule remains in effect in most jurisdictions, the Missouri court apparently departed from that rule, embracing the *Mahoney* reasoning:
Despite the Abbe case and other historical antecedents of the rule of perfect tender in time, it would seem, at least in terms of residential real

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

581 A.2d 846
**(Cite as: 84 Md.App. 702, 581 A.2d 846)**

Page 7

estate, that a mortgagor could discharge the debt by payment in full of all the principal due and all the accrued and unaccrued interest that would be due over the term of the note.

*Skyles,* at 119.

After this apparent embrace of the *Mahoney* holding, the court incongruously went on to utilize a Missouri statute, applying only to residential real estate, to reverse the trial court. [FN14]

> FN14. Whether the language of the *Skyles* Court approving the *Mahoney* view is sufficiently clear to constitute a holding, in view of its subsequent reliance on statutory authority, is unclear and will have to await subsequent treatment by the Missouri courts.

### The Maryland Law

*714 Both parties have informed us that the present case is one of first impression in Maryland. Their assertion is largely correct; however, several Maryland cases exist that address the prepayment issue in other contexts. The line of cases which we will discuss is consistent with the majority rule.

[2][3][4] A basic principle of contract law is that a party to a contract does not have any unilateral right to modify, and courts may not redraft, an agreement merely because it turns out to be disadvantageous. *Vincent v. Palmer,* 179 Md. 365, 372, 19 A.2d 183 (1941). One of the issues in the case of *Meinecke v. Goedeke,* 195 Md. 373, 73 A.2d 445 (1949), was whether a contract purchaser of land would be permitted to make a lump sum payment of the total sum due under the contract where the contract was silent as to prepayment, and the seller objected. The trial court ruled that he could not prepay. The Court of Appeals affirmed, saying:

> As the appellants refused to accept in a lump sum the balance of the purchase money due for the reason that they desire the 6% interest on this balance, the chancellor was correct in decreeing that the balance of the payments be made at $50.00 per month as specified in the contract.

*Id.* at 382-83, 73 A.2d 445.

The Court in *Great United Realty Co. v. Lewis,* 203 Md. 442, 450, 101 A.2d 881 (1953) was again concerned with a contract for the sale of realty. It stated: "... the law is settled that a contract between competent parties cannot be rescinded by either party *without an option to do so* or without the other parties consent.... A party to a contract has no right to rescind it merely because he finds in the light of changed conditions that he made a bad deal." (Emphasis added) This rule has been applied in a case involving a contract which forbade prepayment of the monthly payments. The Court in *Pierson v. Pyles,* 234 Md. 119, 122-23, 197 A.2d 890 (1964), stated that the appellee's *715 position was that it had entered into the provisions preventing prepayment for investment purposes and "that to permit the vendees to prepay the purchase price would deprive the estate of its legal right under the contract." The Court agreed.

We affirmed in a case where a contract contained a clause requiring payment of the full amount of interest in the event of prepayment. We adopted a portion of the trial court's finding, which we quoted in part:

> That provision created and conferred upon the lender ... a valuable contractual right of which she should not, and cannot, be deprived.... Agreeable, as it was, to the buyers, obligors, guarantors and transferees, it constitutes a contractual obligation with which the Court should not, and cannot, tamper.

**853 *Connolley v. Harrison,* 23 Md.App. 485, 491, 327 A.2d 787, *cert. denied,* 274 Md. 727 (1974). More recently, in *Andresen v. Young Contracting Co.,* 32 Md.App. 98, 359 A.2d 111, *cert. denied,* 278 Md. 715 (1976), we examined a note which contained no right of prepayment, and concluded that the debtor was required to make payments according to the terms of the note.

In discussing the policy reasons inherent in the majority rule, the Supreme Court of Washington opined:

> If there is a need for regulations to be imposed in commercial loans regarding the amount of prepayment penalties that can be demanded, that subject is more appropriately addressed to the legislature. As [a] California court observed in that regard,
> [I]nstitutions which lend vast sums of money should be informed, not by judgments after the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

facts on a case-to-case basis, but by laws or regulations which are in existence in advance of the undertaking to execute loans, of the validity or invalidity of terms that are commonly used.

*McCausland v. Bankers Life Ins. Co.,* 110 Wash.2d 716, 757 P.2d 941, 945 (1988) (quoting **\*716** *Lazzareschi Inv. Co. v. San Francisco Federal Savings & Loan Ass'n,* 22 Cal.App.3d 303, 311, 99 Cal.Rptr. 417 (1971)). We agree.

We adopt the majority rule and hold that where a contract of indebtedness does not contain a provision permitting prepayment, that indebtedness may not be prepaid by the borrower without consent of the lender unless a statute provides otherwise.

II
Did the trial court err in holding that an instrument, as amended, which
purported to restate a promissory note in full nevertheless incorporated by
reference prepayment provisions from the prior note?

The final issue we shall resolve concerns construction of the writing itself. The trial court concluded that the prepayment clause of the First Modification was incorporated into the Second Modification by reference, and that it survived as part of the Second, because the prepayment clause in the first modification was not expressly eliminated. His conclusion was legally incorrect.

[5][6] As a threshold matter, there was no dispute of fact, so the "clearly erroneous" standard of review urged upon us by Promenade and set forth in Md. Rule 8-131(c) is inapplicable. *Sica v. Retail Credit Co.,* 245 Md. 606, 227 A.2d 33 (1966); *Suburban Properties, Inc. v. Mayor and Council of Rockville,* 241 Md. 1, 6, 215 A.2d 200 (1964). The construction of a written contract is a matter of law to be resolved by the trial judge, and we review it accordingly. *James Julian, Inc. v. State Highway Administration,* 63 Md.App. 74, 94, 492 A.2d 308 (1985). The applicable rules of construction were succinctly stated by the Court of Appeals in *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985):
    It is well settled that Maryland follows the objective law of contracts. A court construing an agreement under this test must first determine from the language of the agreement itself what a

reasonable person ... meant *at \*717 the time it was effectuated.* In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court *must* presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean. [Emphasis added, citations omitted]

The agreement's preamble states: "WHEREAS, Borrower, Beneficiary, and Trustee *desire to modify* the Consolidated Note and Consolidated Deed of Trust, all as hereinafter set forth." (Emphasis added) Then in Paragraph Three, the agreement states: "The Consolidated Note is hereby modified and *amended* so that, from and **\*\*854** after the date of this Agreement, the Consolidated Note shall read *and be deemed to read in full* as follows...." (Emphasis added) The note itself is then set forth, and after it, Paragraph Four declares that "Borrower hereby confirms and reaffirms the terms, covenants and conditions of the Consolidated Note, *as amended hereby,* and hereby confirms and reaffirms its promise to pay to the Beneficiary ... the full principal ... with interest thereon, all in accordance with the terms of the Consolidated Note, *as amended hereby."* (Emphasis added)

[7] The test for ambiguity is whether the terms are reasonably susceptible to two or more meanings. *P.V. Properties v. Rock Creek Village Associates Limited Partnership,* 77 Md.App. 77, 549 A.2d 403 (1988). After having read the Second Modification as a whole, we conclude that there is no possible significance to be gleaned from the terms in that modification other than their obvious meaning.

[8][9][10][11][12][13] **\*718** The key terms emphasized *supra* are not defined in the contract, so we must ascribe to them their ordinary meanings. This is best done by referring to their dictionary definitions: "In full" means "Complete; giving all details." *Black's Law Dictionary* 781 (6th ed. 1990). "Modify" is defined as to "alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce." *Id.* at 1004. "Amend" is defined as to "change for the better by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

581 A.2d 846
**(Cite as: 84 Md.App. 702, 581 A.2d 846)**

removing defects or faults," *id.* at 80, and "amendment" means to "alter by modification, *deletion,* or addition." *Id.* at 81. (Emphasis added) *See also Random House Dictionary of the English Language* 47 (unabridged ed. 1983) (amendment defined as "a change made by correction, addition, or deletion"). According to these definitions, the Second Modification has excluded the prepayment terms embodied in the First Modification. [FN15]

> FN15. Other jurisdictions concur with our definitions of these terms. *See, e.g., Foshee v. Mims,* 279 Ala. 414, 186 So.2d 129, 130 (1966) (the word "full" is synonymous with "complete"); *People v. Sarver,* 102 Ill.App.3d 255, 57 Ill.Dec. 834, 429 N.E.2d 1108 (1981) ("[a]n amendment is that which alters 'by modification, deletion or addition' "); *Matter of Meekins,* 554 P.2d 872, 875 (Okla.App.1976) ( "modify" defined as " 'to alter; ... limit, reduce' ").

[14] When the terms of a contract such as this are clear and unambiguous, the trial court may not rewrite them, as the trial judge did in the case at bar, even to avoid hardship to the parties. *Stueber v. Arrowhead Farm Estates,* 69 Md.App. 775, 780, 519 A.2d 816 (1987). The function of the trial court was to apply the law as evidenced by the clear language which created a contract of indebtedness silent as to any right of prepayment. The court's failure to do so constituted reversible error.

JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.

581 A.2d 846, 84 Md.App. 702

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

### *DEFENDANTS' AND COUNTER-PLAINTIFFS' REQUESTED INSTRUCTION 18B*

### ASSENT TO PROPOSED CONTRACT MODIFICATION

In order to assent to a proposal to modify terms of an existing contract, the party from which such a modification is sought will not be deemed to have consented to a modification by his silence.  If you find that Point Blank entered into employment agreements with Messrs. Price, Krummel, and Murray in January 2001, then you may find that Point Blank's issuing restricted stock and warrants to purchase restricted stock to be an attempt to unilaterally modify the compensation terms of the employment agreements and that Messrs. Price, Krummel, and Murray were not required to state any formal objection to Point Blank's attempt to unilaterally modify the contract, as silence is insufficient to show assent to a modification.

*Cambridge Technologies, Inc. v. Argyle Industries, Inc.*, 146 Md.App. 415, 434, 807 A.2d 125, 135 (2002).

18B and 19A

146 Md.App. 415

**CAMBRIDGE TECHNOLOGIES, INC.**

v.

**ARGYLE INDUSTRIES, INC.**

**No. 1519, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 9, 2002.

Seller brought action against buyer to recover payment after buyer cancelled contract to supply parts. Buyer filed counterclaim to recover damages caused by cancellation of Defense Department contract. The Circuit Court, Dorchester County, Truitt, J., entered judgment in favor of seller. Buyer appealed. The Court of Special Appeals, Salmon, J., held that: (1) seller did not substantially perform the contract; (2) buyer did not waive the issue of timely delivery and did not assent to modification; (3) seller was not entitled to recover in quantum meruit; and (4) buyer failed to establish that Department of Defense cancelled contract because of seller's tardiness.

Reversed and remanded.

**1. Sales ⟐150(3)**

Seller did not substantially perform contract to supply parts for telescoping rods attached to stretchers; the buyer could not make use of the individual parts until complete sets of all seven parts were delivered, the seller knew that time was of the essence when it agreed to the sixteen-week delivery schedule, but it never met the original schedule or the schedule it unilaterally modified.

**2. Contracts ⟐294**

The substantial performance rule does not apply where the parties, by the terms of their agreement, make it clear that only complete performance will be satisfactory.

**3. Sales ⟐176(3)**

Buyer did not waive the issue of timely delivery by its failure to make any objection to seller's tardiness prior to cancelling the contract.

**4. Sales ⟐152**

Buyer had no duty to notify seller of its breach of delivery obligations; the seller was well aware of the delivery deadlines at the time it failed to meet them.

**5. Sales ⟐152**

The Uniform Commercial Code (UCC) does not require the buyer to give notice to the seller where there is non-delivery; in a case of non-delivery, the seller as well as the buyer knows of the breach and needs no further notice.

**6. Sales ⟐89**

Seller had no right to unilaterally modify the contract regarding delivery dates.

**7. Contracts ⟐236**

A party to a contract does not have any unilateral right to modify.

**8. Contracts ⟐236**

Modification of a contract requires mutual assent of the parties.

**9. Sales ⟐89**

Buyer's silence following seller's failure to comply with delivery schedule was insufficient to show assent to a modification.

**10. Implied and Constructive Contracts
⟐4**

One who proves a quasi contract (contract implied in law) is entitled to recover restitution.

**11. Sales ⊗170**

Seller that breached contract to supply parts for telescoping rods attached to stretchers was no longer entitled to the contract price for the various incomplete sets of parts delivered.

**12. Implied and Constructive Contracts ⊗110**

The measure of damages for unjust enrichment is the gain to the defendant, not the loss by the plaintiff.

**13. Implied and Constructive Contracts ⊗31**

Seller of parts for telescoping rods attached to stretchers was not entitled to recover, in quantum meruit, for the delivered parts that could not be assembled to make up sets of rods, where the seller did not show the value of those parts to the buyer.

**14. Sales ⊗417**

Evidence supported buyer's decision to charge $35 per hour and a total of $8,623.15 to remove burrs from defective parts supplied by seller for telescoping rods attached to stretchers; testimony by seller's vice president that the hourly rate was excessive was not meaningful rebuttal.

**15. Sales ⊗418(17)**

Buyer failed to establish that Department of Defense cancelled contract because of seller's tardiness in supplying parts and that seller's breach entitled the buyer to lost profits and the cost of parts and materials to fulfill obligations under defense contract.

**16. Sales ⊗418(19)**

Buyer's charge of $8,623.15 for fixing the clamps and lock rings that were delivered by seller in a defective condition had to be set off by $2,813.82, which was the difference between the value of the sets used by the buyer ($33,541.08) and what

the buyer had already paid ($30,727.26) to the seller.

———

William W. McAllister, Jr. (Demetrios G. Kaouris and Miles & Stockbridge, P.C. on the brief), Cambridge, for appellant.

Stephen H. Kehoe (Ewing, Dietz, Turner & Kehoe, P.A. on the brief), Easton, for appellee.

Argued before SALMON, SHARER, and CHARLES E. MOYLAN, JR., (Ret., Specially Assigned), JJ.

SALMON, Judge.

In the fall of 1997, Argyle Industries, Inc. ("Argyle"), contracted to deliver 14,-500 sets of parts to Cambridge Technologies, Inc. ("Camtec"). The parts were to be delivered in accordance with a schedule that was set forth in a purchase order. Camtec intended to assemble the parts manufactured by Argyle (and others) and to sell the assembled product to the Department of Defense ("DOD") in fulfillment of a contract it had with the U.S. government.

Argyle did not meet the delivery schedule set forth in its contract with Camtec. Nevertheless, Argyle made some late deliveries, and Camtec did not complain about the fact that the delivery schedule was not being met. After Argyle had delivered approximately forty percent of the sets of parts it had promised, and after the deadline for supplying all the contracted-for parts had expired, the DOD cancelled its contract with Camtec—due to the latter's tardiness in making its deliveries. Immediately after the DOD contract was cancelled, Camtec, in turn, cancelled its contract with Argyle.

Argyle filed a two-count complaint against Camtec in the Circuit Court for Dorchester County. The first count was for breach of contract, and the second was under a *quantum meruit* theory. Camtec filed an answer to the complaint, together with a counter-complaint, in which it alleged, *inter alia*, that Argyle's tardiness in making delivery caused it to lose the DOD contract. The breach (allegedly) caused Camtec to make expenditures that would have otherwise been unnecessary and to lose the profits it would have otherwise made.

At the conclusion of a bench trial, the trial judge delivered a brief oral opinion in which he found that there had been "substantial compliance" with the contractual terms on Argyle's part and awarded Argyle damages in the amount of $33,541.08 as to Count I. The damage award, purportedly, was based on figures supplied by Camtec.

The trial court disposed of the counterclaim with the following words: "The counterclaim is denied for failure of proof of damages." Camtec filed this timely appeal and raises three major questions:

1. Did the trial court err in finding that Argyle had substantially performed the contract?

2. Did the trial judge err in calculating damages?

3. Did the trial court err in denying Camtec's counterclaim on the basis that it had failed to prove damages?

## I. *BACKGROUND FACTS* [1]

Argyle, a New Jersey corporation, is in the business of providing wholesalers with manufactured metal products. Camtec is in the business of manufacturing mechanical and electrical systems for the healthcare industry. Over the last forty years, one of Camtec's main customers had been the DOD.

In 1996, Camtec began negotiations with the DOD to provide the latter with telescoping I.V. rods, which were to be designed so that I.V. bottles could be hung from the rods and the rods themselves could be attached to stretchers. The negotiations with the DOD were fruitful, and on April 7, 1997, the DOD awarded Camtec a contract for the manufacture of 14,162 I.V. rods.[2] The contract originally required Camtec to deliver the rods on or before November 18, 1997. Between April and October 1997, Camtec worked with the DOD to update the specifications for the rods to conform to the most modern technology.

Meanwhile, in contemplation of fulfilling its contract with the DOD, Camtec, on March 12, 1997, asked Argyle for an estimate of the cost of fabricating 14,500 I.V. poles, 500 "rod-jaws," and 14,500 lock rings, which were all to be used in connection with the assembly of the I.V. rods. Argyle provided Camtec with a price for those items. Later, in September 1997, Camtec sought an additional quote from Argyle for some other items needed in conjunction with the construction of the rods.

On October 6, 1997, Camtec and Argyle entered into the contract that is the subject of this suit. The contract was set forth in Purchase Order No. 01057. In the purchase order, Argyle agreed to produce and deliver 14,500 sets of parts needed to

---

1. The facts set forth in Part I are undisputed.

2. The contract between Camtec and the DOD allowed for a two percent margin, meaning

that Camtec could ship to the DOD either two percent more or two percent less than 14,162 I.V. rods.

construct the I.V. rods.[3]  The purchase order provided that Argyle was to commence work when Camtec approved Argyle's design prints for each of the seven items that made up the individual sets of parts needed to construct the I.V. rods. The seven parts were: (1) a 17″ tube; (2) a 13.625″ tube; (3) an "upper rod"; (4) a clamp; (5) a "jaw," which attaches to the rod; (6) Lock Rings No. 1; and (7) Lock Rings No. 2. All seven parts were necessary in order for Camtec to commence its assembly of the I.V. rods.  The contract between Argyle and Camtec provided that "parts must be free of burrs and chips." Chemical and physical analyses were required to be provided with each shipment.

By December 23, 1997, all the sample parts that Argyle had provided to Camtec had been approved for production.  Under the terms of the purchase order, Argyle was to supply twenty-five percent of the 14,500 sets of parts within ten weeks of December 23, 1997, and then provide twenty-five percent of the sets every two weeks thereafter.  Thus, under the contract, Argyle was obligated to deliver 3,625 sets of parts by March 3 and a similar number on March 17, March 31, and April 14, 1998.  From the outset, Argyle understood that time was of the essence.

After Camtec contracted with Argyle, the DOD and Camtec agreed to revise Camtec's delivery schedule.  Camtec was required under the revised contract to deliver fifty percent of the I.V. rods (7,081) by February 27, 1998, and fifty percent by March 31, 1998.

A Camtec representative testified at trial that the extension had been expected because previously he had "verbal assurances" from the DOD that the latter would not hold Camtec to the original schedule.

Therefore, in October 1997, when the purchase order was issued to Argyle, Camtec knew it would have additional time to complete the DOD contract—according to Camtec's witness.

By February 27, 1998, Argyle knew that it was not going to be able to meet the schedule of producing twenty-five percent of the order (i.e., 3,625 sets) by March 3, 1998, nor was it going to be able to deliver a similar number every two weeks as scheduled.  As of February 27, 1998, of the seven parts ordered, Argyle had delivered all the 17″ tubes, all the 13.625″ tubes, as well as all the upper rods.  But it had delivered only 198 clamps and a similar number of jaws.  It had delivered no Lock Rings Nos. 1 or 2.

On February 27, 1998, a representative of Argyle wrote Camtec and said:

We will be shipping the following on Monday, 3/2/98:

237  pcs. of Lock Ring # 1

243  pcs. of Lock Ring # 2

686  pcs. of the Jaws

On Wednesday, 3/4/98, we will have 2,000 of each of the four parts fully fabricated[;] it will take a few days for tumbling.

We will be producing at least 1,000 sets a week, though this will probably be closer to 2,000 sets a week.

Shipments will be made every other week if this is acceptable to you.

If you have any questions or comments[,] please do not hesitate to call.

After receipt of the February 27 letter, no one from Camtec protested the revised delivery schedule, nor was Argyle ever told of the deadlines set forth in Camtec's contract with the DOD.

---

**3.**  Apparently Camtec intended to manufacture more I.V. rods than were ordered because the DOD contract allowed a deviation in quantity of plus or minus two percent.  Two percent of 14,162 is 283.24.

The promises made in the letter of February 27 were not fulfilled. Argyle did send by March 6 (not March 3, as promised) 235 Lock Rings No. 1, 141 Lock Rings No. 2, and 679 jaws. Thus, by March 6, 1998, Argyle had delivered only 141 complete sets of parts, which was less than five percent of the 3,625 sets due as of March 3.

Argyle wrote Camtec on March 6, 1998, and said:

> As we discussed, we will be shipping you the following on or before Friday 3/13/98:
>
> 2,000  pcs. P/N 901042, Clamp
>
> 3,000  pcs. P/N 901048–0, Jaw
>
> 3,000  pcs. P/N 901047–0, Lock Ring #1
>
> 3,000  pcs. P/N 901046–0, Lock Ring #2
>
> We have shipped 143 pieces of Lock Ring 2 and 237 pieces of Lock Ring 1. As soon as we have better information on this we will pass it along.
>
> We will be producing at least 1,000 sets per week. The production should be closer to 2,000 sets per week.
>
> Thank you for your patience. We understand time is of the essence. If you have any questions[,] please do not hesitate to call.

After March 6, 1998, Argyle never came close to delivering 1,000 sets of parts per week—much less 2,000. By March 31, 1998, which was four weeks and four days after the February 27 letter, Argyle had delivered an additional 4,740 jaws but had failed to make delivery of *any* additional lock rings (either No. 1 or No. 2), and only 2,183 clamps. Therefore, by March 31, 1998—the date when, under the terms of the purchase order—10,875 sets of the parts were to have been delivered, only about two percent (141) complete sets had been delivered to Camtec.

In early April 1998, Argyle delivered nearly all the jaws remaining due under the contract. But by April 14, 1998, the date when, under the agreement, all 14,500 sets should have been delivered to Camtec, Argyle had delivered only 1,633 complete sets. Even if appellant had met its own self-imposed 1,000 sets of parts per week schedule, 8,000 sets of parts would have been delivered by April 14, 1998.

Besides delivery problems, the quality of the clamps and lock rings that were delivered by Argyle were unacceptable. As mentioned earlier, the purchase order accepted by Argyle provided that the manufactured product was to be free of burrs (among other things). A burr in an aluminum product is a sharp edge around a hole, caused by drilling of the hole. Before delivery to a customer, aluminum parts go through a process called "tumbling" to get rid of burrs. According to a witness called by Camtec, one hundred percent of the clamps delivered by Argyle had a burr around the screw holes. The defective clamps were not returned to Argyle; instead, they were fixed by Camtec. The repair procedures for getting rid of a burr in a clamp takes an estimated one and a half minutes per clamp. A somewhat similar problem existed with both Lock Rings Nos. 1 and 2. According to the testimony of Camtec's witness, during the tumbling process, the rough edges around two small holes (where the jaw was to be screwed into the clamp) were "rolled into the thread," thereby causing the thread to be "bugered." The problem was remedied by Camtec's employees tapping out the holes that had "bugered" edges.

On April 30, 1998, the DOD cancelled Camtec's contract to supply I.V. rods due to Camtec's "extreme tardiness" in making deliveries of the final product. Camtec immediately notified Argyle of the cancellation and directed it to stop all work

immediately. The next day (May 1, 1998), Argyle sent Camtec a letter, which read as follows:

> In regards to the above listed purchase order, please find the following breakdown of our current stage of production:
> 1. P/N 901042–0—Clamp
> a. 5,920 Pieces fabricated/tumbled awaiting shipment
> b. 3,172 Pieces not fabricated/tumbled
> 2. P/N 901047–0—Lock Ring # 1
> a. 850 Pieces completed and shipped 4–30–98
> b. 5,850 Pieces fabricated/tumbled awaiting shipment
> c. 4,133 Pieces not fabricated/tumbled
> 3. P/N 901046–0—Lock Ring # 2
> a. 9,003 Pieces not fabricated/tumbled
> The total value of the above listed material is $21,934.88. In addition, there is a balance of $28,509.47 due against material that has already been shipped to your location.

Except for the three parts mentioned in the letter of May 1, Argyle had delivered all the parts that had been ordered. The problem, however, from Camtec's perspective, was that Argyle had delivered less than one-half the contracted-for complete sets of parts, and without complete sets, Camtec could not assemble the I.V. rods for delivery to the government.

In response to the May 1, 1998, letter, Camtec wrote:

> As you have been advised, we have had a cancellation of the contract using the parts set forth in our purchase order 010157. This may turn out not to be a complete cancellation and we are negotiating with the government relative to the specifics in this matter. Please stop all work on this order.

> On May 1, 1998, you sent me a memorandum outlining the status of the par-

ticular parts which you are making for us and listed monetary values for same.

> Please note that the $28,509.47 mentioned in your memo covers material which had been shipped to us, but is in a "hold status" because of possible quality problems. Until these problems are resolved, I am not in a position to comment on this particular item.

> We are working as quickly as possible to get a full understanding of the implications resulting from the government action relative to the specific contract. As information develops, we will certainly be in touch with you.

Argyle, on May 4, 1998, provided Camtec with a breakdown as to how they arrived at the $21,934.88 figure mentioned in its letter of May 1, 1998. The next day, May 5, 1998, Argyle sent Camtec a letter saying in regard to the open invoices (*i.e.,* invoices totaling $28,509.47) "[i]f we remove all parts in question, whether it be for count or quality, there is still a $17,060.32 balance." Argyle then detailed how they arrived at that last-mentioned number.

Camtec responded to the May 5 missive by listing a series of invoices where there were "quality discrepancies" and/or quantity discrepancies, or both. On May 7, 1998, Argyle wrote Camtec and said, in confirming a phone conversation, that Argyle was "looking for $17,060.32 by the end of the week for materials on your floor which have been counted, inspected, and accepted by Camtec." Parenthetically, we note that neither the letter, nor subsequent trial testimony, indicated that Camtec agreed with Argyle's figures. The letter went on to say that the $17,060.32 figure "does not cover material" where Camtec questioned the quality of the work, nor did it include Argyle's work in progress, nor Argyle's expenses for unfabricated aluminum that had been purchased in anticipation of ful-

fillment of the contract. Argyle demanded, in addition, immediate payment of $5,890.24 for the cost of the unfabricated aluminum.

On June 1, 1998, Camtec wrote Argyle a letter, the contents of which were summed up in the concluding paragraph, *viz:*

> In view of Argyle's inability to perform under the Purchase Order which was a major factor in Camtec's ability to perform under the Department of Defense contract, Camtec feels no obligation for further payment of any sort to Argyle.

Earlier in the letter, Camtec had said that

> [a] major contributing factor to Camtec's non-delivery [to the DOD] can be traced to Argyle's inability to produce acceptable parts in accordance with the delivery schedule in the original Purchase Order ... and subsequent delivery promises [referring to the letters of February 27 and March 6]. Based on your delivery dates sets forth in [the February 27 letter], Camtec hired workers and started production. This effort had to be discontinued when Argyle failed to ship on 3/2/98 and 3/4/98. In fact, Argyle never achieved anywhere close to shipping 1,000 sets of acceptable parts per week.

After the DOD cancelled its contract, Camtec entered into a modified contract with the DOD to provide 5,947 I.V. rods. The number equaled the number of useable complete sets of parts Camtec had been supplied by Argyle as of April 30, 1998—according to Camtec's figures.

## II.  *THE TRIAL*

During the trial of this case, both sides relied primarily on documents that were admitted into evidence without objection. Those documents spelled out, in a clear fashion, the contract between the parties and presented an understandable picture of what items were delivered by Argyle and when. In addition, two witnesses were called by Argyle and one by Camtec. An unusual feature of the case was there was remarkably little conflict in the testimony of the witnesses.

One slight divergence that separated the parties was that Argyle maintained that it did not know the identity of the customer with whom Camtec had contracted to sell the I.V. rods prior to the April 30, 1998, cancellation. Camtec, on the other hand, presented a witness who testified that from the outset Argyle did know that Camtec had a contract with the DOD. All witnesses agreed that Camtec never advised Argyle of its deadlines under the DOD contract.

Camtec's president, Thomas Holdt, was asked at trial why he did not cancel the contract when Argyle sent the letter dated February 27, changing, or at least attempting to change, the delivery schedule. He answered that if the schedule set forth in the February 27 letter had been met he felt confident that Camtec still could have sold all 14,162 I.V. rods to the DOD. Mr. Holdt explained that he stayed in contact with the DOD, and they had indicated a willingness to amend their contract with Camtec to push back the delivery dates provided they were given firm dates when they could expect to receive the I.V. rods. Therefore, according to Mr. Holdt, "If we had gotten the parts as indicated in the letter of [February] the 27th, I believe I could have made a reasonable presentation to the Department of Defense for extending the delivery dates and delivered the contract."

Mr. Holdt testified that prior to the cancellation of the contract he had been in touch with the DOD because it "hadn't been getting anything [from Camtec]," nor

had they "been getting satisfactory answers." As a consequence, the DOD advised Comtec that "they were going to cancel the contract because of late delivery." Mr. Holdt conceded that Camtec never advised Argyle of the problems it was having with the DOD. He explained Camtec's silence by saying it

> depended upon Argyle's written schedule that they had presented to us, and if they had stuck to those schedules [Camtec] would have been okay. Even defective parts, we could have cleaned up the defective parts and built I.V. rods.

According to Mr. Holdt, Camtec told the DOD of its problems, but the latter would not give Camtec an extension until it had "some definite figures from us."

During Argyle's counsel's cross-examination of Mr. Holdt, the witness was asked why Camtec did not alert Argyle to the fact that late deliveries were jeopardizing Camtec's contract with the DOD. Mr. Holdt replied that no notification was made because "our arrangement was between Argyle and Camtec, not Argyle and the Department of Defense." [4]

Argyle's counsel also cross-examined Mr. Holdt regarding the letter he wrote dated June 1, 1998, in which he said that a "major contributing factor" to the cancellation of the DOD contract was Argyle's late deliveries. Counsel asked whether "there were other factors that caused" DOD's cancellation. Mr. Holdt steadfastly maintained that there were none. Thereafter,

counsel for Argyle again suggested by his questions that there was more than one cause for delay when he directed Mr. Holdt's attention to a June 18, 1998, letter from Mr. Holdt to a representative of the DOD. In that letter, Camtec requested an extension of four months for the completion of the original contract and said that the request "is necessitated by our vendors not delivering material in accordance with our purchase orders." (Emphasis added.) Mr. Holdt denied the implication that more than one vendor was responsible for the delay.

Argyle's proof of damage was simple. Relying on the same figures as set forth in its letter to Camtec dated May 1, 1998, Argyle asserted it was due $28,509.47 for parts already delivered. That last-mentioned figure was based upon the contract price for each part that was shipped. Additionally, Argyle claimed it was entitled to the sum of $21,934.88 for aluminum materials purchased in anticipation of fulfilling the contract, but not manufactured, together with parts that were manufactured but not yet delivered.

In support of its counterclaim, Camtec introduced an exhibit that set forth its damages as follows:

| | |
|---|---|
| Loss of Value/Mitigation | $ 8,623.15 |
| Lost Profits on 8215 Rods | $19,498.78 |
| Unutilized Goods/Services | $25,349.40 |
| Amount Paid to Argyle | $30,727.86 |
| Amount Due Argyle for 5,947 Sets of Parts | ($33,541.08) |
| Total Damages | $50,658.11 |

---

**4.** On re-direct examination, Mr. Holdt said that he did not understand why Argyle's counsel had stressed the dates of the contracts between the DOD and it because

> our agreement with Argyle was not contingent upon that contract[;] ... our agreement with Argyle was a contract with Argyle. If they had produced, they would have been paid because that's the unit that is used unless they've stopped killing soldiers, and unfortunately, I don't think they

have. [The DOD is] going to order. They've ordered more of them since that contract. They're going to order some more of those things. And we, in the past, have built for stock to that type of situation. We knew they were going to come back, and there were going to be additional contracts and by buying in quantity and getting a price break you have a very favorable situation.

The \$8,623.15 figure represented the amount it cost Camtec to remedy the defects in the lock rings (both Ring Nos. 1 and 2) and the clamps. The category "Unutilized Goods/Services" included costs for materials purchased but not utilized due to the loss of the DOD contract and \$9,529.40 for the labor involved in threading tubes supplied by Argyle but not used, again due to the loss of the DOD contract.

At the conclusion of the case, the trial judge commenced by saying that, although the contract was far from a "Hornbook example" of what a contract should be, a contract, nevertheless, existed "and there was substantial compliance with the contract by plaintiff." The trial judge concluded his brief opinion in these words:

> So under the first count of the complaint—I'm going to use [Camtec's counsel's] figures or Argtec's figures here under the first count breach of contract thirty-three thousand five hundred forty-one dollars and eight cents plus costs.
>
> The counterclaim is denied for failure of proof of damages. . . .

### III.

**Did the trial court err in finding that Argyle had substantially performed[5] the contract?**

**[1]** Argyle claims that the trial judge was not clearly erroneous when he found that Argyle had substantially performed its contract.[6] Camtec counters that the court was clearly erroneous in this regard because (1) at the time that the parties

entered into the contract, Argyle acknowledged that time was of the essence; (2) under the unambiguous terms of the contract, Argyle was required to deliver 3,625 sets of parts by March 3, 1998, and a similar number every two weeks until April 14, 1998, when all 14,500 sets of parts were to be delivered; (3) Argyle never came close to meeting the delivery schedule set forth in the contract.

The evidence was undisputed that as of April 30, 1998, the date that Camtec cancelled the contract, Argyle had produced approximately forty-one percent of the sets of parts it was obligated to deliver. The record is also clear that the schedule announced by Argyle in its February 27, 1998, letter was not met either. Moreover, at trial, Argyle gave no excuse for its failure to make timely deliveries.

Argyle devotes only one paragraph in its brief to explain why it contends that the evidence showed that it had substantially performed its contract. Appellee says:

> The instant case is quite different [from *Della Ratta, Inc. v. American Better Community Developers, Inc.*, 38 Md. App. 119, 134, 380 A.2d 627 (1977)], because Argyle produced goods for Camtec at Camtec[']s request. There is no question that Argyle provided Camtec with materials that Camtec used and there is no question that Argyle manufactured materials for Camtec[']s use. During April and May of 1998, when Camtec told Argyle to stop work, the only dispute was to the price of the

---

5. In their briefs, the parties assume that the trial judge used the term "substantial compliance" to mean the same thing as "substantial performance." We believe that the assumption is a valid one.

6. We are required to use the clearly erroneous test set forth in Maryland Rule 8–131(c), which reads:

**Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

materials that had been delivered and the price of the materials that had been manufactured yet not delivered. It would be totally inequitable for Camtec to have retained those materials that Argyle had delivered to it without compensating Argyle for them. The remaining materials were specialty items to which Argyle was entitled to compensation. The court[']s finding in this regard demonstrates that it must have fully understood the [substantial performance] doctrine when it applied it.

(Reference to extract omitted.)

[2] The fact that Argyle supplied some sets of parts that Camtec used is scarcely determinative of whether it substantially performed the contract, especially when the parties agreed that time was of the essence. In this regard, what was said in 15 Richard A. Lord, *Williston on Contracts* § 44.53 at 224–25 (4th ed.2000) (hereinafter "*Williston on Contracts*"), is apposite:

**Effect of Express Contract Provision**

*The substantial performance rule does not apply where the parties, by the terms of their agreement, make it clear that only complete performance will be satisfactory.* The general acceptance of the doctrine of substantial performance does not mean that the parties may not expressly contract for literal performance of the contract terms; however, where the parties have not made it clear that literal and exact compliance is necessary, substantial performance will suffice, especially if requiring literal performance will result in a forfeiture. Thus, substantial performance is ordinarily not applicable to excuse the nonoccurrence of an express condition precedent to a contract. Stated otherwise, if the terms of an agreement make full or strict performance an express condition precedent

to recovery, then substantial performance will not be sufficient to enable recovery under the contract. *A typical example of a clause requiring strict compliance is one making time of the essence of the contract; substantial, although late, performance, is not generally sufficient to permit the party who has not performed in a timely manner to bring an action on the contract.*

(Footnotes omitted) (emphasis added).

[3] We interpret Argyle's argument that the only dispute between the parties concerned price up until the contract was cancelled as an assertion that Camtec waived the issue of timely delivery by its failure to make any objection to Argyle's tardiness prior to cancelling the contract. This assertion has no merit.

The Court of Appeals has defined waiver as "[t]he intentional relinquishment of a known right...." *Government Employees Ins. Co. v. Group Hospitalization Medical Services, Inc.*, 322 Md. 645, 650, 589 A.2d 464 (1991). "The intention to waive must be clearly established and will not be inferred from equivocal acts or language." *Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.*, 294 Md. 443, 449, 450 A.2d 1304 (1982). Moreover,

[m]ere silence, acquiescence, or inactivity is insufficient to show a waiver of contract rights where there is no duty to speak or act.... Forebearance to assert or insist upon a right does not, by itself, constitute waiver. A party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligation under the contract should not ordinarily lead to a waiver of the innocent party's rights.

*Williston on Contracts* § 39:35 at 653.

[4] Argyle was well aware of the delivery deadlines at the time it failed to meet

them, and when the schedule was not met, there was no duty on Camtec's part to notify Argyle of its breach.

**[5]** The contract here at issue concerned the sale of goods, and therefore Article 2 of the Uniform Commercial Code (hereafter "UCC") was applicable. In *Chemetron Corp. v. McLouth Steel Corp.,* 381 F.Supp. 245, 254 (N.D.Ill.1974), the court held that the UCC does not require that "the buyer give notice where there is nondelivery.... [I]n a case of nondelivery, the seller as well as the buyer knows of the breach and needs no further notice." The *Chemetron* court further noted that "[w]hen the seller has ... failed to make delivery, the buyer may proceed directly to a remedy. No rejection or notice is needed, most probably because the seller in these cases reasonably should know that he has not performed." *Id. See also Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 973 n. 39 (5th Cir. 1976).

**[6–8]** In a related argument, Argyle says: "Given Camtec's complete[ ] nonchalance regarding delivery dates until June 1, 1998, the [c]ourt was justified in finding any commercially reasonable schedule, including the one on which Argyle actually made deliveries, to be appropriate." There are two answers to that assertion. First, Argyle had no right to unilaterally modify the contract. It is a "basic principle of contract law ... [that] a party to a contract does not have any unilateral right to modify...." *Metropolitan Life Insurance Co. v. Promenade Towers Mutual Housing Corp.,* 84 Md.App. 702, 714, 581 A.2d 846 (1990). Moreover, modification requires mutual assent of the parties. *L & L Corp. v. Ammendale Normal Institute,* 248 Md. 380, 384, 236 A.2d 734 (1968). Second, there is nothing in the evidence that would justify a finding that Argyle's

tardy deliveries were "commercially reasonable."

**[9]** Except for pointing to Camtec's silence—which is insufficient to show assent to a modification—Argyle points to nothing else in the record that would justify a finding that Camtec agreed to a modification of the contract. Moreover, even if the February 27 and March 6, 1998, letters could somehow be construed to be a mutually agreed upon modification of the contract, Argyle never came close to meeting the schedule as modified.

Argyle also contends that, in the month that followed Camtec's cancellation of the contract, the correspondence between the parties showed that Camtec recognized "its liability to Argyle." Nothing in the correspondence can possibly be interpreted as a "recognition of liability." After April 30, 1998, Camtec simply made inquiry as to what monies Argyle claimed were due. It never agreed to pay those monies either implicitly or explicitly.

The evidence in this case was undisputed that Camtec could not make use of the individual parts supplied by Argyle until complete sets of all seven parts were delivered. Argyle knew that time was of the essence when it agreed to meet the sixteen-week delivery schedule. Despite this knowledge, Argyle never met the original schedule nor the schedule it unilaterally modified. Under these circumstances, the trial judge was clearly erroneous when he found that Argyle had substantially performed its contract.

**IV.**

**Did the trial court correctly calculate damages?**

The trial judge calculated damages by multiplying the number of useable sets of parts received by Camtec by the contract price for each set (5,947 sets times $5.64

per set), for a total of $33,541.08. That method of calculating damages was clearly erroneous because the court failed to credit Camtec for the $30,727.86 it has already paid Argyle.

In any event, the trial court erred in making *any* damage award under the breach of contract count (Count 1), inasmuch as Argyle did not substantially perform the contract. This leaves open the question (not directly addressed by either party in their briefs) of whether the case should be remanded so that the trial court can determine whether Argyle was entitled to recover under Count 2, *quantum meruit.*

[10] Although Argyle does not provide any argument in support of the assertion, it does boldly proclaim in its brief that it would be "inequitable for Camtec" to retain materials supplied by Argyle without compensating it for those materials. We interpret this assertion to mean that Argyle contends that it is entitled to an implied in law (or quasi-contract) form of *quantum meruit* recovery. One who proves a quasi contract (contract implied in law) is entitled to recover restitution. *See Mogavero v. Silverstein*, 142 Md.App. 259, 276, 790 A.2d 43 (2002) ("The measure of recovery in quasi-contract (implied in law) cases is based upon restitution."); *see also Mass Transit Admin. v. Granite Constr. Co.*, 57 Md.App. 766, 774, 471 A.2d 1121 (1984). (A *quantum meruit* claim seeking recovery in quasi-contract for restitution is referred to as an action for "unjust enrichment.").

Restatement (Second) of Contracts § 374(1) (1981) discusses the type of restitution, or unjust enrichment damages, a party is entitled to recover:

[I]f a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

*Id.*

[11, 12] Here, Camtec justifiably refused to perform based on Argyle's late deliveries. In this Court, and in the court below, Camtec acknowledged that Argyle was entitled to compensation for the sets of parts it was able to use, less the cost of repairing defective parts. Two questions remain, however. Those questions are:

1. Under the *quantum meruit* count, did Argyle prove that it was entitled to recover for parts that were delivered but were not used because complete sets of parts were never shipped?

2. What amount, if any, was Camtec justified in deducting for fixing the parts that were defective?

After Camtec cancelled its contract with Argyle, the latter demanded payment in the amount of $28,509.47 for parts that had been delivered but for which payment had not been made. The $28,509.47 figure was based on the contract price for individual parts. But once Argyle was shown to have breached the contract, it was no longer entitled to the contract price for the various incomplete sets of parts delivered. Instead, the measurement of "unjust enrichment damages is the 'gain to the defendant, not the loss by the plaintiff.'" *Mogavero, supra*, 142 Md.App. at 276, 790 A.2d 43 (quoting *Caroline County v. J. Roland Dashiell and Sons, Inc.*, 358 Md. 83, 95 n. 7, 747 A.2d 600 (2000)).

[13] Argyle failed to prove the value *to Camtec* of the scattered parts Camtec received that did not make up complete sets. We therefore hold that Argyle was not entitled to recover, in *quantum meruit*, for

the parts that could not be assembled to make up sets of I.V. rods because the record did not show the value of those parts to Camtec.

**[14]** Regarding the second question, the evidence was undisputed that some of the parts delivered by Argyle were defective in that they contained "burrs." Camtec gave Argyle timely notice of these defects, and under section 2–714 of the Commercial Law Article of the Maryland Code (1975, 1995 Repl.Vol.), Camtec was entitled to recover damages for any of those non-conforming goods.

With respect to goods that the buyer accepted but gave notice of the non-conformity of the tender, the buyer "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from seller's breach as determined in any manner which is reasonable." Md.Code Ann., Com. Law I § 2–714(1)(1975, 1997 Repl.Vol.). *See also* U.C.C., Vol. 1, White & Summers, § 10–2 (1995) (Costs to repair a non-conforming tender of goods are recoverable under Section 2–714 as damage due to nonconformity of tender.); 4A Ronald A. Anderson, *Uniform Commercial Code* § 2–714:77 (3d ed.1997); *Federal Signal Corp. v. Safety Factors, Inc.,* 125 Wash.2d 413, 886 P.2d 172, 185 (1994) ("mitigation includes other measures such as repairing the goods so that they are usable in a breach of warranty situation").

The cost of these repairs was $8,623.15. No meaningful evidence contradicted that figure.[7] The amount that Camtec already paid ($30,727.26), together with the cost of repairs ($8,623.15) equals $39,350.41. From that last-mentioned figure, the value of the 5,947 sets of parts ($33,541.08) must be deducted. This means that Argyle owes Camtec $5,809.33 ($39,350.41—33,-541.08). Therefore, Argyle was not entitled to recover under Count 2 for unjust enrichment.[8]

### V. *Counterclaim DAMAGES SOUGHT BY CAMTEC*

**[15]** Camtec, in its counterclaim, requested, *inter alia,* a damage award in the amount of $44,848.18 to compensate it for the monies it lost as a consequence of the cancellation of the DOD contract. That last-mentioned figure has two components, *i.e.,* $19,498.78 for loss of profits and $25,349.40 for monies Camtec expended for parts and materials in contemplation of fulfilling its contract with the DOD.

Camtec argues that the only reason that the DOD contract was cancelled was because Argyle had failed to deliver sets of

---

**7.** Camtec charged $35 an hour to repair the defective parts. Camtec's president testified that the repair charges figure accurately showed the amount actually spent to repair the defective parts. In rebuttal, Argyle called James Kane, III, Argyle's vice president. The only criticism of the repair charge voiced by Mr. Kane was that he thought that "the shop rate" of $35 per hour was "pretty excessive." He did not, however, say what a reasonable rate would be, nor was any evidence introduced showing that he had any particular expertise or knowledge as to the reasonable rate for such work. Under these circumstances, the testimony of Camtec was not meaningfully rebutted.

Mr. Kane did say that, if Camtec had returned the parts with burrs, rather than performing the correction themselves, the repairs would have cost Argyle nothing because all the work had been done by third-party vendors and those vendors would have been obligated to remedy the defects. In the case at bar, it was indisputably reasonable to fix the defective parts themselves in light of Argyle's tardiness in making deliveries.

**8.** As already mentioned, Argyle made a claim for parts that were not delivered. Because Argyle breached its contract with Camtec, it clearly had no right to recover for such damages either under a breach of contract or unjust enrichment (*quantum meruit*) theory.

parts in accordance with the contract. This argument does have a factual basis. Camtec produced evidence that, if believed, showed that it had a long relationship with the DOD and, as a result of that relationship, Camtec was justifiably confident that the DOD did not intend to hold it strictly to the delivery schedule set forth in its contract with the DOD. Instead, according to Camtec's evidence, the DOD would have accepted any reasonable (albeit late) delivery schedule, so long as the DOD knew, definitively, when it could expect deliveries. The trouble was, according to Camtec's evidence, that because Argyle did not deliver in accordance with the schedule set forth in the purchase order or even in accordance with its February 27, 1998, letter, Camtec could never make any reliable forecast as to when it could make deliveries to the DOD. Therefore, Camtec argues that, if Argyle had even lived up to the modified 1,000 set per week delivery schedule, Camtec's contract with the DOD would not have been cancelled.

Argyle, on the other hand, argues that Camtec did not prove that its (Argyle's) tardiness in making deliveries was the exclusive cause of the loss of the DOD contract. Argyle points out that under the revised contract with the DOD, Camtec was required to deliver 7,081 sets of I.V. rods by February 27, 1998, and a similar amount by March 31, 1998. If Argyle had performed on schedule, it would not have been required to make any deliveries by February 27, 1998, and thus Camtec, inevitably, would have defaulted on the DOD contract. Three thousand six hundred twenty-five sets of parts were due to be delivered by Argyle on or before March 3, 1998, but even if all those parts had been delivered on schedule, Camtec still would have been required to assemble and ship them afterwards. And Camtec produced no evidence to show how long it took to assemble and ship the completed I.V. rods once Argyle made delivery.

Argyle further stresses that if it had made *all* its deliveries to Camtec in exact conformity with its contract, only 10,875 sets of parts would have been delivered by the date that Camtec was contractually obligated to assemble and deliver *all* 14,-162 sets of I.V. rods to the DOD.

Two letters from Camtec were admitted into evidence that are relevant to the issue as to whether Argyle's delinquencies in making deliveries was, as Camtec contends, the sole cause of the loss of the DOD contract. In a letter dated June 1, 1998, Camtec's president said that a *"major* contributing factor to Camtec's non-delivery" to the DOD "can be traced to Argyle's inability to produce acceptable parts in accordance with the delivery schedule set forth in the purchase order and subsequent delivery promises . . . ." (Emphasis added.) One week later, on June 11, 1998, the president of Camtec wrote to an official at the DOD requesting an extension for performance of the contract. He justified the request by saying it was "necessitated by our vendors not delivering material in accordance with our purchase orders." (Emphasis added.) The use of the plural "vendors," coupled with the characterization of Argyle's delinquencies as a "major contributing factor" could reasonably have led the trial judge to infer that there were other causative factors (other than Argyle's delinquencies) that led to the DOD cancellation.

Taking the evidence, as we must, in the light most favorable to Argyle—the prevailing party below—the trial court could have disbelieved Mr. Holdt when he opined that the DOD would not have cancelled the contract if Argyle had made timely deliveries. Therefore, we hold that the trial judge was not clearly erroneous in finding that Camtec had produced insufficient proof that it suffered cancellation of

contract damages due to Argyle's tardiness.

[16] We do find, however, that the trial judge was clearly erroneous in impliedly finding that Camtec had not produced sufficient evidence concerning the cost to it of repairing the defective parts supplied by Argyle. The charge of $8,623.15 for fixing the clamps and lock rings that were delivered in a defective condition must be set off by $2,813.82, which is the difference between the value of the sets used ($33,541.08) and what Camtec had already paid ($30,727.26). We shall remand this case to the Circuit Court for Dorchester County with instructions to enter a judgment on the counterclaim in favor of Camtec in the amount of $5,809.33 ($8,623.15 less $2,813.82).

JUDGMENT ENTERED IN FAVOR OF ARGYLE INDUSTRIES, INC., REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR DORCHESTER COUNTY WITH INSTRUCTIONS TO ENTER A JUDGMENT IN FAVOR OF CAMBRIDGE TECHNOLOGIES, INC., AND AGAINST ARGYLE INDUSTRIES, INC., IN THE AMOUNT OF $5,809.33; COSTS TO BE PAID SEVENTY–FIVE PERCENT BY ARGYLE INDUSTRIES, INC., AND TWENTY–FIVE PERCENT BY CAMBRIDGE TECHNOLOGIES, INC.



146 Md.App. 440

ROMANO & MITCHELL, CHARTERED

v.

Stephen C. LAPOINTE.

No. 1549, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 9, 2002.

Employee sought order confirming arbitration panel award against former employee for back wages and bonuses. Employer filed a counterclaim alleging employee had violated employment agreement's non-compete clause. The Circuit Court, Montgomery County, Eric Johnson, J., denied employee's motion to dismiss counterclaim, entered order confirming arbitration award, and certified order as a final judgment. Employer appealed. The Court of Special Appeals, Barbera, J., held that certifying arbitration award as final and appealable, even though employer's counterclaim was pending, was not an abuse of discretion.

Affirmed.

1. Appeal and Error ⚖66, 68, 72, 366
The right to seek appellate review ordinarily must await the entry of a final judgment, disposing of all claims against all parties; however, exceptions to rule exist for: (1) appeals from interlocutory rulings allowed by statute; (2) appeals from interlocutory rulings permitted under the collateral order doctrine; and (3) appeals permitted under rule allowing entry of a final judgment when fewer than all of the claims or rights and liabilities of fewer than all of the parties have been adjudicated. West's Ann.Md.Code, Courts and Judicial Proceedings, § 12–301; Md.Rule 2–602(b).

***DEFENDANTS' AND COUNTER-PLAINTIFFS'***
***REQUESTED INSTRUCTION 19A***

## CLAIM FOR BREACH

A party has no duty to notify the other party of that party's breach of contract.  In general a party has three years from the breach to file a civil suit claiming that the other party had breached the contract. If you find that Point Blank entered into employment agreements with Messrs. Price, Krummel, and Murray in January 2001, then you may find that Point Blank's issuing restricted stock and warrants to purchase restricted stock to be a breach of the compensation terms of Point Blank's employment agreements with Messrs. Price, Krummel, and Murray and that they were not required to tell Point Blank that they believed that Point Blank had breached the employment agreements.

*Cambridge Technologies, Inc. v. Argyle Industries, Inc.*, 146 Md.App. 415, 433, 807 A.2d 125, 134-35 (2002).

MD CODE ANN. COURTS AND JUDICIAL PROCEEDINGS §5-101 (2002).

19A

**Article - Courts and Judicial Proceedings**

[Previous] [Next] [Another Article]

**§ 5-101.**

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

[Previous] [Next] [Another Article]