UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| POINT BLANK BODY ARMOR, INC. * | |
| * | |
| Plaintiff, * | |
| * | |
| v. * | |
| * | |
| ALLEN PRICE, * | |
| JOSEPH KRUMMEL, and * | |
| JAMES MURRAY * | |
| * | |
| * | |
| Defendants. * | |
| * | Civil Action No. MJG 01 CV 3256 |
| * | |
| ALLEN PRICE, * | |
| JOSEPH KRUMMEL, and * | |
| JAMES MURRAY * | |
| * | |
| Counter-plaintiffs, * | |
| * | |
| v. * | |
| * | |
| POINT BLANK BODY ARMOR, INC. * | |
| * | |
| Counter-defendant. * | |

## RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR JUDGMENT

Defendants and Counter-Plaintiffs Allen Price, Joseph Krummel, and James Murray (hereafter, collectively, the "Individuals"), by their undersigned counsel, hereby respond to the renewed motion of Plaintiff, Point Blank Body Armor, Inc. ("Point Blank") for judgment as a matter of law and, for the reasons set forth herein, respectfully request that the motion be denied.

**INTRODUCTION**

Point Blank ignores substantial portions of the record that was presented to the Jury. When that evidence is considered it is clear that it amply supports the Jury's verdict. Point Blank's renewed Motion for Judgment, therefore, should be denied.

**STANDARD**

In ruling on Point Blank's motion for judgment filed under F.R.Civ. P. 50(b) the Court must consider the entire record in the light most favorable to the Individuals and, if the Court finds that the evidence presented at trial raised questions upon which reasonable minds can differ, the Court must deny the motion. In re Lone Star Industries Inc., Concrete Railroad Ties Litigation, 882 F. Supp. 482, 495 (D. Md. 1995).

**ARGUMENT**

A. **There is Ample Evidence in the Record to Support the Jury's Finding that the Individuals Were Entitled to Options for the Purchase of Unrestricted Stock.**

Finding no genuine dispute on the issue, the Court instructed the Jury that the contract between the Individuals and Point Blank was evidenced by the "Summary of Employment Package" documents executed by the Individuals on January 12, 2001. Those contracts referenced "stock" and options to purchase "stock". There was no evidence to the effect that during the negotiations leading up to those contracts either party gave any indication that the stock provided, *or the stock to be available through the exercise of the options*, would be anything other than publicly-trade-able, i.e. unrestricted. In fact, the evidence was undisputed that on the only prior occasion in which the Individuals were given stock as part of their compensation, the stock provided was unrestricted, and that, in explaining the stock options, Mr. Brooks told Mr. Price that the options could be exercised on a cashless basis----which would be inconsistent with Point Blank placing any restrictions on the stock options issued to the Individuals as

part of their compensation. Point Blank concedes that, notwithstanding the fact that the Individuals were subsequently provided with certificates for restricted shares, there was sufficient evidence for the Jury to find, as it did, that word "stock" in the employment contracts entitled the Individuals to unrestricted shares of stock. Point Blank's Memo., p. 2. It is clear that there was likewise sufficient evidence for the Jury to conclude that the same word in the same contract should be interpreted in similar fashion in the context of the options to purchase "stock," as a contrary conclusion would have defied logic.

**B. There is Ample Evidence in the Record to Support the Jury's Findings as to Causation and Damages.**

There was no dispute that Point Blank did not provide unrestricted stock or options to purchase unrestricted stock to the Individuals. Therefore, it is conceded that if the Jury found that such stock and options were required by Point Blank's contracts with the Individuals, Point Blank breached the contracts.

Each of the Individuals testified that he intended to and tried to sell his vested shares on January 6, 2002. It is conceded that, had Point Blank provided unrestricted shares as the Jury found were required by the terms of the Individuals' employment, the Individuals would have been able to sell them on that date. However, because Point Blank breached those terms by providing only restricted shares, the Individuals were unable to do so. That fact alone belies Point Blank's assertion that the Jury could not reasonably find that Individuals' failure to realize the stipulated $6 share price on that date was not attributable "to any fault of Point Blank." Other evidence ignored by Point Blank includes:

- In October of 2001, Point Blank had placed a stop transfer order on the restricted shares that were provided to the Individuals.

- The DHB Board of Directors concluded that, because the Individuals did not complete a full year of employment under the new contract, the Individuals were not entitled to <u>any</u> stock.

- DHB instructed Morgan Stanley to return <u>all</u> of the restricted shares that had been provided to the Individuals, asserting that <u>none</u> of them could be sold; it did not demand only an unvested portion.

Point Blank's assertion that the Individuals should have mitigated their damages fails for numerous reasons. First, under Maryland law, the failure of a plaintiff to mitigate damages is an affirmative defense and, had Point Blank asserted that defense in a timely fashion, it would have been Point Blank's burden of proof to establish. <u>See</u> <u>Hopkins v. Silber</u>, 141 Md.App. 319, 337, 785 A.2d 806, 816 (2001). Point Blank waived that defense by failing to assert it in its Answer to the Amended Counterclaim. F.R.Civ.P. 8 (c); <u>Ritz-Craft Corp. v. Stanford Mgmt. Group</u>, 800 F.Supp. 1312, 1316 (D.Md. 1992).[1] Most importantly, up until the time the trial began Point Blank had held to the position, consistent with the wishes of Mr. Brooks and the decision of the DHB Board, and represented to the investing public through its filings with the Securities and Exchange Commission that the Individuals had no legitimate right to <u>any</u> stock or to sell <u>any</u> stock.[2] The stop transfer order that was placed on all of the restricted shares issued to the Individuals was never removed. Indeed, despite the obvious opportunity to present such testimony, DHB's CFO, Ms. Schlegel, did not testify that DHB or Point Blank would have ever permitted, let alone facilitated, any sale of any shares of stock at any time prior to the trial.

---

[1] Accordingly, Point Blank did not request that the Court instruct the Jury on any duty to mitigate, and the Court, without any objection from Point Blank, did not give such an instruction.

[2] DHB discloses in its Form 10K filings the number of registered and unregistered shares of stock the company has issued in the applicable reporting period. As Ms. Schlegel testified during deposition and in the trial, the Form 10K/A filed by DHB for the 12 month period ending December 31, 2001, which encompassed the date when the certificates were issued to the Individuals, did not disclose the issuance of the shares reflected in the certificates because the DHB board had concluded that <u>none</u> of the shares had ever vested. Despite Point Blank's present position, DHB has never taken action to alter or amend its public representation that the Individuals possessed no legitimate stock.

Each of the Individuals also testified that, had Point Blank not breached its obligations and provided him with options to purchase unrestricted shares of DHB stock, he would have exercised those options so on January 3, 2002, the same day that he attempted to sell shares of stock. Ms. Schlegel testified that DHB concluded in October 2001 that it would not allow the Individuals to exercise any warrants or options. On the basis of that testimony, the Jury was clearly able to conclude that the Individuals had demonstrated by a preponderance of the evidence that, as a result of Point Blank's breach, the Individuals suffered the damages that the Jury awarded with respect to the options.

> **C. There is Ample Evidence in the Record to Support the Jury's Finding That There Was No Bona Fide Dispute As to Point Blank's Obligation Under the Contracts to Provide Stock and Stock Options.**

As Point Blank accurately points out, if an employer withheld the wage of an employee in violation of the Maryland Wage Payment and Collection Law and not as a result of a bona fide dispute the employee may be awarded an amount of up to three times the wage, and reasonable counsel fees and costs. The Jury concluded that the only reasonable interpretation that could be made of the contracts between Point Blank and the Individuals was that Point Blank was to provide stock and options to purchase stock that the Individuals could sell, i.e. unrestricted stock. Given the language of the agreements, the fact that they say nothing about restrictions, the evidence of the negotiations preceding the agreements (including the fact that the stock was intended to replace up front cash signing bonuses) and the parties' prior course of dealing, the Jury was more than justified in finding that Point Blank's obligation to provide unrestricted stock and options was not subject to a bona fide dispute.

None of the evidence identified by Point Blank suggests that the Jury's finding of an absence of any bona fide dispute with respect to Point Blank's obligation to provide stock to the Individuals was unreasonable. Moreover, Point Blank fails to point out the complete record as it relates to that evidence:

- <u>The Individuals' actions after Point Blank's failure to perform</u>  The Individuals each testified that they did not immediately understand that the stock certificates and warrant documents that they received or that they did not comply with Point Blank's obligations; that when they determined that the stock could not be sold Mr. Price confronted the President of Point Blank, Sandra Hatfield; and that in light of their other responsibilities, their expectation (at that time) that they would continue in Point Blank's employment for a few years, and the depressed price for the DHB stock (as shown in Individuals' Exhibit 42), they decided not to pursue the matter further at that time.[3]

- <u>The expense that Point Blank would have incurred to provide unrestricted securities</u>  As the Court pointed out to the Jury, without objection from Point Blank, Point Blank could have legally filed a registration statement and provided unrestricted securities. The fact that DHB would have incurred costs in order to permit Point Blank to comply with its contracts does not create a bona fide dispute with respect to the terms of the contracts. Moreover, while Ms. Schlegel testified that the preparation and filing of such a registration statement may have cost $130,000, the "Up Front Cash" signing bonuses that the stock was to replace, as proposed by Mr. Price (Individuals' Exhibit 3), would have totaled $175,000.00.

- <u>Notice to Point Blank</u>  Point Blank concedes that there was evidence before the Jury that Mr. Price told Ms. Hatfield in or around April 2001, within weeks of receiving the stock certificates, that the contracts between the company and the Individuals did not contemplate restrictions on the stock.  There was also evidence that, while Point Blank had already taken steps to prevent such a sale as early as October 2001, Point Blank was aware that the Individuals attempted to sell stock in January 2002 and that the company had attempted to get possession of the stock certificates at that time.  Thus, to the extent that it would have any relevance to the Jury's determination of whether there was a genuine dispute as to what the January 12, 2001 contracts required of Point Blank, it is clear that Point Blank was on notice that the Individuals believed that they were entitled to stock they had not received.[4]  Point Blank's assertion that the Individuals have "profited" by not giving earlier notice (Point Blank's Memo., p. 8, n. 3), suggesting that Point Blank would not have denied the Individuals claims had they been formally asserted at an earlier time, is nonsense.  Despite the fact, which Point Blank does not challenge in its motion, that there was never any bona fide dispute with respect to the salary claim included in the original Answer and Counterclaim filed on November 26, 2001, Point Blank refused to concede its obligation to pay the salary all the way to closing argument at trial.

---

[3] Though the Individuals did confront their employer, they had no obligation to notify Point Blank of its breach. *Cambridge Technologies, Inc. v. Argyle Industries, Inc.*, 146 Md.App. 415, 433, 807 A.2d 125, 134-35 (2002).

[4] In contrast, there was no evidence before the Jury about the date of the filing of the Motion for Leave to File Amended Counterclaim. In fact, Point Blank's former counsel, Angelo Filippi, was advised of the Individuals' intention to pursue claims on the stock and options in a telephone conversation with counsel prior to June 21, 2002.

- <u>Vesting of Stock and Warrants</u>  Regardless of what Mr. Brooks, in hindsight, would have preferred, or what agreements may have existed between Point Blank and other employees, the language in the January 12, 2001 Summary of Employment Package Documents with respect to the vesting of the stock and warrants or options could only be interpreted consistent with the Jury's verdict: the Individuals rights to both the stock and the warrants vested "during" each year of their employment, rather than upon the completion of each year.  Mr. Brooks recognized that fact.  Even if the interpretation argued by Point Blank were reasonable, the Jury was certainly provided with sufficient evidence to find in favor of the Individuals' on this point.  The vesting terms contained no ambiguity, and, perhaps most importantly, Point Blank stipulated at trial that the Individuals had vested in 25% of the stock they received.  The Special Verdict Sheet, which was submitted to the Jury without objection, did not even ask the Jury to decide how much of the stock had vested.  Thus, Point Blank cannot now assert that the Jury should have found that there was a bona fide dispute on that point, when it consented to the form that was presented to the Jury.[5]

In sum, the evidence presented at trial, including that which was subject of stipulation, provided an ample basis for the Jury to conclude that the Individuals' claims for the stock and stock options were without bona fide dispute.  As the Court instructed, the Jury was not required to assume that a bona fide dispute existed merely because the case proceeded to trial.  Indeed, the fact that Point Blank disputed the salary claim demonstrated that, consistent with Mr. Brook's malice toward the Individuals, the company would deny any obligation to the Individuals regardless of whether a bona fide dispute existed.

## CONCLUSION

When the Court considers the entire record, and draws all reasonable inferences from the record in favor of the Individuals, it is clear that the Jury's verdict has a substantial basis.  Point Blank's renewed Motion for Judgment, therefore, should be denied.

---

[5] The Individuals' understanding of what would have happened in the event they sold stock in which they were not vested, and then left Point Blank's employ, an event which did not take place, has no bearing on the reasonableness of the Jury's findings, especially in light of Point Blank's stipulation.  And while that understanding may strain Point Blank's credulity, it is reflected in the formal contracts that the Individuals had proposed, but which were rejected by Point Blank for the sole reason that they were "too long."  <u>See</u> <u>e.g</u>, Individuals' Exhibit 7, p. 4, ¶9.1.

Respectfully submitted,

Dated: August 15, 2003

_____/s/_____
Robert S. Brennen (04499)
William M. Krulak, Jr. (26452)
MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland 21202
(410) 727-6464
(410) 385-3700 (FAX)
Attorneys for Defendants and Counter-Plaintiffs
Allen Price, Joseph Krummel and James Murray